**In re IRIDIUM OPERATING LLC, Iridium Capital Corp., Iridium IP LLC, Iridium Roaming LLC, Iridium (Potomac) LLC, and Iridium Promotions, Inc.**

**Statutory Committee of Unsecured Creditors on behalf of Iridium Operating LLC, Iridium Capital Corp., Iridium IP LLC, Iridium LLC, Iridium Roaming LLC, Iridium (Potomac) LLC, Plaintiff,**

**v.**

**Motorola, Inc., Defendant.**

**Bankruptcy No. 99–45005 (JMP).
Adversary No. 01–02952(JMP).**

United States Bankruptcy Court, S.D. New York.

Aug. 31, 2007.

Greg A. Danilow, Esq., Michael F. Walsh, Esq., Scott J. Atlas, Esq., Diane Harvey, Esq. and Ashish D. Gandhi, Esq., Weil, Gotshal & Manges LLP, New York, NY, for Statutory Committee of Unsecured Creditors.

Garrett B. Johnson, Esq., Anne McClain Sidrys, Esq. and Maria P. Rivera, Esq., Kirkland & Ellis LLP, Chicago, IL, for Motorola, Inc.

## OPINION REGARDING INSOLVENCY AND UNREASONABLY SMALL CAPITAL

JAMES M. PECK, Bankruptcy Judge.

### *TABLE OF CONTENTS*

INTRODUCTORY STATEMENT AND OVERVIEW ........................ 291

PROCEDURAL HISTORY ............................................. 304

JURISDICTION AND VENUE ......................................... 304

FINDINGS OF FACT ............................................... 305

I. IRIDIUM CORPORATE HISTORY ...................................... 305

II. THE IRIDIUM SYSTEM ............................................. 306
 A. Iridium System Performance ......................................... 308
 B. Expectations About Handset Size .................................... 310

III. RELEVANT INFORMATION REGARDING EXPECTED SYSTEM PERFORMANCE WAS DISCLOSED TO IRIDIUM AND ITS INVESTORS ..................................................... 311
 A. Iridium And Its Board Were Informed About The System's Voice Quality And Expected Performance In Various Environments ........... 311
 B. Iridium Publicly Disclosed System Limitations to Investors ............... 313

IV. IRIDIUM'S BUSINESS PLANS AND MARKET RESEARCH ............... 314
 A. Early Iridium Business Planning And Market Research .................. 314
 B. The 1996–1998 Market Research ...................................... 316
 C. Translating Market Research Into Projections ......................... 317
 1. KPMG Financial Models ........................................ 318
 2. Business Plan 2.0 ............................................. 318
 3. Business Plans—2.x, 2.x Update and 3.0 ........................... 319
 D. Marketing Expert Opinions ......................................... 319

V. IRIDIUM'S BANK LOANS ............................................... 320
 A. Global Arrangers' Due Diligence ...................................... 320
 B. The C & L/ADL "Banking Case" ..................................... 322
 1. ADL technical due diligence ..................................... 325
 2. ADL risk assessment........................................... 326
 3. ADL understanding of system performance ....................... 326

VI. IRIDIUM PUBLIC AND PRIVATE EQUITY AND DEBT
 TRANSACTIONS ...................................................... 326
 A. Private Equity Investments.......................................... 326
 1. Due diligence associated with private investments ..................... 328
 a. Goldman Sachs ............................................. 328
 b. Early investors ............................................. 328
 B. 1995 Contemplated Debt Offering ................................... 329
 C. Public Equity Offerings ............................................ 329
 1. Public Equity Due Diligence And Understanding Of System
 Limitations ................................................. 330
 a. Merrill Lynch .............................................. 330
 b. Salomon Smith Barney ...................................... 331
 2. Equity underwriter valuations of Iridium .......................... 331
 D. Iridium's Public Debt Offerings ..................................... 332
 E. Bondholder due diligence and understanding of system limitations ......... 333

VII. IRIDIUM'S STOCK PRICE AND ANALYST ASSESSMENTS................. 333
 A. Iridium Stock Price ............................................... 333
 B. Analysts ......................................................... 334

VIII. EVIDENCE REGARDING IRIDIUM'S CAPITAL ADEQUACY .............. 335
 A. Iridium's Financial Advisors ....................................... 335
 B. Iridium CFO/CEO ................................................. 336
 C. KPMG ........................................................... 336

IX. MOTOROLA SOLVENCY EXPERTS .................................... 337
 A. Paul Pfleiderer ................................................... 337
 B. Bruce Den Uyl .................................................... 337
 1. Den Uyl DCF Analysis .......................................... 337
 a. 1995 DCF analysis .......................................... 338
 b. 1997 DCF analysis .......................................... 338
 c. 1998 DCF analysis .......................................... 338
 C. Other Evidence Regarding Iridium's Solvency.......................... 338

X. COMMITTEE'S SOLVENCY EXPERT.................................... 339
 A. The Committee's Adjusted Iridium Projections ......................... 340
 1. Spragg's 1995 Projections ........................................ 340
 2. Spragg's 1997 Projections ....................................... 341

 CONCLUSIONS OF LAW ............................................. 342

XI. BURDEN OF PROOF ................................................. 342

XII. LEGAL STANDARDS FOR PROVING INSOLVENCY/INADEQUACY
 OF CAPITAL ....................................................... 344
 A. Insolvency........................................................ 344
 B. Capital Adequacy................................................. 345

XIII. RELEVANCE OF IRIDIUM'S SUBSEQUENT FAILURE IN
 DETERMINING INSOLVENCY AND/OR INADEQUACY OF
 ITS CAPITAL ...................................................... 345

XIV. ROLE OF CONTEMPORANEOUS EVIDENCE IN DETERMINING
 IRIDIUM'S INSOLVENCYAND/OR INADEQUACY OF
 ITS CAPITAL .................................................346
 A. Iridium's Market Capitalization. ...........................346
 B. Iridium Projections of Future Cash Flows ..................347
 C. Analysts, Investors and Lenders ...........................348

XV. EXPERT TESTIMONY ON INSOLVENCY AND INADEQUATE
 CAPITAL ....................................................349
 A. Legal Standards Regarding The Reliability And Credibility Of Expert
 Testimony ................................................349
 B. The Expert Opinion Testimony Regarding Insolvency Offered By The
 Committee Is Not Persuasive ..............................350

 CONCLUSION ...............................................352

The Statutory Committee of Unsecured Creditors (the "Committee") on behalf of Iridium Operating LLC, Iridium Capital Corp., Iridium IP LLC, Iridium LLC, Iridium Roaming LLC and Iridium (Potomac) LLC (collectively "Iridium") seeks to recover billions of dollars from Motorola, Inc. ("Motorola") in this litigation on behalf of the Iridium estate. The Committee's claims arise out of Motorola's development and deployment for Iridium of a global telecommunications constellation of sixty-six low earth orbit satellites and related gateways pursuant to what is known as the Space System Contract. Under that contract and related contracts, Motorola received approximately $3.7 billion in transfers from Iridium in accordance with the contract's milestone payment schedule. Iridium activated its service with much fanfare in November 1998 and ended up in bankruptcy about nine-months later. The litigation explored, but did not fully explain, the reasons for this huge and embarrassing failure.

Following years of fact and expert discovery, pretrial motions and the submission of a final pretrial order, the parties, in consultation with the Court, consented to bifurcate the trial in order to streamline what otherwise would have been an unwieldy and prolonged proceeding. The first phase of the trial, by agreement, was limited to the questions of whether Iridium was insolvent or had unreasonably small capital during the four-year period prior to commencement of the bankruptcy case. Even with this agreement to limit the issues, this phase of the trial was unusually long—fifty trial days. Opening arguments took place on October 23, 2006; closing arguments were presented on June 5, 2007. Between the opening argument and the closing, 52 witnesses testified, including 7 experts, and 866 exhibits were admitted into evidence. The parties submitted detailed post-trial proposed findings of fact and conclusions of law and post-trial briefs. The issues regarding insolvency are unusually complex and present a challenging valuation problem.

After consideration of the evidence presented during this bench trial and review of extensive post-trial submissions, the Court in this opinion now decides whether Iridium was insolvent or had unreasonably small capital during the four-year period from August 13, 1995 through August 13, 1999 for purposes of fraudulent conveyance and preference claims seeking to avoid transfers from Iridium to Motorola that total approximately $3.7 billion. In rendering this decision, the Court has considered a vast factual record and has had to weigh the conflicting opinions of

respected experts from a variety of disciplines. For reasons explained in the following introductory statement and overview and as detailed more fully in the findings of fact and conclusions of law sections below, the Court finds that the Committee has not carried its burden of proof in establishing that Iridium was insolvent or had unreasonably small capital during the relevant period.

The introductory statement below provides a summary and overview of the Court's reasoning and reactions to the evidence presented during the solvency phase of the trial, but the reader should consult the findings of fact and conclusions of law sections for a more complete and specific understanding of the determination of the solvency questions before the Court.

The conclusions of law section of the Opinion includes references to the recent Third Circuit case, *VFB LLC v. Campbell Soup Co.* 482 F.3d 624 (3d Cir.2007). *VFB* has been instructive to the Court in identifying ways to think about and to reconcile the conflicting evidence in the record regarding enterprise value. Notably, *VFB* validates the use of market data for purposes of valuing a public company for fraudulent conveyance purposes and makes clear that the public markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view. This Court agrees with the reasoning of the Third Circuit in *VFB* and has found that case to be pertinent and influential prece-

dent. In light of the valuation principles stated in *VFB*, the Court has found insufficient cause to set aside the verdict of solvency and capital adequacy already given to Iridium by the public markets.

### INTRODUCTORY STATEMENT AND OVERVIEW

The Debtors in this chapter 11 case, working closely with Motorola, conceived, developed, owned and operated a global telecommunications system that was designed to provide voice communication and paging services anywhere in the world so long as the antenna of a subscriber's portable telephone handset or paging unit could be positioned to make radio contact with one of Iridium's sixty-six low earth orbiting satellites.[1] The system seemed to be a promising and innovative advance in telecommunications at the time, but the business failed shortly after activation of the system.

Iridium's rapid decline into bankruptcy about nine months following commercial activation of its service was a business failure of epic proportions. During the seven years after Iridium was spun off from Motorola and prior to its bankruptcy and the eventual sale of its assets, Motorola served as Iridium's patron and contract counter-party, offering substantial technical and financial support and receiving progress payments pursuant to its contracts with Iridium during the four years prior to commencement of the bankruptcy aggregating $3.7 billion. These transfers are the real focus of this phase of the trial,

---

1. The original constellation design called for seventy-seven satellites, the atomic number in the periodic table for the element iridium, the inspiration for the company's name. The satellite telephone was not able to communicate with the orbiting satellites in environments where there were any significant obstructions between the antenna and the satellite (such as in buildings, especially high rise buildings, or in the so-called urban canyons of central business districts). The satellite service was augmented during the development of the system to include an optional cellular roaming feature. This roaming feature allowed the Iridium phone to function as a cell phone in obstructed or heavily shadowed environments in regions where cellular service was otherwise available.

because a finding of insolvency or unreasonably small capital is needed to satisfy one of the essential statutory prerequisites for recovery of these transfers under applicable fraudulent conveyance law.

The questions of solvency and capital adequacy necessarily have entailed a comprehensive review of the engineering and commercial origins of the Iridium project, the physics of radio frequency propagation and fading, the technical characteristics and limitations of the Iridium system, what was known concerning these characteristics and limitations, the nature and extent of market research conducted on behalf of Iridium, the adequacy of forward-looking subscriber estimates and revenue projections, the reasonableness of Iridium's business plans, and the significance to the valuation question of various capital markets transactions that took place during the relevant period. Importantly, the evidence also has included conflicting expert opinion testimony regarding Iridium's solvency and the adequacy of its capital in light of its capital structure and business prospects.

*Competing Valuation Philosophies Point To Opposite Conclusions Regarding Insolvency*

Despite the complexity of the problem, at the risk of oversimplification, the valuation question posed by this litigation comes down to a contest between two fundamentally different valuation theories and methodologies. Motorola refers the Court to Iridium's success in the capital markets in raising impressive amounts of debt and equity and to an efficient public trading market in which Iridium's securities traded within ranges indicative of substantial enterprise value. Motorola's solvency defense is grounded in this empirical data.

The Committee disputes the validity of such market data for a company with fundamental weaknesses that it claims were not fully understood by Wall Street, that had no reportable earnings and that was a start-up enterprise gearing up to operate within an unproven new segment of the telecommunications industry, a segment that in practice proved to be worth far less than all the hype had once suggested. The Committee's insolvency case is grounded in the mismatch between market research that predicted a robust market for the new service and a system reality so incapable of servicing its target market that such research must have been seriously flawed.

The Committee asks the Court to disregard historical market data as manifestly unreliable and accept the conclusions of expert witnesses who performed a discounted cash flow analysis using adjusted cash flow projections prepared in contemplation of litigation. This analysis sharply reduces the estimates of projected future cash flow associated with professional business travelers to take into account the limitations of the Iridium service that rendered it unsuitable for this target market.

If the Court accepts the opinions of the Committee's experts, Iridium was insolvent or inadequately capitalized during the entire critical four-year period. If the Court accepts Motorola's market valuation theory, Iridium must have been solvent, despite the fact that it was unable to generate sufficient revenue to service its debt and descended into a death spiral and collapsed into bankruptcy shortly after going into commercial service.

Doubtless, the 1990's were exuberant times in the debt and equity markets. Subsequent reversals of fortune proved these markets to have been overly optimistic about the share values of Iridium and any number of other telecommunications companies that were high flyers during the era. Nonetheless, valuation judgments can only be made utilizing the best

information that is available at the time about future cash flows and business prospects. After careful deliberation, the Court is persuaded that contemporaneous market data for Iridium's publicly traded securities are both consistent with substantial enterprise value and inconsistent with insolvency. The market evidence is simply too voluminous and compelling to reach any other conclusion.

The Committee's experts have been unable to account for, to adequately explain or to reconcile the abundant market data that conflicts with their opinion, other than to question what the market knew about service limitations and to claim market judgments were not meaningful for a start-up company, particularly a company such as Iridium that required huge capital expenditures and a long development stage before generating any revenue. They elected not to test and validate their valuation opinions by utilizing any accepted methodologies other than the discounted cash flow approach to value, and based their opinion on restated cash flow projections that were tailored for litigation purposes well after commencement of this adversary proceeding.

As a result of not confronting the valuations implied by the public markets concerning the enterprise value of Iridium and other comparable companies in the mobile satellite communications industry and of dismissing the market data as inapplicable to their analysis, the Committee's experts narrowed their focus to the point that they did not testify convincingly regarding all of the evidence that the Court needed to evaluate and, in the process, diminished the usefulness and credibility of their opinions. M. Freddie Reiss, who was the Committee's principal valuation witness, at times was also adversarial in defense of his opinions and in many instances did not give simple and direct answers to questions during cross-examination. His "hired gun" advocacy from the witness stand and lack of responsiveness to certain seemingly straightforward questions did not help his credibility.

■ Even though Iridium's failure demonstrates that the public markets turned out in this instance to be a very poor predictor of Iridium's future value, the Court has no doubt that the markets, especially after commercial launch, were reasonably well informed as to Iridium's operating characteristics and constraints, yet still managed to be terribly wrong about the company's actual prospects. Any reader of *The Wall Street Journal* knows that the markets are risky and unpredictable and that share prices frequently are influenced by a variety of factors unrelated to the fundamentals and potential of a particular company. Nonetheless, the public trading market constitutes an impartial gauge of investor confidence and remains the best and most unbiased measure of fair market value and, when available to the Court, is the preferred standard of valuation. *See VFB LLC v. Campbell Soup Co.* 482 F.3d 624 (3d Cir. 2007).

With hindsight (and with what Motorola refers to as "hindsight bias"), the market value for Iridium securities during the relevant period turned out to be an unreliable indicator of future fair market value, but that does not justify ignoring this data. This conspicuously inconsistent data contradicts the opinions of the Committee's experts and needs to be explained and overcome in order for the Committee to carry its burden during this phase of the trial. However, the Committee's experts have treated such data as irrelevant and have not given a satisfactory explanation for the abundant conflicting market judgments of those who were lending to or investing in Iridium during the period

leading up to and immediately after commercial activation.[2]

This failure to address conflicting data points that are opposed to their opinion of insolvency lessens in the Court's mind the weight to be accorded the testimony of these expert witnesses. Their testimony correlates well with the corporate failure that actually occurred but does not correspond with or take into account the widely held market perceptions that prevailed during the period leading up to bankruptcy. Because of the sheer volume of contemporaneous market evidence, to be effective and credible proponents of their opinion, the Committee's experts needed to do more than they did to demonstrate why all of the market participants were so terribly mistaken in assessing Iridium's value.

The failure of the Committee's expert witnesses to incorporate other valuation approaches and to account for inconsistent market data is troubling to the Court, not so much because it is absolutely necessary as a matter of valuation theory, but because the Court needs help to resolve the very pragmatic problem of how to fairly value Iridium. By not dealing directly with the extensive anecdotal evidence that contradicts their opinions, these experts have made it more difficult for the Court to accept their opinion testimony, testimony that seems to have veered into the zone of advocacy. As a result of not confronting the conflicting evidence of Iridium's solvency, the Committee's experts have lessened the impact of their testimony. In short, they have a credibility problem.

Motorola's fact and expert witnesses, on the other hand, succeeded in demonstrating that a tremendous amount of thoughtful planning went into the development, review and testing of Iridium's business plan and that industry consultants and market participants, including equity investors, underwriters and senior lenders, were reasonably well informed regarding the nature of the Iridium system and its limitations. On the basis of this diligence and what was known in the market, these market participants continued to believe, even months after commercial launch revealed how the system actually functioned, that Iridium had the potential to become a viable enterprise that could achieve its projections and that a significant worldwide market could be tapped for satellite

2. Ed Staiano, formerly a senior executive at Motorola and the CEO of Iridium at the time of commercial activation, knew in intimate detail how the Iridium system actually functioned and was well aware of its various technical limitations, including the fact that the Iridium telephone would not work dependably indoors or in the urban canyons of central business districts, but he made the decision, nonetheless, to invest $500,000 of his own money in Iridium securities in March 1999 (11/16/06 Tr. 71:22–24 (Staiano)). Thus, even a highly placed company insider had confidence that the company was a good investment at the same time that the Committee's experts assert that the company was insolvent and its equity was worthless. The Global Arrangers for a $1 billion credit facility that closed in December 1997 engaged Coopers & Lybrand (now known as PriceWaterhouseCoopers) and Arthur D. Little to conduct extensive independent diligence with respect to the Iridium business plan as a condition to extending credit to Iridium. These consultants to the lenders "stress tested" the Iridium projections, prepared a more conservative set of projections that assumed a downside case for future company performance after commercial activation and gave a green light to the loan which was oversubscribed. Notably, well informed insiders and sophisticated outsiders believed in the future of the Iridium technology, considered the business plan to be attainable and thought that it was prudent to invest in or extend credit to the company. These business judgments, while anecdotal, imply that Iridium was solvent at the time and support the Court's decision that the Committee has not carried its burden of proof.

voice communications despite the "line-of-sight" characteristics of the system.

Motorola offered an array of witnesses from multiple disciplines supporting the conclusion that market participants were aware of the limitations of the Iridium service and believed that users would still find it acceptable.[3] These witnesses included former Iridium employees, a major private investor in Iridium, investment bankers retained by Iridium and a representative of the lenders to Iridium. Motorola also called two business school professors, one from Stanford University and another from The University of Pennsylvania. The Stanford professor testified that an aggregation of purchases and sales within an informed market provides a reliable measure of fair market value, that market valuation is a main focus of his scholarly interest and that he regularly teaches this valuation theory to his MBA students. His academic perspective is that the markets provide the best and most meaningful data for determining the value of a business. He was both credible and persuasive. The Wharton professor explained that the survey methods used by consultants for Iridium to collect data regarding the market for the new service, in his opinion, were reasonable. Motorola also relied upon a recognized solvency expert from a financial consulting firm who testified that Iridium was solvent at all material times. That opinion was based on a discounted cash flow analysis and the contemporaneous valuation judgments of financial analysts who followed Iridium securities.

Taken together and on balance, Motorola did a better job in establishing that market evidence was relevant and persuasive data that could not be ignored in determining insolvency than the Committee did in establishing that the market was an unreliable measure of value that should be ignored. Motorola, through convincing and credible evidence, established to the Court's satisfaction that when it came to valuation, market participants had not been misled about the expected performance of the Iridium system and were reasonably well versed regarding its capabilities. These participants seem to have done a poor job in predicting whether and when potential users of the Iridium satellite service would want to become subscribers, but that failure to foresee that Iridium was ultimately doomed to fail does not mean that the original projections must have been wrong or were unreasonable when they were created.

The Committee's experts have assumed that Iridium's projections were unreasonable and have resorted to the creation of

---

**3.** It is worth noting that with the exception of four expert witnesses hired by the Committee to testify in its case, all witnesses for the Committee appeared electronically by means of designated portions of videotaped depositions. In contrast, Motorola presented the testimony of nine live witnesses, including certain individuals who appeared voluntarily even though they were beyond the subpoena power of the Court. Motorola contributed greatly to its defense by having live witnesses whose credibility could be assessed by the Court. Despite the utility of the videotaped testimony offered by both sides, there is no substitute for observing the demeanor of witnesses who are testifying in person in the courtroom. Witnesses who invested in Iridium (Theodore Schell), who provided investment banking services to Iridium (James Attwood) and who acted as one of the global arrangers for Iridium's senior credit facility (Thomas Cassin) all testified in person and, among other things, confirmed their awareness of the "line-of-sight" characteristics of the Iridium satellite service. The Committee elected not to cross-examine Mr. Schell and his testimony on this subject is unrebutted. Multiple witnesses indicated that they were familiar with the "line-of-sight" nature of the system, and, despite that, they appear to have assumed that the service still would be acceptable to prospective users.

their own projections solely for purposes of supporting their opinion that Iridium was insolvent. Given the extraordinary amount of diligence that was performed by consultants retained by Iridium's lenders for the purpose of testing the reliability of Iridium's projections, the alternative set of projections crafted by the Committee's experts solely for purposes of this litigation are of uncertain reliability and of doubtful credibility.

These doubts, coupled with the strong evidence of a prepetition enterprise that had the ability to access the capital markets for debt and equity infusions throughout the relevant testing period,[4] are sufficient for the Court to conclude that the Committee has not met its burden by a preponderance of the evidence. While it may be splitting hairs, the consequence of the analysis described in this opinion is not a determination that Iridium truly was solvent or adequately capitalized but rather that the evidence presented by the Committee is insufficient to establish insolvency or unreasonably small capital.

*The Committee Did Not Prove That Major Marketing Mistakes Doomed Iridium*

The Committee's consistent theme throughout the trial has been that Iridium needed to attract customers within a target market of so-called professional business travelers, but that the Iridium satellite service could not meet the foreseeable needs of such sophisticated travelers because of system limitations that were recognized by Motorola engineers at the earliest stages of system development. The Committee claims that the inherent flaw in the business plan was Iridium's failure to appreciate the misalignment between the capabilities of the Iridium system and the reasonable expectations of its target customers who would insist on better service.

The Committee contends that the Iridium service was not well suited to the needs of professional business travelers and that such travelers would only be interested in subscribing to a service that permitted reliable voice communications in those environments where sophisticated subscribers actually would expect to be able to use their mobile handsets—namely in buildings and in automobiles.

According to the Committee, this fatal marketing mistake grew out of survey questions that incorrectly portrayed the characteristics of the service and glossed over known limits to coverage. The Committee criticizes the language used in these questions that made the coverage seem better than it ever could be and that failed to adequately highlight the foreseeable limitations of the new system. The Committee makes the following contentions regarding Iridium's market research: if survey questions had been sufficiently clear and candid in detailing the holes in the coverage and in alerting respondents to those places where the service would not work, respondents would not have given responses indicating a willingness to use the service; failing to plainly articulate the system limitations caused survey respondents falsely to indicate a potential interest in subscribing to a service that in actuality was unsuitable for their needs, and this led the company and its consultants to a cascade of critical errors and the creation of a completely unreliable and unreasonable business plan; and Iridium ended up badly overestimating the demand for its new service resulting in a material overstatement of the number of projected subscribers, a materially false and overly optimistic estimate of the projected usage of the Iridium service by the professional

---

4. James Attwood, formerly of Goldman Sachs & Co., testified that the capital structure of Iridium was "conservative." (2/9/07 Tr. 109:23–110:5 (Attwood)).

business traveler segment and a gross miscalculation of the resulting revenue to be generated by the new business.

The argument, in a nutshell, is that the system as designed was never suitable for its intended target market and that during the years leading up to commercial activation people who should have known better lost touch with the reality that this particular technology would work well in an open field or on top of a mountain but not in a building and not in an automobile without an extra antenna on the roof—and this meant that the service would never be able to meet the needs of this key subscriber group.

Because of this known limitation in the quality, dependability and utility of the service that Iridium could deliver, the Committee submits that Iridium always lacked the money making potential to pay off the massive debt burden accumulated in connection with the design, development, deployment and commercial activation of the high-tech infrastructure of its business. Global voice communication was a great and novel idea, but the concept

required too much borrowed money to implement, and, if the Committee's theory is accepted, the business concept effectively was bankrupt before the company itself was.

The Committee's case is based, therefore, on the proposition that the capital cost to launch this business was far greater than Iridium ever could have been worth at fair valuation because real world subscribers would consider the service to be unsatisfactory and would not be willing to pay a premium price for spotty service. This means, regardless of what the projections said and regardless of what market participants may have known about the service prior to activation, that Iridium must have been insolvent and must have been undercapitalized during the relevant period.

In short, the Committee asserts that without Motorola's continuing support the business was doomed to fail from the start because it never had the capacity to generate enough cash flow to service or pay back its crushing load of debt.[5] Iridium suffered from unacceptable gaps in its cov-

5. Motorola committed its own resources to Iridium (including research and development relating to the Iridium handset and paging device), invested in Iridium equity, appointed members of Iridium's board of directors and guaranteed certain bank debt of Iridium. This backstopping of Iridium by Motorola may have led to the perception that Iridium was an unofficial part of Motorola's extended corporate family and that Motorola could be counted on to support Iridium, regardless of the lack of any enforceable commitment to do so. Although no evidence was presented during the trial concerning the value of this perceived mutually beneficial relationship with Motorola, the Court believes that market participants must have viewed the Motorola relationship favorably and may have factored Motorola's sponsorship of the project into the decision to purchase shares in or lend to the company. The Committee in questioning certain witnesses raised the possibility that Motorola may have used its position as one of the dominant players in the worldwide telecommunications industry to influence third parties to invest in or to enter into contracts with Iridium, but this point was not sufficiently developed or established definitively during the trial. However, some of the buoyancy in the market value of the securities of Iridium may have derived from the presence of Motorola as a contingent provider of possible credit support and the belief that Motorola had too much to lose, both economically and in terms of its reputation, if it permitted Iridium to fail. There is nothing in the record regarding this issue, nor is there anything to indicate that such perceived support is not a proper factor to be taken into account in determining solvency. This perception, real or imagined, of Motorola's behind the scenes support may help to explain why Iridium equity securities continued to reflect positive enterprise value even on the eve of the bankruptcy that rendered them worthless.

erage, and this meant that the company could never deliver adequate service to its principal target market, professional business travelers and high income individuals who would travel away from their home cellular systems and demand a quality of service comparable to the evolving quality of cellular service that would, at a minimum, permit coverage in buildings and in automobiles. Thus, the Committee claims, Iridium's failure was inevitable.

Notwithstanding this theory and the intuitive judgment that a business meltdown of this magnitude could not have occurred without a major structural defect in the business plan, oddly missing from the voluminous record is any credible proof as to what actually caused Iridium to fail. The business itself was a grand and elaborate vision of a global telecommunications future that proved to be wrong for a variety of reasons, including the unexpectedly rapid build-out of competing cellular systems, the expense and bulk of a telephone handset that was not as attractive or compelling as the evolving generation of pocket-sized cell phones with which it was being compared, the relatively high cost of subscribing to the service, the decision to proceed with commercial activation before all the software bugs had been eliminated from the system, lackluster performance by various gateway operators around the world who were insufficiently aggressive or simply unsuccessful in marketing the service to subscribers and undesirable limitations in the quality and performance of the satellite telephone service. No one disputes that there were many contributing factors. However, the Committee offered no proof demonstrating that the service limitations in fact caused business travelers to conclude that the service was unsatisfactory.

The Court is left to speculate as to whether the projections were wildly overstated for this reason or whether some other combination of factors is to blame.

Did poor planning or poor execution or both cause Iridium to fail so spectacularly and so quickly? No single factor explains why Iridium was unable to sign up anywhere near the number of subscribers needed to achieve its business plan[6] and as Leo Mondale, Iridium's former Vice President of Marketing and Strategic Planning, has testified, there was no consensus within the company's senior management as to why Iridium failed (2/9/07 Tr. 73:24–74:6 (Mondale)). Counsel for the Committee acknowledged during closing argument that what caused the failure of Iridium is still an open question (6/5/07 Tr. 29:6–11 (Danilow)). This is an additional reason for concluding that the Committee has not met its burden of proving insolvency.

*Leo Mondale Confirmed That Iridium Performed Within Expected Ranges*

In addition to pointing out that there was no consensus regarding the proximate cause of Iridium's failure, Mr. Mondale provided the Court with particularly helpful insights regarding many of the other disputed facts in this case. Mr. Mondale appeared by means of video in the Committee's case and as a live witness for Motorola. He was knowledgeable and credible and offered testimony demonstrating how difficult it is to assign blame, after the fact, for the failure of a complex and technologically sophisticated project such as Iridium and to figure out what, if anything, was wrong with a marketing effort and business plan that had been so carefully considered and so thoroughly examined prior to system launch.

6. Iridium created multiple business plans from its inception through the filing of its Chapter 11 petition. Some were issued in conjunction with private and public equity and debt offerings.

As the senior officer mainly responsible for Iridium's marketing efforts, Mr. Mondale provided evidence that was helpful to the legal positions of both the Committee and Motorola. The fact that he was not aligned with either side served to burnish his credibility and add weight to his testimony. The Court asked no questions of any other witness during the trial except for Mr. Mondale and considered him to be an excellent source of information as to what actually took place during the development stage of Iridium's business. His responses to direct and unrehearsed questions were knowledgeable, candid and unbiased. Based on those responses, the Court is satisfied that the marketing functions at Iridium were carefully, thoughtfully and expertly managed in light of the information that was available at the time. The Court finds, as a result, that Iridium's own projections, rather than the adjusted set prepared by the Committee's experts, constitute the most appropriate starting point for performing a discounted cash flow analysis.

Mr. Mondale was no fan of Motorola, but he nonetheless agreed to appear as a live witness during Motorola's defense. He was something of a wildcard witness in that he could easily have provided evidence that would benefit the Committee. In the end, however, he demonstrated that the reality of Iridium's performance was neither black nor white, but nuanced, and he helped to sink the Committee's case while at the same time giving the Committee some useful ammunition. For example, he complained that Motorola did not share all of the technical information regarding the limitations of the system that the company needed to develop its marketing strategy. He also described how he clashed with Ed Staiano over the right date for activating the Iridium service; Staiano was a forceful leader with experience in the launching of cellular systems who would not tolerate further delays in activating the system while Mondale was urging caution due to his concern that the system was not yet ready for commercial use and that more time was needed to eliminate software bugs from the system. The system was launched on Staiano's schedule, an error that some would argue led to Iridium's prompt demise. (Tr. 2/9/07 39:23–40:25, 61:22–63:10 (Mondale))

Importantly, Mr. Mondale confirmed that the Iridium System after activation performed within expected ranges, albeit at the lower end. This means that the system upon commercial activation, while disappointing to those at Iridium like Mondale who had hoped for performance at the upper end of the spectrum of foreseeable outcomes, actually did deliver service to subscribers that matched Iridium's expectations. Mr. Mondale indicated that he might have elected to pursue a modified marketing strategy if he knew in advance precisely how the system would function once activated, but such an acknowledgement does not mean that the marketing strategy adopted by Iridium was anything but reasonable. (Tr. 2/9/07 36:5–24 (Mondale))

Quite to the contrary, Mr. Mondale's testimony supports the conclusion that the business plan was developed with extreme care and with the recognition that satellite service suffered from inherent line-of-sight limitations, which meant that the quality of subscriber service could not be predicted and depended on the physical location of both the satellite and the subscriber. That is why he summed up the subscriber experience with the comment "it depends," and with those two words conveyed an essential truth about satellite technology and the subscriber experience. Users needed to accept the fact that service would not be reliable in all environments.

The subscriber experience was by its very nature variable and hard to define, and this is the source of the marketing problem that is at the heart of this case. Mr. Mondale and others may have hoped that the service would be better than it turned out to be, but the service parameters were entirely foreseeable. Mr. Mondale, those who worked with him in the marketing department, and the consultants for the Global Arrangers [7] all were aware of the fundamental characteristics of the satellite technology and did their best with diligence and in good faith to predict the market demand and anticipated future revenue in light of known risks. Their failure to predict the market demand accurately does not imply that they failed to act reasonably or to generate reasonable projections.

*Projections Were Not Unreasonable When They Were Prepared*

Embedded within the Committee's theory of the case is the common sense notion that Iridium's failure shows that its projections were unrealistic and must have been unreasonable. While this argument does have some superficial appeal, the Court is unable to make the logical leap that Iridium's failure leads to the conclusion that the projections must have been unreasonable when they were prepared.

This aspect of the Committee's case amounts to *res ipsa loquitur*-type thinking: i.e., how could the projections have been close to reasonable when the service turned out to be so inadequate, the debt burden turned out to be so high and the revenue turned out to be so pathetically low? In effect, the Committee submits that the Court should apply its own independent judgment to reject the Debtor's projections as being so patently absurd

and unreasonable as to be neither credible nor reliable.

The Court is not prepared to do that on the basis of this record. Iridium's cash flow projections were the result of a prolonged, deliberative process in which assumptions were vetted internally and by outside consultants. An extraordinary amount of work went into the development of these projections. As it turns out, the projections were not even close to being an accurate forecast of future performance, but the fact that Iridium ended up in bankruptcy does not mean that these projections were unreasonable and should be discarded or that it is now appropriate to start over and create a new set of adjusted projections.

Based on the evidence presented and the "right stuff" attitude displayed by many of the "Motorolans" who conceived and developed the system, the blind spot that permitted so many people to be so wrong about Iridium may be explained by a kind of "Field of Dreams" mentality that prevailed during the development stage of the project and that may have been colored by their own experience with cellular telephony. No one has stated in so many words, "if we build it, they will come," but the Court is left with the impression that those who worked on this project, including the various consultants who performed so much diligence on the projections, must have felt intuitively that the ability to use one communications device in virtually all parts of the globe would be an irresistible innovation that would be attractive to many people. The sense of technical progress and the shared view at the time that global communications would find a market may have influenced those who re-

7. The Global Arrangers for Iridium's 1996–1998 bank loans were Chase Securities, BZW and Barclays. (2/7/07 Tr. 6:16–7:5 (Cassin); MX 777 at MOT 942,559 (4/17/96 BOD Minutes))

viewed the projections.[8] Context here is meaningful. This was very much a nineties project that was being developed at a time when the markets were hot and fueled by a sense of optimism in a future of global connectivity.

Despite a comprehensive market research effort, actual subscribers were scarce and did not sign up in anywhere near the numbers projected or needed for commercial viability. The reality was far worse than what had been anticipated, but the failure to attract subscribers does not necessarily mean that Iridium's forward-looking projections must have been unreasonable as of the time that they were created. The demonstrated inaccuracy of the projections does not justify rewriting them in the manner adopted by the Committee's experts, particularly in the absence of any proof regarding the reasons the projections turned out to be so wrong.

And that is a vexing problem with the opinions presented by the Committee's experts. The creation of a revised set of projections for purposes of performing a discounted cash flow analysis supporting the conclusion that Iridium was insolvent looks like second-guessing by financial experts who are doing precisely what they were hired to do—doing everything that needs to be done in order to justify giving an insolvency opinion.

The use of experts to express opinions that are essential elements to the prosecution of a cause of action is a familiar aspect of the litigation process. Therefore, the fact that the Committee's experts offered the opinion that Iridium was insolvent is hardly cause for surprise. However, it is cause for the Court to be vigilant in scrutinizing that opinion. The projections as revised by the Committee's experts assume that the original projections were seriously flawed because of the assumptions made regarding professional business travelers. This is fully compatible with the Committee's theory of the case, but appears designed to yield the desired results.

The Committee's experts have created their own projections that have been cut drastically to account for an overly optimistic projection of subscribers within the category of professional business travelers, but there has not been a persuasive showing that the methods used and the adjustments made are appropriate and that the revised projections should be accepted as a valid starting point for performing a discounted cash flow analysis. In addition to creating new projections that appear to have been fashioned for the express purpose of supporting the conclusion that is being advocated by the Committee, the Committee's experts have also chosen valuation dates that ignore a number of significant financing and capital markets transactions for Iridium. The analysis performed by the Committee's experts was structured with the objective of enabling these experts to conclude that Iridium was insolvent. While that is a recognizable aspect of complex commercial litigation, the Court finds the resulting opinion in this case to be contrived and unconvincing.

*There Is No Proof That Focuses On The Question Of Iridium's Insolvency During The Months Before Bankruptcy*

The solvency case, as tried by each of the Committee and Motorola, was presented as an all or nothing proposition that sought to characterize Iridium's financial condition during the entire four-year peri-

---

**8.** It is notable that Iridium was not alone at the time in pursuing the dream of global satellite voice and data communications. Another competitor in the mobile satellite industry during this period was Globalstar. Globalstar followed a trajectory similar to Iridium's and filed for bankruptcy in the District of Delaware on February 15, 2002.

od prior to commencement of Iridium's bankruptcy cases. Neither side elected to approach the questions of solvency and capital adequacy by parsing this four-year period into smaller blocks of time or by concentrating on discrete smaller testing periods that are relevant to a preference and fraudulent conveyance analysis, such as the ninety-day or one-year period before bankruptcy. From the opposing points of view of the adversaries in this litigation, Iridium's financial condition was either uniformly positive or negative, either comfortably solvent and robust or hopelessly insolvent and undercapitalized throughout all four years before bankruptcy, and neither the Committee nor Motorola offered any evidence that focused particular attention on the critical months of growing financial distress leading up to Iridium's bankruptcy filing.

The Court recognizes, however, the very real possibility that Iridium may have been in the zone of insolvency or may have actually slipped into insolvency at some point between the date of commercial activation and the petition date. For example, during the nine months after commercial activation and before bankruptcy, the closing price of Iridium's shares began an inexorable and increasingly sharp decline. On the day after commercial activation, the price per share was $48.75, but six months later had decreased to 14.00, and this might well be an indication that the equity market was starting to come to grips with the company's serious problem in attracting subscribers and in dealing with financial covenant defaults with its lenders. However, because of the way that the parties chose to present their theories of insolvency, the Court is unable to make any well-founded findings or conclusions as to this particular period of fairly conspicuous financial distress.

As of the petition date the price per share was $3.06, and still reflected a positive enterprise value. Despite Iridium's business problems after commercial activation, the market continued to show a positive equity valuation for the company, even though that value dropped considerably in the months before bankruptcy and billions of dollars in assumed enterprise value evaporated. The Committee argues that the loss of this value in the period leading up to bankruptcy helps to demonstrate the fallacy of looking to the public market valuations as a reliable means to measure what a company is really worth, but, other than making a common sense argument based on the seemingly illogical ups and downs of the market, the Committee does not explain why these valuations should not be trusted as valid reference points even in a down market for a particular security.

While arguing that the decline in the price of Iridium shares before the filing date was a clear sign of financial distress and that positive share prices were false indicators of value given the grim reality of Iridium's inability to solicit subscribers and fulfill its business plan, the Committee presented no other evidence whatsoever focusing on the subject of solvency or capitalization during this period of rapidly deteriorating prices for Iridium equity. Curiously, in this respect, both the Committee and Motorola look to the same data, the share prices of Iridium equity, to support their respective positions.

The Committee's experts did not even value the company as of any date later than March 31, 1997 and did not consider events subsequent to that date to be relevant to their opinion regarding Iridium's financial condition. As a result, except for the overall opinions of FTI that are applicable to the entire four-year period, there is no direct evidence in the record to sup-

port a finding of insolvency at any point during the financial crisis that was brewing in the months before Iridium filed for bankruptcy, and the Court is left to speculate as to whether it might have been possible to prove by other means that Iridium was insolvent at some point in time prior to the petition date. Rather than speculate, the Court finds that there has been a failure to prove insolvency even during the period that Iridium's prepetition financial condition was most obviously suspect.

*No Support For Rejecting Market Indicators On Grounds Of Exuberance And Irrationality*

Throughout the trial, Motorola has hammered repeatedly that the public trading market for Iridium's securities was adequately informed and that the collective judgment of sophisticated market participants confirmed that enterprise value must have been significant. By treating this market data as irrelevant and unreliable, the Committee and its experts have elected to avoid a direct confrontation with this central message of Motorola's defense.

More recently, however, in its post-trial briefs and in closing argument, the Committee has suggested that the Court does not need expert testimony to discredit the values implied by the capital markets and can use its own insights, judgment and experience regarding irrational exuberance during the late 1990's to find that the market value of Iridium's securities is a poor proxy for determining fair market value.

The Committee has pointed to the dramatic failure of Iridium and the sale of its assets in bankruptcy for a tiny fraction of the billions that it cost to build the system as empirical proof that the market could not have been a rational valuation tool, at least in this instance of bullish optimism in the securities markets. According to the Committee, the market as a barometer of value should be rejected because market participants were oblivious to the dire consequences of Iridium's high leverage and low revenue.

The Committee asserts that the ultimate reality check here is that the market, in retrospect, could not have been a reliable reference point in light of subsequent events that proved the market to be so plainly wrong in measuring Iridium's fair value. Accordingly, the Committee says, the judgment of the market must be rejected. The Committee argues that the Court should pay attention to what actually happened to Iridium after commercial activation (including the steep decline in share values for Iridium during the months immediately before the bankruptcy filing) and disregard contemporaneous market data that appears to have been divorced from business reality, both with respect to the telecom industry in general and Iridium in particular.

Although this argument does highlight the "bubble" mentality that produced so many high-tech and telecom corporate disasters, there is no support in the record for not treating the public market data with deference as the best indicator of value, notwithstanding that the market was plainly wrong as an indicator of future value and badly misjudged the likelihood of Iridium's success. The Court is not bound to accept the value that has been ascribed to Iridium's securities by the public markets and has the broad discretion to find that the markets somehow were distorted and did not fairly reflect the underlying enterprise value of Iridium, but to justify disregarding values placed on these securities in an efficient public trading market, the Court needs a substantial reason to depart from that standard and find that the value implied by an efficient market is not a trustworthy benchmark. No

such reason to disregard that benchmark is present here, and no persuasive evidence has been offered to justify any deviation from the valuation implied by the public trading markets.

## PROCEDURAL HISTORY

On August 13, 1999, involuntary petitions were filed in this Court against Iridium, and Iridium and Iridium World Communications Ltd. ("IWCL") filed voluntary petitions on that same date in the United States Bankruptcy Court for the District of Delaware. By September 14, 1999, all of the Iridium entities had filed voluntary petitions in this Court or had their cases transferred from Delaware to be, with the exception of IWCL, procedurally consolidated. The Committee was authorized by order dated March 15, 2000 to bring an action against Motorola on behalf of the Iridium debtors. On July 19, 2001, the Committee filed this adversary proceeding against Motorola. Motorola answered the Committee's complaint on October 8, 2001. Soon after, the discovery process began with initial document requests being served on November 1, 2001. Approximately a year later, Motorola moved for judgment on the pleadings. The Committee opposed the motion and the motion was denied on February 27, 2003.

Massive numbers of documents were produced and over eighty individuals were deposed. On February 28, 2006, following a pre-motion conference, Motorola moved for summary judgment as to all counts of the complaint. The Committee opposed summary judgment and, after significant briefing, the Court heard arguments on May 15, 2006. The summary judgment motion is currently pending, although this opinion disposes of a number of causes of action that were the subject of the motion.[9]

In May 2006, Motorola filed *Daubert* motions to exclude the testimony of certain expert witnesses including the Committee's solvency expert, M. Freddie Reiss of FTI Consulting, and the Committee opposed these motions. The Court heard arguments on August 8, 2006 and concluded that Mr. Reiss was qualified to testify, but did express some concerns at that time regarding Mr. Reiss' failure to incorporate market data in his expert opinion. In September 2006, the parties agreed to limit the first phase of the trial to the issues of Iridium's insolvency and capital adequacy.

The trial began on October 23, 2006. In January 2007, at the conclusion of the Committee's case, Motorola moved for judgment on partial findings under Rule 7052(c) of the Federal Rules of Bankruptcy Procedure. Motorola's motion under Rule 7052(c) challenged again the sufficiency and credibility of Mr. Reiss' opinion testimony and argued that the Committee had failed to prove insolvency. The Court reserved decision on that motion, and Motorola put on a solvency defense that included fact and expert witnesses. After the close of evidence, the parties submitted extensive proposed findings of fact, proposed conclusions of law and post-trial briefing. The Court heard closing arguments on June 5, 2007.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1334(b) and 157(a)

---

**9.** The trial on insolvency disposes of the Committee's avoidance actions, Counts I and III (fraudulent transfers) and Counts II and IV (preferences), because insolvency is a necessary element of those claims. Count V (breach of fiduciary duty), Counts VIII and IX (breach of warranty in the SSC) and Count X (equitable subordination) are not resolved by this opinion. The Committee voluntarily dropped Counts VI and VII in September 2004.

and under the July 10, 1984 "Standing Order of Referral of Cases to Bankruptcy Judges" of the United States District Court for the Southern District of New York. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and (H). Venue of this adversary proceeding is proper in this district under 28 U.S.C. § 1409.

This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Rule 52(a) and (c) of the Federal Rules of Civil Procedure, made applicable by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT [10]

### I. IRIDIUM CORPORATE HISTORY

The Iridium concept was first conceived of and developed by Motorola engineers working in Motorola's Strategic Electronics Division in Chandler, Arizona. In 1987, Barry Bertiger, Ray Leopold and Ken Peterson, engineers in Motorola's Strategic Electronics Division, developed the concept for a satellite-based telephone system that would have commercial applications and that would provide worldwide coverage using one handheld, portable device. This became what was ultimately known as the "Iridium System." (10/24/06 Tr. 12:22–17:6 (Bertiger)[11]).

Once Motorola's corporate leadership approved moving forward with the Iridium project in the 1989–1990 time period, a special business unit was formed to further pursue Iridium's design and development,

and a number of additional engineers were hired. (10/24/06 Tr. 24:18–27:25 (Bertiger)) Shortly thereafter, this special business unit became Motorola's Satellite Communications Division ("SatCom"). (10/24/06 Tr. 28:1–16 (Bertiger)).

Iridium, Inc. (later Iridium LLC) was incorporated in June 1991 as a separate and distinct entity from Motorola SatCom, and this separate entity eventually became the owner of the Iridium System. (MX 501 at MOT 1,379,070 (Iridium 1998 10–K)). On July 29, 1993, through a private placement of Iridium, Inc. stock, the ownership of Iridium, Inc. was transferred from Motorola to a consortium of private investors. (MX 501 at MOT 1,379,070 (Iridium 1998 10–K)) and additional shares of Iridium, Inc. were sold in supplemental private equity offerings in 1994 and 1996. (MTX 135 (IL & FS SPA[12])); MTX 144 (1994 SPA); MTX 145 (Veba SPA); MTX 146 (Iridium SudAmerica SPA)

After Iridium's private placement in July 1993, Motorola held a significant interest in Iridium Inc., and by virtue of its investment had several representatives on the Iridium Board of Directors. (PX 255 at MOT 1,442,562 (1994 PPM[13]); MX 501 at MOT 1,379,070 (Iridium 1998 10–K)) Motorola had commercial relationships with many of the private equity investors.

On July 29, 1996, Iridium Inc. changed its corporate form and became a Delaware limited liability company, Iridium, LLC, and the shareholders in Iridium, Inc. be-

---

10. Pursuant to Fed.R.Civ.P. 52, as made applicable by Bankruptcy Rules 7052 and 9014, without regard to what section of the opinion they are found, any and all findings of fact, shall be deemed to constitute findings of fact even if they are stated as conclusions of law, and any and all conclusions of law shall be deemed to constitute conclusions of law even if they are stated as findings of fact.

11. Barry Bertiger was the Assistant General Manager of Motorola's Satellite Communications Division, and later its General Manager during the Iridium development effort.

12. Hereafter, "SPA" means Stock Purchase Agreement.

13. Hereafter, "PPM" means Private Placement Memorandum.

came members of Iridium LLC. (MX 501 at MOT 1,379,070 (Iridium 1998 10–K))

## II. THE IRIDIUM SYSTEM

Iridium LLC and Motorola entered into several agreements related to the Iridium System, including the Space System Contract ("SSC"), Operations & Maintenance Contract ("O & M Contract") and Terrestrial Network Development Contract ("TNDC"). (MX 68 at MOT 1,266,080 (IPO Prospectus))

Pursuant to the SSC, Motorola served as the prime contractor for the development of the space-related portions of the Iridium System, consisting of the satellite constellation itself and system control functions. The SSC also obligated Motorola to develop, license and sell certain handsets and provide gateway equipment systems by agreed deadlines. (PX 373 at MOT 249,654 and 658–60(SSC))

Motorola's SatCom unit focused on a number of aspects or segments of the Iridium program, including: overall design of the complete Iridium System; designing, producing and launching the satellite constellation; designing, building and operating the system control facility that controlled and managed the network and constellation of satellites; designing and building the ground stations that connect the satellites to a terrestrial communication network; designing and developing the communication electronics; and interfacing with Iridium LLC. (1/24/07 Tr. 11:8–13:4 (Hoppal [14]))

The Iridium System as a whole was comprised of four principal components: the orbiting satellites, the gateways, the Iridium subscriber equipment, and the land-based interprotocol roaming infrastructure. (MX 501 at MOT 1,379,009 (Iridium 1998 10–K)) The first Iridium satellite was launched in May 1997 and most of the 66–satellite constellation was deployed by May 1998. (1 /30/07 Morning Tr. 10:1–13 (Stamp [15])) Iridium announced that it had commenced commercial voice service on November 1, 1998, followed by paging service on November 15, 1998. (MX 501 at MOT 1,379,003 (Iridium 1998 10–K))

Early plans for the Iridium System called for a 77–satellite constellation that generated a range of 6–12 dB of link margin. In 1992, Motorola re-designed the system to have 66 satellites and 16 dB average link margin.[16] (1/24/07 Tr. 14:15–15:12 (Hoppal)) When Iridium was being designed in the late 1980s and early 1990s, there was some publicly available data on the effect of tree shadowing and building penetration losses on satellite signals.

14. Tom Hoppal was a Motorola employee who worked in the systems engineering group on the Iridium program from 1991 to 1999. Hoppal was involved in conducting propagation studies and in developing a simulator to demonstrate Iridium's voice quality.

15. Dannie Stamp was the former Space System Segment Manager at Motorola SatCom. Stamp was the senior Motorola engineer in charge of producing and deploying the Iridium satellite constellation from 1990 to 2000. In late 2000, Stamp became Chief Operating Officer of Iridium Satellite LLC, the company that acquired Iridium's assets during the bankruptcy case for $25 million. Since 2000, Stamp has overseen all operational aspects of the Iridium system, including the satellites, gateways and handset production.

16. Generally, link margin is an accepted engineering term that indicates how much excess power (expressed in decibels (dB)) a wireless communication link has to operate above what is required to operate at optimal conditions. Additional link margin allows a system to penetrate or withstand more environmental or propagation effects. (1/24/07 Tr. 16:20–18:10 (Hoppal)) Increases in decibels are logarithmic increases in power, which means that Iridium's 16 dB of link margin for satellite voice communications is 40 times more power than zero dB. (12/12/06 Tr. 133:23–135:8, 136:12–137:9 (Elbert))

(12/1/06 Tr. 22:13–23:4; 57:11–58:24 (Vogel [17]))

To gather additional data on possible system performance in varying environments (such as in moving vehicles), Motorola hired a recognized expert in the field, Dr. Wolfhard Vogel, to conduct propagation studies for the Iridium program beginning in November 1990.[18] (1/24/07 Tr. 20:8–21:2 (Hoppal)) Dr. Vogel developed and performed at least fifteen propagation data collection studies related to Iridium (almost all from 1991–1995). (PX 664 at MOT 3,231,508–510 (ITN–580, describing propagation data collection); MX 274 at W. VOGEL 0001102 (Paper describing propagation data collection)) Dr. Vogel was responsible for designing and conducting these propagation experiments. (12/1/06 Tr. 31:18–32:1, 33:2–14 (Vogel); 1/24/07 Tr. 32:11–24 (Hoppal))

The propagation studies performed and designed by Dr. Vogel were quite comprehensive. Through these studies, Dr. Vogel and Motorola gathered propagation data for different types of potential Iridium users, in a number of different environments. (PX 664 at MOT 3231511 (ITN–580, describing propagation data collection); MX 553 at ADL 0061702 (ITN–155, L–Band Propagation Statistics)) These studies were important because they provided data regarding the performance to

be expected from the Iridium System, including foreseeable limitations in service.

Because a system may still be able to perform even when fades are sometimes greater than the system's nominal link margin, one cannot extrapolate directly from fade data to system performance without using a computer-based simulator that considers system parameters beyond link margin. (1/24/07 Tr. 40:3–55:5 (Hoppal); 12/1/06 Tr. 54:24–55:16, 84:18–93:17 (Vogel))

In 1991, as Dr. Vogel and Motorola gathered propagation data, Motorola began developing a voice quality simulator to attempt to provide a demonstration of what Iridium voice service would sound like in various environments and also to assist in optimizing the design and performance of the Iridium System. (1/24/07 Tr. 34:15–35:3, 65:15–66:14 (Hoppal); 1/31/07 Tr. 6:20–7:20 (Ranganathan [19])) The simulator's capabilities were improved and expanded over time and allowed the user to adjust different variables to experience the impact on voice quality. (1/24/07 Tr. 65:15–66:22, 73:13–75:20 (Hoppal); MX 555 (ITN–107, L–Bank Link Voice Simulator))

The simulator provided an approximation of what the voice quality of the Iridium service would sound like in different

---

**17.** Dr. Wolfhard Vogel is a University of Texas researcher and expert in radio frequency propagation, with a specialty in space to ground signal propagation.

**18.** Propagation or environmental effects are objects or obstructions in the path between the subscriber and the satellite that cause attenuation of the signal. (1/24/07 Tr. 18:4–10, 19:19–24 (Hoppal)). A propagation study is done to determine the amount of signal attenuation in different situations and environments. (1/24/07 Tr. 19:25–20:13 (Hoppal)). During a propagation study, a radio signal (of a known strength) is propagated, or sent, from a transmitting device into a partic-

ular environment or location, where a receiver measures the level of the signal received. Simplifying the process, the "difference" in the measured signal power that was sent, and the amount remaining at the receiver, is the amount of signal attenuation or fade (in dB) present in the particular environment that was the subject of the test. (1/24/07 Tr. 22:9–24:12, 28:22–29:7 (Hoppal))

**19.** Murali Ranganathan was a Systems Engineer in Motorola's SatCom organization from 1995 to 1999. Ranganathan had responsibility for simulator development and voice quality testing.

environments using actual propagation data taken by Dr. Vogel and taking into account the impact of the vocoder forward error correction and error mitigation techniques and other system features. (1/24/07 Tr. 65:15–66:5, 68:2–70:10 (Hoppal); 12/1/06 Tr. 46:24–49:7 (Vogel); MX 555 at MOT 3,238,297 (ITN–107, L–Band Link Voice Simulator)).

Before system launch, the simulator was the best available method for drawing conclusions about performance of the system with respect to the voice quality of the service that could be expected after system launch. (1/24/07 Tr. 100:14–23 (Hoppal); 10/24/06 Tr. 187:6–11 (Bertiger); 12/1/06 Tr. 46:24–49:7, 54:24–55:16, 84:18–93:17 (Vogel))

## A. Iridium System Performance

The initial underlying premise of Iridium was stated, among other places, in the 1992 PPM: "The Iridium System is not expected to compete directly with traditional landline and cellular communication systems since it will cost more to use and will be subject to certain capacity limitations. Rather, it is intended primarily for use by individuals whose travel takes them to places where either their cellular standard is not available or traditional communications systems are inconvenient or unavailable." (PX 253 at MOT 130,242)

In the late 1980s and early 1990s, terrestrial cellular systems operated with considerably less power than they do today, and service was not generally available deep within buildings. To the limited extent cellular service could be utilized in buildings, it was very spotty and depended on where the user was in the building and where the cell tower was located relative to the user. Users were accustomed to walking to windows, or walking outside, to make or receive cellular calls. (1/23/07 Tr. 12:7–13:21, 67:19–69:13 (Adams [20]); 12/4/06 Tr. 181:14–182:15 (Hillis [21]); 2/9/07 Tr. 102:3–103:1 (Attwood); 2/1/07 Tr. 33:1–34:19, 36:4–9 (Schell [22]); see also 10/25/06 Tr. 114:23–115:12 (Gercenstein [23])) In addition, many of the cellular units in use at the time were mobile units that operated in vehicles using external antennas, and only some of these devices could be taken out and used as handhelds. (12/4/06 Tr. 150:2–7 (Hillis)) Satellite service was available at this time using equipment that was bulky and that was transported in a suitcase-sized carrying case. The subscriber units for the Iridium System were expected to be much smaller than the equipment that was in use at the time.

The Iridium System, like all other mobile satellite communications systems (and geostationary satellite systems), operates best when there are no obstructions in the path, or line-of-sight, between the handset antenna and the orbiting satellite. (2/9/07 Tr. 100:13–101:14 (Attwood [24] ("Line-of-

---

**20.** Jerrold Adams was Iridium's President and Chief Operating Officer from October 1991 to February 1997.

**21.** Durrell Hillis was General Manager of Motorola SatCom from 1990 to 1995.

**22.** Theodore Schell was Sprint's Senior Vice President of Strategy and Corporate Development from 1984 to 2000. Schell oversaw and managed Sprint's due diligence process and assessment of the Iridium investment opportunity. Schell also served on Iridium's Board of Directors from 1993 through 1999.

**23.** Mark Gercenstein was in charge of marketing and business development issues at Iridium from 1989 to 1993, and in that capacity, was responsible for generating Iridium's initial business plans.

**24.** James Attwood is a former Senior Vice President of Goldman Sachs' Investment Banking Division. Attwood was part of the Goldman team that was engaged as Iridium's financial advisor from 1991 through 1995. He served as placement agent for Iridium's 1993 and 1994 equity offerings, and he was

sight was the best. . . ."))); 2/1/07 Tr. 23:8–24:8, 36:10–37:11 (Schell ("[L]ine of sight applies to all satellites.")); 12/5/06 Tr. 76:19–77:16 (Maul[25]); 2/9/07 Tr. 13:23–14:5 (Mondale[26] ("you can be sure it will work if you have line-of-sight")) In other words, "there must be an unobstructed path between the user and the handset and the satellite as the satellite moves through the sky and that clear unobstructed path must exist from the time that the phone is activated and a call is placed and the user conducts the phone call, until the user is finished and hangs up." (Trial Tr. 12/12/06 at 8:6–22 (Elbert[27])) This meant that there was uncertainty as to where and when the Iridium System would work and that the system performance could be fairly described with the words "it depends." (2/9/07 Tr. 36:13–20 (Mondale)) The quality of service depended on multiple factors ranging from the location of the satellite to the degree of shadowing in the environment.

Motorola's former Chief Executive Officer, Chris Galvin, and Iridium's former Chief Executive Officer (and a Motorola senior executive before joining Iridium), Edward Staiano, testified that they knew since the late 1980s or early 1990s that the Iridium System would have line-of-sight limitations. (Trial Tr. 11/16/06 at 8:10–23 (Galvin); Trial Tr. 11/7/06 at 114:7–115:11 (Staiano))

Iridium had 16 dB of link margin, meaning that it had approximately 40 times more power than necessary to operate in clear line-of-sight conditions. (2/13/07 Tr. 33:15–34:3 (Maul); 10/24/06 Tr. 38:4–25, 172:17–174:16 (Bertiger); *see also* 12/12/06 Tr. 133:23–135:8, 136:12–137:9 (Elbert)) Therefore, while operation in line-of-sight conditions would be optimal, the system was also expected to operate in certain situations where there were some obstructions in the line-of-sight between the satellite and the subscriber. (2/13/07 Tr. 33:15–34:3 (Maul); 10/24/06 Tr. 38:4–25, 172:17–174:16 (Bertiger); 2/9/07 13:23–14:5 (Mondale))

As a consequence of Iridium's line-of-sight operations, the Iridium System did not work consistently in many wireless environments because of obstructions caused by buildings. These environments included urban areas, central business districts, and the interior of many buildings regardless of environment. (12/12/06 Tr. 8:23–11:4 (Elbert)) The reason, as Dr. Staiano explained, is that "[i]f you do that calculation, you will *realize* that the Iridium System had one-one thousandths of the power of a cellular system. The ability to attempt to penetrate walls, steel, cardboard of substance was not in the cards

selected to underwrite Iridium's contemplated high yield debt offering in 1995.

25. Jeffrey Maul was Director of Arthur D. Little's Communication and Electronics Technology Consulting Group, and served as program manager and director in charge of the technical specialists who performed Arthur D.Little's technical due diligence on behalf of Iridium's lenders from May/June 1996 to December 1998.

26. Leo Mondale joined the Iridium project in 1990 and worked for the company until August 1999. From January 1995 to mid–1997, Leo Mondale was Iridium's Vice President of

Marketing and Strategic Planning. Leo Mondale was named Iridium's Vice President of Marketing and Strategic Planning in early 1995, and led the marketing efforts during this time frame. As Vice President of Marketing and Strategic Planning, Mondale was responsible for the development of Iridium's business plan 2.0 during 1995, 1996 and 1997.

27. Bruce Elbert testified for the Committee as an expert. He was, among other things, the Senior Vice President of Operations at Hughes Aircraft, where he worked with communications satellites.

from day one, and that design was well-understood from day one." (11/7/06 Tr. 115:15–116:3 (Staiano))

However, the system could work in any of these realistic wireless environments (i.e., in buildings, in urban areas and central business districts) if the conditions were exactly right at the time—if the satellite and the handset could "see each other." (*See, e.g.,* 11/7/06 Tr. 125:4–16 (Staiano); 10/24/06 Tr. 170:25–170:14 (Bertiger); 12/12/06 Tr. 24:23–25:6 (Elbert)). Typically this meant the satellite would have to be on the same side of the building in sight of the window where the user was located. Dr. Vogel confirmed that operation within certain buildings was possible where fading was not extreme, particularly near windows and in smaller buildings of lighter construction density. (12/1/06 Tr. 58:10–59:8 (Vogel))

Because the Iridium satellites were constantly moving, service was not predictable in environments with obstructions. As the person in charge of technical consulting for Iridium's senior secured lenders explained: "Satellites are constantly moving, so that's luck of the draw. You go to this window, if there happens to be a satellite right outside this window within the line-of-sight, you may be able to establish a call, but you may not be able to hold the call up more than a minute or two because the satellite has moved out of position." (12/5/06 Tr. 79:5 –12 (Maul)) As soon as the satellite passed overhead or was otherwise no longer in clear-line-of-sight with the handset (i.e., blocked by the building itself), the call would be dropped. (12/12/06 Tr. at 23:1–26:13 (Elbert))

The same line-of-sight concept applies to in-vehicle use. That is, when the antenna could see the satellite, the user could get service, provided that, the vehicle itself was not in an area where there were obstructions that prevented a line-of-sight

link. (2/9/07 Tr. 103:2–15, 104:1–10 (Attwood); 10/24/06 Tr. 94:13–24, 53:21–54:7 (Bertiger))

Motorola believed in 1992 that the Iridium voice service would operate inside a vehicle in open, freeway type environments where there were limited roadside obstructions to the line-of-sight. (12/4/96 Tr. 113:19–114:8 (Hillis); 1/24/07 Tr. 104:18–107:4 (Hoppal); 10/24/06 Tr. 95:5–20, 99:8–101:18, 166:4–170:16 (Bertiger))

Between 1992 and 1995, Dr. Vogel and Motorola continued to collect additional propagation data relating to usage in vehicles and continued to learn more about how the system would perform and operate in vehicles in different environments. (1/24/07 Tr. 111:11–112:6 (Hoppal))

Ultimately, it was concluded that an accessory antenna would improve in-vehicle system performance and Iridium supplied the accessory antenna as part of the package with the Iridium handset. (1/24/07 Tr. 114:10–115:1 (Hoppal); 2/9/07 Tr. 15:1–15 (Mondale)). Although there might be conditions that allowed in-vehicle usage of the Iridium System without an external antenna, the System had the best chance of working in a vehicle with a car-top antenna in an open or "lightly treed" environment. (Tr. 11/8/06 at 75:4–14 (Staiano)) (Tr. 10/24/06 at 53:21–54:7 (Bertiger))

## B. Expectations About Handset Size

From the early 1990s on, Motorola's handset group developed a number of concept handset models. (PX 132 (photo of various concept models)) These concept models were not working prototypes, but represented what Motorola hoped or expected the unit might look like at the time of commercial launch, which was understood to be years away. (11/6/06 Tr. 18:8–19:17 (Mondale); 11/15/06 Tr. 36:4–36:17

(Seitz [28]); 10/24/06 Tr. 163:5–166:10 (Bertiger), 11/13/06 Tr. 16:3–16:25 (Zocher [29]))

Motorola engineers showed concept handset models of different sizes and shapes to Iridium, potential investors, and Goldman Sachs in the 1991–1993 timeframe. One such model, the Model D, was among the concept models shown. (11/15/06 Tr. 36:18–25 (Seitz); 10/24/06 Tr. 163:5–166:10 (Bertiger); 11/15/06 Tr. 149:4–17, 150:17–151:1, 159:5–9 (Mitchell [30]) (testifying that larger concept models, including MX 1111 and MX 1112, were shown to investors)) Iridium, the early investors and Goldman Sachs knew that there could be changes or modifications to the handset models as a result of the ongoing development process. (11/15/06 Tr. 37:1–38:1 (Seitz); 02/01/07 Tr. 39:17–22 (Schell); 1/23/07 Tr. 70:11–71:12 (Adams); 12/11/06 Tr. 150:6–21 (Daverio [31]); 2/9/07 Tr. 99:6–100:3 (Attwood); 10/24/06 Tr. 163:5–166:10 (Bertiger))

The Model F (with a larger antenna) was depicted in Iridium's 1995 S–1, which stated: "Motorola has informed the Company that the portable, handheld ISU Motorola will develop is expected to be significantly larger and heavier than today's smallest and lightest pocket-sized, handheld cellular telephones and is expected to have a significantly longer and thicker antenna than hand-held cellular telephones." (MTX 1 at 14, 44 (7/14/95 Form S–1)) Although the Committee contends that the

size of the handheld individual subscriber unit ("ISU") actually introduced was unattractively large in comparison with cellular handsets at the time, the Court, having examined various models of the ISU's used by Iridium subscribers (e.g., PX 257), finds that handset size was not a material factor in Iridium's lack of success in attracting subscribers. While smaller is almost always better when it comes to technology and a smaller headset with a smaller antenna undoubtedly would have had greater appeal to potential users, the ISU's dimensions were in line with the size of portable cellular phones that were then still in use. The ISU was also much smaller than certain of the earlier competing satellite equipment of the era.

### III. RELEVANT INFORMATION REGARDING EXPECTED SYSTEM PERFORMANCE WAS DISCLOSED TO IRIDIUM AND ITS INVESTORS

#### A. Iridium And Its Board Were Informed About The System's Voice Quality And Expected Performance In Various Environments

Although everyone at Iridium may not have completely understood all the nuances and possible usage permutations regarding the System's performance, Iridium knew that the system had line-of-sight limitations. (1/9/07 Tr. 29:11–34:16, 109:2–6 (Reiss [32]))

**28.** Marty Seitz was a Motorola engineer within the Cellular Subscriber Group who managed the team developing Motorola-manufactured Iridium handsets from late 1990 until 1999.

**29.** Joan Zocher was Marketing Manager from 1990–1997 for the Satellite Subscriber Products Group, the part of Motorola's Cellular Subscriber Group responsible for Iridium handset development.

**30.** John Mitchell was Vice Chairman of Motorola from 1988 to 1995, and an Iridium Board Member from July 1993 through 1999.

**31.** Paul Daverio was Chief Financial Officer of Iridium from January 1994 to the end of March 1997.

**32.** M. Freddie Reiss was the Committee's solvency expert. He is a senior managing director in FTI's Corporate Finance practice.

For example, Dr. Staiano, Iridium's CEO, testified that he, along with the rest of Iridium's management and engineers, was aware of the System's likely limitations and capabilities. (11/7/06 Tr. 30:22–31:14 (Staiano)) Other witnesses including Mark Gercenstein, Jerry Adams, William Kraus,[33] Leo Mondale and Kevin Lavin also corroborated that Iridium management was aware of the system's anticipated operating constraints. (10/25/06 Tr. 101:1–102:11, 110:17–112:21, 115:13–118:19 (Gercenstein)); (1/23/07 Tr. 27:6–24 (Adams)); (2/7/07 Tr. 166:9–167:19 (Kraus)); (2/9/07 Tr. 13:14–14:17 (Mondale)); (1/25/07 Tr. 39:20–43:8 (Lavin))

Iridium employees, engineers and Board members were among the people who listened to the voice quality simulator set up at the Motorola facility in Chandler, Arizona. (1/24/07 Tr. 85:5–88:16 (Hoppal); 10/24/06 Tr. 160:14–161:22, 184:19–187:16, 190:14–195:17, 196:18–197:6 (Bertiger); *see also* 1/31/07 Tr. 7:8–20 (Ranganathan)) Iridium representatives had access to the simulator and could listen to any propagation environments that they might choose. (10/24/06 Tr. 186:25–187:16 (Bertiger)); 10/25/06 Tr. 112:22–113:7 (Gercenstein (Iridium's marketing team had access to and listened to the voice quality simulator))

The testimony of various former Iridium employees confirms that there was no mystery surrounding the expected operating characteristics of the Iridium System. It was generally recognized within the company that the satellite service would not work reliably within buildings, in automobiles (without an external antenna) or in environments with obstacles between the ISU and the satellite. Although these operating parameters were generally known,

Iridium did not learn precisely how the system would actually function until it was activated and used by subscribers. Leo Mondale testified that the quality of the service turned out to be within the range that had been expected during the development of the Iridium System, but was at the lower end of that expected range. To that extent, the service, while foreseeable, was also disappointing. (2/9/07 Tr. 34:2–24 (Mondale))

Iridium had its own engineering staff that was involved with and kept apprised of technical developments as the system evolved. Some of those Iridium engineers worked at Motorola facilities. (1/30/07 Morning Tr. 15:23–17:9 (Stamp)); 10/24/06 Tr. 176:1–11 (Bertiger); 1/23/07 Tr. 53:7–16 (Adams) To the extent Motorola did not actively inform the Iridium engineers about an advance with the System, Iridium had access to information it needed regarding System development to make informed judgments about projected System performance. Iridium engineers attended and participated in numerous technical review meetings. (1/23/07 Tr. 53:7–54:19 (Adams); 10/24/06 Tr. 177:6–15 (Bertiger); 1/30/07 Morning Tr. 15:23–18:5 (Stamp)) Iridium engineers were invited to Motorola's *daily* operations meetings in Chandler, Arizona and participated in monthly operations reviews with Motorola subcontractors. (1/30/07 Morning Tr. 15:23–17:9 (Stamp)); Iridium engineers had full access to Motorola test facilities and factories. (1/30/07 Morning Tr. 16:22–17:1 (Stamp); 10/24/06 Tr. 175:14–176:11 (Bertiger)); Iridium engineers witnessed and participated in key engineering tests. (1/30/07 Morning Tr. 17:2–9 (Stamp); 10/24/06 Tr. 177:20–178:8 (Bertiger)); Iridium engineers were provided with a great

---

**33.** William Kraus was Iridium's Manager of Marketing Models and Simulation, and later, Senior Manager of Marketing Models and Simulations, and eventually named Executive Director of Marketing.

deal of technical documentation and studies related to the System and the progress of its development, and were free to ask for specific documentation they needed. (1/23/07 Tr. 54:11–19 (Adams); 1/30/07 Morning Tr. 15:23–17:9 (Stamp); 10/24/06 Tr. 177:13–20 (Bertiger))

The Iridium Board established the Technical Advisory Committee (TAC) to help keep the Board informed about technical issues, and to examine technical issues related to the performance of the Iridium System in providing satisfactory service to Iridium users. (MX 1211 at MOT 1402677 (4/20/94 BOD Minutes); MX 406 at MOT 930240–41 (4/20/94 BOD Meeting Materials); # 1/23/07 Tr. 54:20–55:18 (Adams); 11/29/06 Tr. 42:11–20 (Bennett)) TAC members included Iridium engineers and employees, as well as technical experts chosen by board members, (1/30/07 Morning Tr. 18:6–20 (Stamp); 10/24/06 Tr. 184:3–14 (Bertiger); 11/29/06 Tr. 41:3–43:21 (Bennett); MX 406 at MOT 930243 (4/20/94 BOD Meeting Materials)) and until 1997, the TAC held regular, daylong meetings that involved presentations on technical topics as well as open discussion among participants. (1/30/07 Morning Tr. 18:6–19:10 (Stamp); see, e.g., PX 84 at IR 061788 (12/15/96 TAC meeting materials)) Many of the engineers and other technical representatives who served on the TAC were also present during Iridium Board of Directors meetings. (11/29/06 Tr. 42:21–43:21 (Bennett)); see also 12/4/06 Tr. 166:21–168:13 (Hillis (Iridium BOD had "inside knowledge" regarding technical issues before Board meetings via their technical representatives))

At each Board meeting, Motorola gave a presentation regarding the technical status of the System, including progress on the SSC, any scheduling issues, and any new information on expected System performance to date. (12/4/06 Tr. 166:21–167:16 (Hillis); 11/15/06 Tr. 170:9–172:1 (Mitchell); 11/7/06 Tr. 9:14–20, 11:14–21 (Staiano); 10/24/06 Tr. 180:17–197:6 (Bertiger); 2/1/07 Tr. 45:21–46:9 (Schell); see, e.g., MX 912 at MOT 946292–325 (4/19/95 BOD Materials))

During the months leading up to commercial activation in late 1998, Mr. Staiano chaired a *daily* meeting to discuss the Iridium System's status and efforts to ready the system for activation. Motorola would generate, for Iridium's review, the *daily* action/status summary of key technical issues, expectations for the following day, constellation status (including load status of the latest software releases), call performance, ISU defect status, payload software defect status and Gateway status, among other things. All of these data were the result of an ongoing large-scale testing and data analysis effort by teams of Motorola engineers. (11/28/06 Tr. 51:7–53:18 (Borota[34]); 11/27/06 Tr. 87:5–23, 115:17–120:9 (Millington); 1/31/06 Tr. 15:12–19:3, 27:19–28:18 (Ranganathan); 11/7/06 Tr. 32:15–34:17 (Staiano)) MX 1190 at MOT 61445 *et seq.* (Daily Status Report for 11/1/98)

*B. Iridium Publicly Disclosed System Limitations to Investors*

In multiple public filings, including the 1995 S–1 Registration Statement and Private Placement Memorandum ("1995 PPM"), and subsequent public offering documents, Iridium described the limitations of the satellite voice service. In the context of what Iridium knew at the time, these descriptions were reasonable and accurate in describing the Iridium System's

---

**34.** Mark Borota was a Motorola engineer who joined the Iridium program in 1990 and had responsibility for the SSC, including the design and development of the satellite constellation and the satellite control center that operates the constellation.

projected performance. As a result, third parties were on notice as to the characteristics and limitations of the Iridium System. (*See* MX 631 at IR–B 25498, 25498–99; MX 68 at MOT 1,266,021, 1,266,021–22; PX 123 at MLUC 14668–69; MX 100 at MOT 967,732–33; MX 98 at MOT 958,557–58)

Iridium's January 21, 1999 prospectus for its secondary stock offering ("Secondary Offering Prospectus") confirms that the limitations of the System as delivered matched Iridium's prior expectations. Although it was prepared after commercial launch—after Iridium, the underwriters and others had used the System—the Secondary Offering Prospectus made virtually the same disclosures about satellite service limitations that had appeared in earlier disclosures. (MX 87 at MOT 2247456–457 (1/21/99 Prospectus)) Mondale testified, based on his experience as a current user of mobile satellite systems ("MSS") that these 1999 descriptions of service limitations were accurate in January 1999 "and accurate today as well." (2/9/07 Tr. 34:24–35:20 (Mondale))

### IV. IRIDIUM'S BUSINESS PLANS AND MARKET RESEARCH

From 1990 to 1998, Iridium (initially as a Motorola subsidiary) generated a series of business plans. These plans provided detailed information about Iridium's business, including estimates of the number of projected subscribers to the Iridium satellite voice and paging services, anticipated minutes of use of those services, expected pricing of the service and handsets, and revenues to be derived from subscriber usage. (MX. 384 (12/90 BP); MX 396 (12/91 BP); PX 253 (8/92 PPM); MX 409 (4/95 Market Analysis); MX 1274 (detailed 1995 projections and financials); MX 780 (BP 2.0); MX 734 (BP 2.x Update); MX 353 (BP 3.0))

### A. Early Iridium Business Planning And Market Research

Iridium's initial subscriber projections were based on a "top-down" analysis using several different inputs (10/25/06 Tr. 8:14–9:7 (Gercenstein); 3/12/07 Tr. 31:16–33:9 (Bradlow [35])) The process involved developing projections that would be supported by the capabilities of the system and that would meet the needs of the business plan. (10/25/06 Tr. 106:2–10, 123:19–124:8 (Gercenstein))

Gercenstein believed the early subscriber projections were reasonable and realistic based on the information known at the time. (10/25/06 Tr. 99:6–22, 86:23–87:21, 122:24–123:16 (Gercenstein); MX 392 at MOT 1,266,593–597 (2/91 Consortium Meeting Materials))

The earliest primary market research done for the Iridium offering was the Arthur D. Little ("ADL") analysis of U.S. Demand for Iridium Type Services conducted in 1991 (the "6/91 ADL Study"). (PX 1036 (6/91 ADL Study)) The 6/91 ADL Study was conducted to validate the original projections that had been created (10/25/06 Tr. 92:23–93:8 (Gercenstein)) and contained market estimates for U.S. subscribers as of 2000 and 2007. (3/12/07 Tr. 55:18–56:23 (Bradlow); PX 1036 at IR 97592, 97595 (6/91 ADL Study))

Question 3 of the ADL survey, described the Iridium service as follows: "There will soon be a new personal telephone service which at a reasonable cost will provide you with the capability to be reached or to place calls anywhere in the world using

---

**35.** Dr Eric Bradlow is a professor of marketing statistics and education at the Wharton School of the University of Pennsylvania who was qualified as an expert in marketing, market research and forecasting.

satellite technology, which is not limited in coverage like a cellular phone. To access the service you would have a small handset that fits in your pocket ..." (PX 1036 at IR 97697 (6/91 ADL Study))

This description described the global coverage of the satellite service, as contrasted to the limited geographic coverage of cellular at the time. (10/25/06 Tr. 27:2–23, 28:13–29:5, 93:9–18 (Gercenstein); 3/12/07 Tr. 52:5–53:7 (Bradlow); MX 438 at ADL 120365–66 (12/96 ADL memo re Technical Competitive Assumptions); MX 535 at CH–NY 0034121 (10/97 ADL Technical Information Memoranda)) Despite the Committee's challenge to the "anywhere in the world" language used in this survey question, the Court finds that the question was reasonably descriptive of the geographical scope of the service and that it was not necessary to include language regarding service limitations within the question.

Prospective Iridium investors were briefed on the results of the 6/91 ADL Study at the June 1991 investor conference. Early investors, Goldman Sachs and later Coopers & Lybrand (consultants to the Global Arrangers of Iridium's bank debt, "C & L") received a copy of the 6/91 ADL Study, including the questionnaire. (2/9/07 Tr. 146:2–9 (Attwood); MX 395 at MOT 3,111,163–176 (6/91 Investor Consortium Meeting Materials); 2/28/07 Tr. 19:13–20:2 (Kenny [36]); MX 1042 at IR 133140 (Index of market research documents provided to C & L/syndicate banks))

Upon the closing of the 1992 PPM, Iridium took over responsibility for the mar-

keting projections and the business plan (10/25/06 Tr. 78:11–15 (Gercenstein)) and continued to update, refine and reevaluate those projections. (10/25/06 Tr. 135:25–136:7 (Gercenstein))

During this same time period, Iridium and Motorola commissioned market research studies and assessments, including a 1993 two-volume study conducted by Booz Allen & Hamilton ("Booz Allen" or "BAH"). (MX 402 (BAH 1993 2–Volume Market Study ("1993 BAH Study")))

The 1993 BAH Study was designed "to provide an independent analysis of issues related to [the Iridium] project and its business potential." (11/6/06 Tr. 22:11–20 (Mondale)) To that end, Booz Allen assessed Iridium's technical feasibility by analyzing things such as coverage, capacity, continuity of service, voice quality, satellite reliability and maintenance requirements. (12/7/06 Tr. 13:6–14:6 (Cornet [37]); *see also* MX 402 (1993 BAH Study)).

Prospective investors and Goldman Sachs were provided with a copy of the 1993 BAH Study. (11/6/06 Tr. 22:11–14 (Mondale); MX 402 at MOT 1,334,726–733 (2/93 BAH letter re: provision of study to Iridium investors); 2/9/07 Tr. 159:4–160:2 (Attwood))

In early 1995, Iridium reexamined its business plan and reaffirmed the subscriber and revenue projections contained in the 1992 PPM. (MX 409 at MOT 1,324,029 (4/95 Market Reassessment)); MX 408 at MOT 3095950 (4/95 Mondale memo); 2/9/07 Tr. 16:17–25 (Mondale (Iridium be-

---

**36.** Lawrence Kenny was a Coopers & Lybrand partner, who led C & L's Iridium marketing due diligence activities on behalf of Iridium's Global Arrangers from 1996–1997.

**37.** Dr. Edward Cornet is a Vice President and Division Manager at Booz Allen in its worldwide technology business group, which focuses specifically on the space systems industry. Dr. Cornet and his team assessed the Iridium system technology for Booz Allen from 1992 to 1997, in connection with various market assessments that were then being performed by Booz Allen.

lieved projections underlying 1995 S–1 were reasonable))

Goldman Sachs also conducted due diligence on the Iridium business plan in 1995 in connection with Iridium's proposed debt offering. As part of that due diligence, Goldman Sachs re-examined and re-affirmed the 1995 projections and business plan. (2/9/07 Tr. 121:3–5, 128:7–15 (Attwood (Goldman Sachs believed the projections underlying the 1995 S–1 were reliable)))

By 1996, Iridium's marketing department included over 100 employees, (2/9/07 Tr. 19:14–21; 21:13–19 (Mondale); 11/8/06 Tr. 160:10–19 (Nadkarni)) many of whom had backgrounds in consulting, satellite, and telecom businesses. (2/7/07 Tr. 82:17–84:1, 85:21–86:9 (Kraus))

Dr. Prakash Nadkarni led the day-to-day activities of the marketing department during this time. Dr. Nadkarni was responsible for serving as an "interface" between the Iridium marketing and engineering departments, and to ensure that the "technical implications [and] constraints" of the Iridium System were taken into account in Iridium's marketing and business planning. (11/8/06 Tr. 112:7–113:17 (Nadkarni))

### B. The 1996–1998 Market Research

By early 1996, Iridium had begun the process of rewriting its business plan. (2/9/07 Tr. 17:9–18:10 (Mondale)) This involved a re-examination of Iridium's business proposition and intended markets, along with a new, large-scale primary market research campaign. (11/8/06 138:12–140:2 (Nadkarni); 1/23/07 Tr. 77:20–80:7 (Ohlandt); 2/7/07 Tr. 87:15–89:14 (Kraus); 2/9/07 Tr. 20:8–21:12 (Mondale); MX 780 at IRID–WH 244688 (BP 2.0))

In contrast to its earlier business plans, Motorola's marketing expert Dr. Bradlow confirmed that Iridium used a "bottoms-up" methodology to size its markets for the 1997 and 1998 business plans. (3/12/07 Tr. 69:22–72:11 (Bradlow))

These market research efforts were very complex, utilizing extensive survey instruments and sophisticated methodologies. (2/7/07 Tr. 100:18–101:13 (Kraus)) The research studies were executed on a massive scale and involved a significant commitment of resources. (1/23/07 Tr. 163:11–164:4, 178:2–8 (Ohlandt); 2/7/07 Tr. 98:23–99:14 (Kraus); MX 780 at IRID–WH 244688 (BP 2.0); MX 353 at IR–M 35260 (BP 3.0); MX 306 at IR 1094 (7/97 C & L Final Report))

Iridium's market research efforts was designed to achieve three primary goals-to size the potential market for MSS services, to estimate the portion of that market that would likely subscribe to Iridium over a competitor and to estimate the minutes a potential subscriber would use the Iridium services (satellite, paging and/or cellular roaming). (2/7/07 Tr. 91:21–94:15 (Kraus); 3/12/07 Tr. 81:11–83:12 (Bradlow)) Portions of the market research were also designed to gather information about pricing sensitivity to be used by Iridium in setting its product and airtime pricing. (2/7/07 Tr. 109:14–114:14 (Kraus))

The result of this market research process was six studies, which were used as inputs to the forecasts and projections in Iridium's BP 2.0, 2.x, 2.x Update, and BP 3.0: (MX 780 at IRID–WH 244688 (BP 2.0; see also 2/9/07 Tr. 22:4–12 (Mondale)))

?? AT Kearney Study of Demand for Mobile Satellite Services by the High Income International Professional Traveler (PX 156; see also MX 307 at PWC 92441–473—Appendix E (7/97 C & L Final Report Appendices));

?? The Gallup Organization Survey of Demand for Global Stand–Alone

Paging Services (MX 51; *see also* MX 307 at PWC 92474–479—Appendix F (7/97 C & L Final Report Appendices));

?? The Gallup Organization Survey of Demand for Satellite and ICRS Services (MX 246; *see also* MX 307 at PWC 92480–513—Appendix G (7/97 C & L Final Report Appendices));

?? The Gallup Organization Survey of Demand for Iridium Roaming Services Among Frequent and Infrequent Travelers (PX 157; *see also* MX 307 at PWC 92514–556—Appendix H (7/97 C & L Final Report Appendices));

?? Booz Allen & Hamilton Study of the Corporate/Industrial Market for Roaming Services (PX 158; *see also* MX 307 at PWC 92668–703—Appendix K (7/97 C & L Final Report Appendices));

?? Booz Allen & Hamilton Analysis of Usage (MX 842; *see also* MX 307 at PWC 92557–667—Appendices I, J (7/97 C & L Final Report Appendices))

Gallup, Booz Allen and AT Kearney were qualified and capable market research firms. (12/13/06 Tr. 116:22–117:23, 145:12–21 (Kraemer[38]) (2/7/07 Tr. 150:3–23 (Kraus); 1/23/07 Tr. 80:17–81:7 (Ohlandt); 11/8/06 Tr. 180:13–181:1 (Nadkarni)))

*C. Translating Market Research Into Projections*

Iridium analyzed the raw market research data and used computer models to develop actual subscriber and usage projections. (MX 780 at IRID–WH 244713 (BP 2.0))

The process of translating the raw data into projections was influenced by advice from consultants to the Global Arrangers.

Iridium discussed with C & L the various analytical steps it was performing on the raw data and provided substantial documentation of its analysis to C & L, including mathematical models. Iridium made changes in its analysis in response to comments from C & L. (2/8/07 Tr. 8:17–10:1 (Kraus)) C & L also participated in the process of determining the number of potential Iridium subscribers. (11/6/06 Tr. 205:24–206:15 (Kenny))

Because Iridium assumed the System was to be used only as a communications means of last resort, it assumed that users would be willing to take reasonable steps to accommodate to the limitations of the system, such as moving to locations where the phone might work better. (2/8/07 Tr. 62:5–63:3 (Kraus)) Thus, limitations were recognized but assumed to be acceptable inconveniences to prospective users of the service. Iridium also utilized filters (the same ones used by Booz Allen in its usage assessment), in an attempt to capture only those minutes of usage that could be expected on the Iridium System, based on where the System was expected to work and the availability of other superior communications options. (2/8/07 Tr. 11:18–13:2 (Kraus))

Iridium assumed for purposes of estimating mobility minutes of usage that subscribers would prefer using their cellular phone and would use that first if they could connect to their cellular network; in descending order of preference, subscribers would next consider using an Iridium device on a cellular network if that was an available option; subscribers were assumed to choose their satellite phone as a

---

**38.** Joseph Kraemer, the Committee's marketing expert, was the partner-in-charge at AT Kearney when the AT Kearney study of International Professional Travelers was completed and provided to Iridium and when it was subject to due diligence by C & L.

last resort only if they had no cellular or roaming option. (2/8/07 Tr. 12:17–20 (Kraus); 12/13/06 Tr. 166:17–169:5 (Kraemer); MX 306 at IR 1154 (7/97 C & L Final Report) ("Only potential call minutes made beyond existing coverage accrue to Iridium MSS network."))

### 1. KPMG Financial Models

KPMG was retained to develop financial models to be used to generate and analyze the subscriber and revenue estimates in Iridium's BP 2.0, BP 3.0 and Business Financial Plans. (1/31/07 Tr. 169:23–170:1 (Blough [39])) KPMG developed three models for Iridium—financial, demand and pricing. (1/31/07 Tr. 120:4–121:18, 127:24–129:4, 129:23–130:21 (Blough)); 11/6/06 Tr. 200:16–201:1 (Kenny); MX 707 (12/96 memo re: scope of work for demand model); (MX 708, MX 709 (11/96 letters re: pricing model)); MX 710 (summary of inputs to summary financial model); MX 838 (2/97 C & L summary of KPMG demand model)

One of the purposes of the financial model was to allow the Global Arrangers to analyze and mitigate the risks of financing the Iridium project. (1/31/07 Tr. 120:24–122:16, 147:6–11, 149:4–11, 151:19–152:16, 182:12–184:5 (Blough); 12/11/06 Tr. 124:3 –22 (Daverio); MX 714 (11/20/96 letter from Global Arrangers re: risk factors to be incorporated in financial model from KPMG files)) The Global Arrangers were satisfied with the KPMG models as delivered to them. (1/31/07 Tr. 173:4–174:7 (Blough))

Representatives from KPMG, Iridium, the Global Arrangers, C & L and ADL developed the sensitivity analyses and risk factors addressed by the models via a collaborative effort. (1/31/07 Tr. 121:19–123:1, 147:6–15 (Blough); MX 713 (notes of 11/96 meeting between Global Arrangers, KPMG, ADL and C & L re: model); MX 714 (11/96 letter from Global Arrangers re: requirements for financial model with lists of risk factors identified by ADL and C & L)) C & L and ADL provided input about the risk factors they wanted incorporated into the financial model. (12/11/06 Tr. 125:24–127:5 (Daverio); 1/31/07 Tr. 147:12–152:16 (Blough); MX 714 (11/96 letter from banks re: requirements for financial model with lists of risk factors identified by ADL and C & L))

The variables in the financial model included: the effect of lower than expected performance of the Iridium System; delay in development and activation of the system; less than expected market access in key markets; errors in market research and analysis; and greater than expected competition from terrestrial cellular and other satellite providers. (MX 714 at KPMG 4741–4746; *see also* 1/31/07 Tr. 184:6–15 (Blough (risk factors identified in MX 714 were addressed in the final KPMG model); 12/11/06 Tr. 125:24–127:5 (Daverio); MX 714 at KPMG 4739 (Chase letter re KPMG Financial Model); MX 715 at IR 45852, IR 45863 (Financial Model Status Report)))

### 2. Business Plan 2.0

In April 1997, Iridium released its BP 2.0, that included the ICRS offering and that gave subscribers the option of selecting satellite service, roaming service or both. (MX 443 (3/97 Mondale memo re: BP 2.0)) The addition of the ICRS offering to Iridium's business plan was presented to and formally approved by Iridium's Board of Directors. (MX 442 at MOT

---

**39.** Dr. Stephen Blough was the KPMG Partner in charge of developing the financial models used to generate and analyze the subscriber and revenue estimates in Iridium's BP 2.0, BP 3.0 and Business Financial Plans.

926,312–313 (1/97 BOD Meeting Minutes); MX 447 at IR 140647 (4/97 BOD Meeting Minutes)); 11/6/06 Tr. 75:10–77:1, 84:5–85:6 (Mondale) The March 31, 1997 Iridium Business Financial Plan was produced in conjunction with BP 2.0 and provided detailed projections, and information about the assumptions underlying them. (MX 243 (Iridium 3/31/97 Business Financial Plan))

Iridium believed that the market research instruments, the modeling, and the due diligence that went into BP 2.0 resulted in defensible forecasts that were appropriate to use in BP 2.0. (2/9/07 Tr. 30:12–22 (Mondale); 2/8/07 Tr. 14:3 –7 (Kraus)) Iridium believed that the projections in BP 2.0 were reasonable, and these projections were the result of a carefully managed, deliberative process. (2/9/07 Tr. 30:12–22 (Mondale))

The Court finds that the process that produced the projections in BP 2.0, including market research and analysis, was carefully planned, thoughtfully considered, and diligently executed. The work product was subject to internal and external review. As a result, the projections in BP 2.0 were reasonable when they were prepared.

### 3. Business Plans—2.x, 2.x Update and 3.0

Iridium released its BP 2.x update in November 1997 (MX 734 (BP 2.x Update)) and its updated BP 3.0 and updated Business Financial Plan in August 1998. (MX 353 (BP 3.0))

Iridium believed that its business plan forecasts remained "legitimate and accurate" even after commercial launch of the system. (2/9/07 Tr. 37:14–17 (Mondale); see generally 2/9/07 Tr. 35:21–37:24 (Mondale))

### D. Marketing Expert Opinions

Motorola's marketing expert, Dr. Eric Bradlow, testified regarding the market research and business planning by Iridium from 1990 to 1998. (3/12/07, 3/14/07 Tr. (Bradlow)) Dr. Bradlow examined Iridium's business plans from 1990 to 1998, including the underlying market research and methodologies used to create those plans. (3/12/07 Tr. 9:22–12:22, 22:17–27:16 (Bradlow)) Dr. Bradlow examined the numerous sources of support for the 1997 BP 2.0 and BP 2.x update, as well as the underlying projections, and concluded that they were reasonable. (3/12/07 Tr. 66:23–69:21, 111:18–117:19 (Bradlow))

Dr. Bradlow expressed the opinion that:

?? Iridium's projections as of June 30, 1995, November 30, 1997 and December 31, 1998 were the product of a reasonable and appropriate forecasting process; including the underlying market research and data, and that the resulting forecasts were reasonable. (3/12/07 Tr. 10:10–13, 13:2–17:11 (Bradlow))

?? The market research underlying these business plans—including the challenged 1991 ADL and 1997 Gallup Frequent/Infrequent (F/I) study—were appropriate and reliable inputs. (3/12/07 13:6–18, 15:19–16:4, 37:2–10, 84:3–24 (Bradlow))

He also confirmed that the "top-down" approach used by Iridium is typical for early-stage start-up companies, such as Iridium in 1991–1995. (3/12/07 Tr. 35:6–36:12 (Bradlow))

The Committee's marketing expert, Joseph Kraemer, challenged the reasonableness of the projections contained in Iridium's Business Plan 2.0 and expressed the opinion that the market research for those projections materially overstated the addressable market for professional business

travelers largely because of the service descriptions used in Iridium's market research instruments. (Tr. 12/13/06 13:12–18 (Kraemer)) Although Mr. Kraemer was impressive and offered instructive testimony regarding the methodologies used in market research, the Court agrees with Dr. Bradlow and finds that the market research underlying the Gallup F/I study was appropriate.

## V. IRIDIUM'S BANK LOANS

### A. Global Arrangers' Due Diligence

Chase Securities, BZW and Barclays were the Global Arrangers for Iridium's 1996–1998 bank loans. (2/7/07 Tr. 6:16–7:5 (Cassin [40]); MX 777 at MOT 942,559 (4/17/96 BOD Minutes))

The first loan that the Global Arrangers arranged for Iridium was in August of 1996 for $750 million and was fully guaranteed by Motorola. (2/7/07 Tr. 10:18–20 (Cassin); MX 291 at MOT 1,438,648 (8/21/96 Credit Agreement))

On December 19, 1997, Iridium entered into an agreement for a $1 billion credit facility with a syndicate of banks (the "Banks") led by the Global Arrangers. This facility was secured by the assets of Iridium, including a pledge of Iridium's rights in the $243 million reserve capital call upon Iridium's initial equity investors and the FCC license for the Iridium System held by a Motorola subsidiary. (2/7/07 Tr. 16:2–15 (Cassin); MX 539 (12/19/97 Credit Agreement); MX 313 at IR 12618 (10/97 Confidential Information Memorandum))

This credit facility was 1.7 times oversubscribed and was increased from the originally proposed amount of $750 million because of the "excellent response" by the Banks. (MX 783 at IR 73890 (11/24/97 Banking & Finance Committee Materials))

On December 23, 1998, Iridium Operating LLC entered into two loans with the Banks: (i) a $750 million Senior Guaranteed loan, fully guaranteed by Motorola, and (ii) an $800 million Senior Secured loan, secured by the assets of Iridium and its affiliates (including the FCC license for the Iridium System, which was held for Iridium by a Motorola subsidiary) and a $300 million standby guarantee from Motorola. (2/7/07 Tr. 42:16–43:4 (Cassin); MX 319 (11/6/98 Confidential Information Memorandum); MX 794 at MOT 1,438,854 (12/23/98 Iridium Press Release); MX 315 ($750M Senior Guaranteed Credit Agreement); MX 546 ($800M Senior Secured Credit Agreement); MTX 66 at CH–DE 0093567–69 (Second Amended and Restated MOU))

The December 1998 loans re-financed $271.5 million outstanding on the 1996 Guaranteed Facility and the $410 million outstanding on the 1997 Secured Facility. (See MX 501 at MOT 1,379,027, 1,379,100–101 (Iridium 1998 10–K))

The Banks included a number of lenders that had not participated in the 1997 loans. (2/7/07 Tr. 57:3–14 (Cassin); MX 549 at CH–DE 7736 (12/16/98 Chase Interoffice Memo re Iridium Update))

In deciding to make loans to Iridium, the Global Arrangers focused on Iridium's ability to repay the loans. (2/7/07 Tr. 6:4–15 (Cassin); MX 714 at KPMG 4738 (11/20/96 letter re Financial Model ("the Global Arrangers will require sufficient model detail to determine the impact of such risks on the ability of Iridium to repay its debt obligations"); 2/26/07 Tr. 105:13–106:21 (Pfleiderer))) The Global Arrangers were concerned about the Banks'

---

**40.** Thomas Cassin worked in Global Syndicated Finance at Chase Securities, and was the Chase banker principally responsible for the loans to Iridium from 1996 to 1998.

ability to get repaid, and thus focused on what would happen in a downside case. (2/7/07 Tr. 20:19–21:2, 28:19–29:11 (Cassin); 2/26/07 Tr. 105:22–106:21 (Pfleiderer); 12/5/07 Tr. 34:25–35:4 (Maul))

In addition to the due diligence conducted by the Global Arrangers' marketing and technical consultants on the issue of Iridium's ability to repay the loans, the Global Arrangers also assessed Iridium's overall capital structure and financing plan. (MX 545 at CH–NY 1335 (Iridium Screening Script); MX 544 at CH–NY 4969 (11/14/98 Chase Structuring Summary); MX 313 at IR 12604, 609 (10/97 Confidential Information Memorandum); MX 319 at IR–B 60049, IR–B 60063 (11/98 Confidential Information Memorandum))

The Global Arrangers analyzed Iridium's financing requirements, financing plan and sources and uses of funds. (MX 537 at CH–DE 80726 (12/97 Closed Deal File)); MX 544 at CH–NY 4959–61 (11/14/98 Chase Structuring Summary (discussing financing needs, sources and uses of funding, and analyzing cash flows)); MX 545 at CH–NY 1335 (Iridium Screening Script (examining sources and uses and capital structures)); MX 313 at IR 12604, 12607 (10/97 Confidential Information Memorandum (examining sources and uses and cash flow for debt service); MX 319 at IR–B 60049 (11/98 Confidential Information Memorandum))

Iridium provided the Global Arrangers and their consultants with information about the company and its business plan, including risks associated with the business plan. Iridium was fully responsive to questions and requests for information of the Global Arrangers and their consultants. (1/25/07 Tr. 28:1–30:12, 32:5–9 (Lavin); 11/7/06 Tr. 66:10–24, 67:5–16 (Staiano); MX 635 at IR 128838 (6/21/96 Due Diligence Memo))

Chase representatives were allowed to sit in on Iridium board meetings, they participated in a test call over the Iridium System in December 1997, the purpose of which was "to ensure that [the system] will meet the Banks' expectations," and they were invited to participate in the daily calls Dr. Staiano held in the months leading up to commercial activation. (11/7/06 Tr. 36:7–18, 67:11–16 (Staiano); MX 451–LM at IR 21489 (11/97 Mondale memo re: Bankers' Voice Demonstration))

Chase was aware that there were limitations in how well the Iridium satellite service would work in cities and in buildings and had the ability to discern for themselves, through their advisors, the extent of those limitations and what, if any, effect these limitations would have on the Banks' exposure to risk. (2/7/07 Tr. 40:1–12 (Cassin); MX 313 at IR 012667 (10/97 Confidential Information Memorandum))

Cassin believed that the Banks had enough information to understand the limitations of the Iridium satellite service. (2/7/07 Tr. 41:18–25 (Cassin))

In connection with its analysis, the Global Arrangers examined Iridium's capital structure based on book and market values. (MX 545 at CH–NY 1335 (11/99 Iridium Screening Script $1.5BN Senior Credit Facilities); MX 319 at IR–B 60049 (11/98 Confidential Information Memorandum); 2/27/07 Tr. 128:18–130:2 (Pfleiderer))

The Global Arrangers concluded that Iridium had a sufficiently strong capital structure as of December 1997 to raise $2.2 billion in debt and equity from strategic investors and had a market cap of approximately $6.2 billion. (2/7/07 Tr. 30:3–9 (Cassin); MX 313 at IR 12609 (10/97 Confidential Information Memorandum))

On the basis of both its own due diligence and that of its marketing and technical consultants, Chase believed that Iridium would be able to repay or refinance the loan, that the Banks were adequately secured, and that the Banks would be made whole. (2/7/07 Tr. 32:25–33:10, 60:15–22 (Cassin)) These conclusions were based in part of the work performed by C & L as marketing expert and ADL as technical expert for the Global Arrangers. (2/7/07 Tr. 8:15–9:2 (Cassin)) These entities were capable and qualified to conduct due diligence for the Banks. (12/13/06 Tr. 145:22–146:13 (Kraemer))

### B. The C & L/ADL "Banking Case"

In connection Iridium's credit facilities, the Global Arrangers hired C & L to perform business diligence and provide the Global Arrangers with a "banking case" scenario.

From May 1996 to October 1997, C & L conducted extensive due diligence on Iridium's marketing and distribution plans, including the underlying market research and analysis. (2/7/07 Tr. 7:16–14, 36:5 –12 (Cassin); 2/28/07 Tr. 4:7 –11, 5:1–8 (Kenny)), and

C & L was involved in the rewrite of Iridium's business plan in 1996 and 1997. (MX 780 at IRID–WH 244688, 244713 (BP 2.0))

The C & L due diligence team ranged in size from 20 to 60 people (2/28/07 Tr. 5:12–16 (Kenny)), and included telecom specialists in all major regions of the world. (11/6/06 Tr. 156:18–157:1 (Kenny))

C & L engaged Opinion Research Corporation ("ORC") as a subcontractor on the project to serve as subject matter experts in the areas of survey design, research, and execution, as well as subsequent analysis of data. (2/28/07 Tr. 29:21–30:14 (Kenny); 2/7/07 Tr. 90:2–16 (Kraus))

C & L understood the importance of the professional traveler segment to the overall business plan and so looked particularly closely at that component of the forecast. (11/6/06 Tr. 161:18–162:4 (Kenny)) C & L recognized that the business traveler targeted by Iridium was not the typical business traveler, but rather the business traveler going to areas where terrestrial communication services were not available. (2/28/07 Tr. 7:7–17, 8:3–7, 55:19–25 (Kenny); 11/6/06 Tr. 262:15–24 (Kenny); MX 780 at IRID–WH 244667 (BP 2.0))

At the outset of its work, C & L was briefed extensively on the Iridium business plan, service offerings and limitations, target markets, and completed and planned market research. (11/6/06 Tr. 166:18–167:11 (Kenny); MX 223 (7/96 C & L Project Immersion materials); MX 225 (7/97 Iridium Marketing and Regulatory Plan Review presentation to C & L); MTX 155 (C & L list of all market research provided)). As part of this briefing, C & L was given copies of all of Iridium's marketing reports and distribution plans. (11/6/06 Tr. 167:15–168:1 (Kenny); see also MX 223 at PWC 40805–38 (C & L 7/96 Project Orientation Materials); MX 1042 (C & L market research index); MTX 155 (C & L list of all market research provided)) This included copies of the 1991 ADL Study, and the 1993 and 1996 BAH studies. (2/28/07 Tr. 19:24–20:2 (Kenny); MX 1042 at IR 133140 (C & L index of all market research received from Iridium, including ADL 1991 study); MX 223 at PWC 40805–38 (C & L 7/96 Project Orientation materials with summaries of all Iridium market research, including 1994 DS Howard, 1993 BAH Study, 1996 BAH Study))

C & L reviewed and assessed all of Iridium's past market research, including the service descriptions used in such research. (11/6/06 Tr. 175:8–16 (Kenny))

During its due diligence, C & L had meetings with the Iridium marketing team several times a week, and also exchanged emails and phone calls. In some cases, C & L had people working on site in Iridium's offices. (2/8/07 Tr. 10:2–11 (Kraus); see also 11/6/06 Tr. 85:14–86:4 (Mondale))

The due diligence effort was broken into two phases. Phase One consisted of an examination and analysis of Iridium's existing market research and business plan. Phase Two involved all aspects of the re-write of Iridium's business plan. (2/28/07 Tr. 17:25–18:15, 29:10–20 (Kenny))

Phase Two of C & L's due diligence began in October 1996 and continued through the development and release of Iridium's Business Plan 2.0, culminating in a July 1997 final report to the Global Arrangers. (2/28/07 Tr. 28:20–29:19, 33:14–34:11, 44:14–46:8 (Kenny); see also MX 435 (C & L Phase II Scope of Work); MX 306 (7/97 C & L Final Report); MX 307 (7/97 C & L Final Report Appendices))

C & L and ORC were involved in every step of the design and execution of the market research initiated after C & L's engagement—including the six studies that went into Iridium's Business Plan 2.0. (2/28/07 Tr. 29:10–20 (Kenny); 11/7/06 Tr. 16:23–18:16 (Staiano); 11/6/06 Tr. 61:3–16, 62:18–63:2 (Mondale); MX 435 at IR–B 54114 (11/96 C & L letter re: expansion of scope of work ("Coopers will be involved in every step of the proposed research")); 2/28/07 Tr. 6:14–24 (Kenny); see also MX 837 (12/96 Market Research Workplans); MX 780 at IRIDWH 244688, 244713 (BP 2.0))

C & L and ORC participated in the design of the studies conducted during the Phase Two due diligence. Because these studies were initiated during C & L's engagement, C & L and ORC were able to work closely with Iridium and the relevant research entities in charge of the studies on all aspects of the survey design, including reviewing the content of the surveys on a question by question basis. (2/28/07 Tr. 30:20–31:12, 36:4–10, 40:15–19 (Kenny); 1/23/07 Tr. 84:13–85:24, 86:20–87:5, 88:3–14 (Ohlandt); see also MX 435 (11/96 C & L letter re: expansion of scope of work); MX 307 at PWC 92514 (7/97 C & L Final Report Appendices))

Only after C & L and ORC were satisfied with the research design for each of the market research studies, including the specific wording of the questionnaire to be used during the research, did Iridium proceed to the execution stage. (1/23/07 Tr. 125:12–126:15 (Ohlandt); MX 336 (memo re sign-off from C & L))

C & L reviewed all steps of the analysis of the raw data from the surveys as well as translation of that data into the subscriber, usage and revenue projections in Iridium's Business Plan 2.0. (2/28/07 Tr. 31:18–32:21 (Kenny); 2/7/07 Tr. 121:18–122:23, 127:16–128:24, 174:7–17, 175:13–176:6 (Kraus)) The process of translating the survey data into these projections was complex and involved the use of a number of detailed analyses and sophisticated computer models, including a model, which allowed C & L and the Global Arrangers to analyze the effects of different assumptions and findings on the revenue case going forward. (11/6/06 Tr. 184:19–186:1 (Kenny); see also MX 828 (10/96 C & L letter re Interim scope of work)) The model took into account risks such as adoption rate, price movements, usage levels, and distribution constraints, as well as certain technical risks. (11/6/06 Tr. 186:24–187:24 (Kenny))

C & L had individuals on its Iridium due diligence team with telecom and technical experience, on whom C & L also relied for its understanding of system capabilities. (2/28/07 Tr. 8:19–22 (Kenny)) C & L repre-

sentatives visited Motorola facilities in Arizona and talked to Motorola engineers and believed the people with whom it interacted at Iridium were knowledgeable about the expected characteristics of the product and service. (11/6/06 Tr. 164:23–165:23 (Kenny))

From the outset of its role as marketing due diligence consultant to the Global Arrangers, C & L understood that the Iridium system would work optimally when the terminal or the antenna on the terminal had a clear view of a satellite in the sky but that obstructions would lessen or eliminate the ability to create or maintain a connection. (2/28/07 Tr. 12:5–21 (Kenny); 11/6/06 Tr. 172:15–173:25 (Kenny); *see also* MX 824 (7/23/96 Information exchange meeting notes)).

During its due diligence, C & L also worked closely with the Global Arrangers' technical advisor, ADL. (2/28/07 Tr. 9:2–10 (Kenny)) ADL served as C & L's primary source of technical expertise and understanding of system capabilities. (2/28/07 Tr. 8:14–18 (Kenny)) The two advisors coordinated so that ADL's technical knowledge was conveyed to C & L and properly reflected in the marketing due diligence, including the Iridium Business Plan 2.0. (MX 436 at IR 4234–36 (11/96 ADL letter re expanded scope of work); MX 438 at ADL 120364 (12/96 ADL memo re technical competitive assumptions); MX 437 (11/96 ADL memo re technical competitive assumptions))

One of ADL's primary responsibilities was to highlight any technical risks that might impact the technical performance of the system, especially those that might impact a subscriber's decision to buy the service. (2/13/07 Tr. 17:20–19:5, 24:23–25:12 (Maul); 12/5/06 Tr. 27:2–25 (Maul); 2/9/07 Tr. 23:13–24:5 (Mondale); MX 1129 at ADL 0138593, 138605 (6/27/96 ADL

Presentation); MX 1135 at ADL 0081543 (ADL 30 Day Due Diligence Report))

ADL had access to much, if not all, of the information generated regarding System performance and developed its understanding of System capability in real time in that ADL continued to learn more about the expected performance of the System and refined their understanding over time. (2/13/07 Tr. 34:4–35:23, 133:14–134:10 (Maul); 2/28/07 Tr. 88:19–89:25 (Kenny); MX 824 (7/23/96 Information exchange meeting notes)).

ADL reviewed from a technical standpoint the descriptions in the market research questionnaires of the various Iridium services. (2/13/07 Tr. 42:20–43:25, 51:13–18 (Maul); 12/5/06 Tr. 98:25–99:4 (Maul); 2/28/07 Tr. 31:13–17 (Kenny); MX 440 at IR 014976 (12/13/96 ADL detailed work schedule); MX 437 at IR 004210 (11/20/96 Memo re ADL Competitive Assumptions); MX 438 (12/20/96 Follow-up to Competitive Assumptions))

ADL concluded there were no major technical issues with the market research questionnaires. (2/13/07 Tr. 51:19–52:3 (Maul); 12/5/06 Tr. 99:19–100:4 (Maul); MX 440 at IR 014976 (12/13/96 ADL detailed work schedule)) To the extent ADL had questions or concerns about the market research questionnaires, it raised the issues with C & L and C & L agreed to take those issues into account when interpreting the results. ADL agreed this was an appropriate approach. (2/13/07 Tr. 52:4–54:15 (Maul); 12/5/06 Tr. 101:8–103:16 (Maul); MX 1141 at IR 004373 (2/28/97 ADL detailed work schedule); *see also* MX 1140 at ADL 0119328 (1/17/97 ADL detailed work schedule (ADL also sent comments or surveys to Iridium)))

ADL also concluded that Iridium's coverage was consistent with that assumed in the market research that formed the basis of Iridium's business plan. (MX 535 at

CH–NY 0034121 (10/97 ADL Technical Information Memoranda); 11/6/06 Tr. 74:23–75:9 (Mondale (ADL's assumptions about system performance "were consistent with the market research")))

After performing its due diligence, C & L prepared and provided the Global Arrangers with its final report, (MX 306) which contains a detailed analysis of Iridium's BP 2.0 projections, as well as C & L's more conservative projections—the Banking Case—and C & L's rationale for those more conservative estimates. (MX 306 at IR 1030–38, 1046–48, 1094–95 (7/97 C & L Final Report)) C & L's final report takes a downside or conservative approach in quantifying the various risks that it identified for the Banks. (2/28/07 Tr. 44:14–45:4 (Kenny)) C & L concluded that its findings "supported management in broad terms about the size of the total potential subscriber base." (2/28/07 Tr. 45:5–12 (Kenny); MX 306 at IR 1031 (7/97 C & L Final Report)) Likewise, C & L concluded, "We believe Iridium's strategy is a rational response to Management's view of the market opportunity." (11/6/06 Tr. 210:18–211:7 (Kenny); *see also* MX 306 at IR 1027 (7/97 C & L Final Report))

In C & L's summary (included in the Confidential Information Memorandum given to the lending syndicate for the 1997 loan), C & L detailed its downside projections and further stated its conclusion that "while Iridium's assumptions, methodologies and data are not unreasonable for an equity case, C & L has approached banking case revenues from a debt standpoint, which requires the use of additional caution and conservatism, both cases, Iridium and banking, reasonably define the most likely boundaries of the company's actual performance." (2/28/07 Tr. 48:21–49:5, 49:10–18 (Kenny); 2/7/07 Tr. 28:14–29:11 (Cassin); MX 313 at IR 12721 (10/97 Confidential Information Memorandum))

*1. ADL technical due diligence*

In May/June 1996 ADL was retained as a technical advisor by the Global Arrangers. (2/13/07 Tr. 6:5–9, 11:4–15, 7:15–23 (Maul)) ADL advised the Global Arrangers for two and a half years, performing technical due diligence on Iridium into December 1998, after Iridium's commercial launch. (2/13/07 Tr. 6:10–13 (Maul))

One of ADL's primary roles was to consult with and advise C & L in connection with its marketing due diligence and work in connection with BP 2.0.

During this time, ADL had, on average, 20 people working primarily on the Iridium project. (2/13/07 Tr. 24:12–17 (Maul)) Jeff Maul, who led the ADL due diligence effort, worked full time on the Iridium assignment for much of ADL's engagement. (2/13/07 Tr. 7:24–8:6 (Maul))

ADL had expertise in propagation, radio transmission, satellites, wireless telephone networks, telephone equipment, telephone handsets and paging devices, billing systems, computer systems, and antenna technology. To the extent ADL did not have a particular expertise in-house, it brought in qualified subcontractors with such expertise. (2/13/07 Tr. 8:7–10:14 (Maul); 12/5/06 Tr. 8:19–11:8 (Maul); MX 1127 (ADL Selected Qualifications); MX 1039 at CH–DE 39061 (ADL Pitch Materials))

ADL's work consisted of several major activities: 1) assessing for the Global Arrangers the Iridium technology and the risks it entailed; 2) drafting and monitoring the technical conditions precedent in the December 1997 loan; and 3) working closely with the Global Arrangers' marketing and other consultants to attempt to ensure they understood the system's technical limitations. (2/13/07 Tr. 12:10–22 (Maul); 12/5/06 Tr. 18:8–20:17 (Maul); *see*

*also* 12/5/06 Tr. 14:11–18:7 (Maul); MX 527 at ADL 0057140–7144 (ADL Engagement Letter))

### 2. ADL risk assessment

Because the lenders were interested in Iridium's ability to repay bank debt, ADL's focus during its risk assessment was to identify the technical risks that might impact Iridium's ability to meet its business plan and service its debt. (2/13/07 Tr. 21:8–22:12 (Maul); 12/5/06 Tr. 25:4–24; 32:6–18 (Maul); MX 430 at IR 008079 (ADL 90 Day Technical Due Diligence Report)) This included identifying risks to achieving the expected level of system performance. (2/13/07 Tr. 13:1–14:6 (Maul); MX 1135 at ADL 0081543–554 (ADL 30 Day Due Diligence Report); MX 1129 at ADL 138590–93 (6/27/96 ADL Presentation); MX 431 (9/11/96 ADL slides re Iridium Due Diligence Meeting))

ADL's risk assessment concluded that the Iridium System, as designed, would likely work and could be implemented on or close to the planned commercial activation date. ADL shared this conclusion and the reasoning behind it with the Global Arrangers and Banks in October 1997. (2/13/07 Tr. 67:5–14 (Maul); 12/5/06 Tr. 47:7–49:6 (Maul); MX 535 at CH–NY 034112 (10/97 ADL Technical Information Memorandum))

### 3. ADL understanding of system performance

Throughout its engagement, ADL worked to identify and predict the likely limitations of Iridium's satellite service. To that end, ADL drew on its prior experience with satellite systems, reviewed propagation and attenuation data, analyzed the technical operations of the satellites and created computer models. Based on his team's work, Maul believed that ADL understood how the Iridium System operated

and the factors that impacted its performance. (2/13/07 Tr. 137:7–15 (Maul)) Specifically, ADL believed in 1996 and 1997, prior to commercial launch, that Iridium satellite voice service would work best in open, clear line-of-sight conditions. (12/5/06 Tr. 76:19–77:16 (Maul))

ADL believed it was accurate to generally describe the satellite voice service as operating "outside major cities, in open areas or within buildings near outside walls or in vehicles with external antenna." ADL provided this description to C & L to aid in the development of the market research. (2/13/07 Tr. 46:8–47:18 (Maul); 12/5/06 Tr. 94:11–95:23 (Maul); MX 438 at ADL 120368 (12/20/96 ADL memo re Technical Competitive Assumptions for Market Research))

In late 1998, Maul tested the system by using Iridium handsets in a number of different environments. (2/13/07 Tr. 48:19–49:7, 133:8–14 (Maul)) Based on his own use of these handsets with the operational system, Maul believed ADL's description of the satellite service "got it right." (2/13/07 Tr. 46:8–47:18, 48:19–49:12 (Maul); MX 438 at ADL 120368 (12/20/96 ADL memo re Technical Competitive Assumptions for Market Research))

## VI. IRIDIUM PUBLIC AND PRIVATE EQUITY AND DEBT TRANSACTIONS

### A. Private Equity Investments

From 1992 to 1996, Iridium engaged in a series of private placements with a consortium of private investors, raising approximately $1.9 billion from these transactions. (MTX 1 at 3 (7/14/95 Form S–1); MX 632 at IRID–WH 36898–99 (2/19/96 Board Materials))

In August 1992, Iridium Inc. issued a private placement memorandum (PPM) in

connection with an $800 million private placement offering. (2/26/07 Tr. 93:10–94:6 (Pfleiderer); PX 253 (1992 PPM))

The 1992 PPM was the product of drafting and consultation among representatives from Iridium, Goldman Sachs and Motorola to ensure it was accurate based on the information known at the time. (1/23/07 Tr. 39:16–40:14 (Adams); 10/25/06 Tr. 46:21–47:24 (Gercenstein); 11/6/2006 Tr. 15:8 –16:7 (Mondale))

Jerry Adams, Iridium's then President and COO, was involved in preparing the 1992 PPM and reviewed it for accuracy and completeness prior to its issuance to potential private investors. (1/23/07 Tr. 39:16–40:14 (Adams); *see also* 12/4/06 Tr. 156:7–13 (Hillis (1992 disclosures were "accurate to the best of our ability")); 11/6/06 Tr. 15:8–16:7 (Mondale ("confident" that the 1992 disclosures were accurate)))

On July 29, 1993, the offering presented in the August 1992 PPM closed and the majority of Iridium, Inc.'s stock ownership was transferred from being wholly-owned by Motorola to a consortium of private investors. (MTX 17 (1993 SPA))

In May 1994, Iridium Inc. issued a private placement memorandum in connection with a $600,000,000 private placement offering. (2/26/07 Tr. 93:10–94:6 (Pfleiderer); MTX 108 (1994 PPM)) The private placement offering set forth in the May 1994 PPM closed in August 1994. (MTX 144 at MOT 1,418,864 (1994 SPA); MTX 108 (1994 PPM))

After the close of the 1994 supplemental private placements, Iridium had raised over $1.6 billion in equity, (MX 631 at IR–B 25480, 25482 (1995 PPM)).

In November 1995, Iridium, Inc. issued a private placement memorandum for 14½% Cumulative Convertible Preferred Stock and Units. Each Unit consisted of a $100,000 14½% Senior Subordinated Discount Note due 2006 and a Warrant to purchase 13.8777 shares of Common Stock of Iridium. (MX 631 (1995 PPM)) The private offering set forth in the November 1995 PPM closed on February 16, 1996. (MX 632 at IRID–WH 36898–99 (2/19/96 Board Materials))

The investors acknowledged in the SPA's executed for the 1993–1996 private placements that they: (i) received and reviewed the PPM; (ii) understood that the PPM did not contain all information that may be relevant or necessary to understand the complexities of the Iridium technology; (iii) had an opportunity to ask questions as needed to understand the Iridium System, and (iv) had "full access to such other information" relating to the Iridium System "as such Investor has requested." (2/1/07 Tr. 17:20–18:21 (Schell); MTX 17 at MOT 26,526 (1993 SPA); MTX 135 at IRID–WH 363 (IL & FS SPA); MTX 144 at MOT 1,418,876 (1994 SPA); MTX 145 at MOT 1,418,915 (Veba SPA); MTX 146 at MOT 1,419,020 (Iridium SudAmerica SPA); MTX 147 at MOT 1,419,090–91 (Korea Mobile SPA))

After the close of the offering in February 1996, Iridium had raised over $1.9 billion in debt and equity. MTX 1 at 3 (7/14/95 S–1); MX 632 at IRID–WH 36898–99 (2/19/96 Board Materials) This substantial private equity contribution by investors from 1992–1996 supports a finding of Iridium's solvency during that period, and the Court agrees with Motorola's experts on this point. (3/19/07 Tr. 25:14–26:2 (Den Uyl[41]); 2/26/07 Tr. 94:7–95:11

---

**41.** Bruce Den Uyl is a managing director and co-head of the financial advisory services practice at Alix Partners. Mr. Den Uyl was called by Motorola and was qualified as an expert in valuation and solvency.

(Pfleiderer [42]))

### 1. Due diligence associated with private investments

#### a. Goldman Sachs

Goldman Sachs served as placement agent for Iridium's 1992 and 1994 private equity offerings, and helped to identify and pursue the early equity investors. (2/9/07 Tr. 86:18–87:19, 95:7–14 (Attwood))

From 1991 to 1995, Goldman Sachs conducted due diligence on Iridium, including meeting with engineers involved in the project, reviewing market research studies and the business plan, and conducting sensitivity analyses of the Iridium business plan. (2/9/07 Tr. 96:12–98:15 (Attwood))

In connection with its due diligence, Goldman Sachs reviewed all the early market studies, including the 1991 ADL Study, the 1992 and 1993 BAH Studies and other marketing studies commissioned by certain private investors. (2/9/07 Tr. 97:20–22, 121:3 –5, 122:21–123:25, 146:2–9 (Attwood); MX 626 at IR–B 105447, 105450–51 (5/24/95 Due Diligence Document Index); MTX 18 (1992 BAH Study from GS files); MTX 19 (1993 BAH Study from GS files); MTX 130 (1992 McLaughlin Study from GS files); MTX 131 (1/93 BAH Presentation re: 1992 study from GS files))

Goldman Sachs also performed its own independent investigation of Iridium's business plan and concluded it was reasonable. ([1995 proposed] 2/9/07 Tr. 99:3–5, 128:7–15 (Attwood ("We [GS] would not have proceeded with that offering if we thought the business plan was unreasonable."))); see also MTX 10 at GSUC 5972 (9/12/96 Goldman IPO Pitch ("credibility of market and revenue projections" is a key variable for valuation)) As part of its due diligence, Goldman Sachs reviewed the System capabilities and limitations (2/9/07 Tr. 121:6–8 (Attwood)), saw videos regarding System performance (2/9/07 Tr. 127:24–128:6 (Attwood)) and learned how the Iridium System was expected to operate, including the line-of-sight limitations of the satellite system.

#### b. Early investors

The experience of Sprint Corp., as an early investor in Iridium, appears to be representative of the experience of other early investors in Iridium. Sprint and most of the other private investors were sophisticated businesses with experience in the telecommunications industry. (2/9/07 Tr. 91:3–6 (Attwood); 11/15/06 Tr. 162:9–163:25 (Mitchell); 2/1/07 Tr. 7:9–8:14 (Schell); MX 1113 at IRM–M 115157–60 (Investor Profiles); MX 501 at MOT 1,379,002 (Iridium 1998 10–K); MX 87 at MOT 2,247,508–510 (1/21/99 Prospectus))

Prior to investing in Iridium, Sprint and certain other of the private investors conducted thorough due diligence. (2/1/07 Tr. 8:23–9:13 (Schell); 2/9/07 Tr. 94:4–16 (Attwood); 1/23/07 Tr. 29:23–30:6 (Adams); 10/24/06 Tr. 149:13–22, 158:22–159:2 (Bertiger)) Sprint came to the decision to invest in the Iridium project with its eyes wide open following a detailed review of Iridium's business prospects and did so with knowledge of the line-of-sight limitations to the service. (2/1/07 Tr. 19:19–23, 22:5–24:8, 32:12–33:10, 33:17–34:19 (Schell))

Sprint understood Iridium's business plan, targeted markets, and associated

**42.** Dr. Paul Pfleiderer is a Professor of Finance at Stanford University. He has a Ph.D. in financial economics from Yale and teaches MBA and undergraduate principles of valuation. The Court accepted Dr. Pfleiderer as an expert in financial economics and corporate finance, including valuation, and he examined Iridium's solvency and capital adequacy from 1995 through the end of January 1999.

risks and concluded that the Iridium business plans were reasonable. (2/1/07 Tr. 11:3–9,19:24–21:23, 39:8–16 43:6–44:11 (Schell)). It appears that other early investors came to the same conclusions as Sprint and had access to the same available information before investing, although there is no direct evidence regarding what these investors knew or their motivations in deciding to invest.

### B. 1995 Contemplated Debt Offering

In April 1995, Iridium and its financial advisor Goldman Sachs decided to raise additional capital through a high yield debt offering. (MX 624 at IR 67180 (4/19/95 Financing Committee Meeting documents); 12/11/06 Tr. 82:7–83:4 (Daverio)) Goldman Sachs and Merrill Lynch were selected as the underwriters for the contemplated 1995 debt offering ("Contemplated Debt Offering"). (2/9/07 Tr. 119:10–120:1 (Attwood); MTX 1 (7/14/95 Form S–1))

Before going forward with the Form S–1, Goldman Sachs conducted extensive due diligence, including another review of the market projections and forecasts, and a detailed review of the System limitations and capabilities. (2/9/07 Tr. 120:2–121:8 (Attwood); 12/11/06 Tr. 83:22–87:5 (Daverio); MX 625 at IR–M 109519–520 (2/24/95 memo re S–1 Due Diligence)) In connection with its work on the Contemplated Debt Offering, Goldman Sachs came to the independent conclusion that the Iridium business plan and projections were reasonable. (2/9/07 Tr. 128:7–15 (Attwood))

Upon meeting resistance from prospective investors during road shows relating to the Contemplated Debt Offering, Iridium and Goldman Sachs concluded that the market conditions were not favorable to Iridium, and this led to the abandonment of the Contemplated Debt Offering and to the decision of Iridium's private equity investors to provide financing internally from the ranks of existing equity holders. (12/11/06 Tr. 90:23–93:4, 95:1–96:6, 97:23–98:8, 102:9–16 (Daverio); 2/9/07 Tr. 129:9–130:7 (Attwood); MX 629 at IR 13863–64) Globalstar encountered similar resistance at around this time and also withdrew its bond offering from the market in 1995. (12/11/06 Tr. 99:23–100:5 (Daverio); 2/9/07 Tr. 129:3–130:8 (Attwood); MX 630 at IR 067267)

### C. Public Equity Offerings

In June 1997 and January 1999, Iridium World Communications Ltd. (IWCL), a member of Iridium LLC, engaged in public equity offerings. (1/25/07 Tr. 10:25–11:19 (Lavin); MX 68 (IPO Prospectus); MX 87 (Secondary Offering Prospectus))

Merrill Lynch was the lead underwriter on Iridium's June 1997 IPO. (1/29/07 Tr. 69:15–23 (Schmiedeler[43])) The co-managers for this offering were Donaldson, Lufkin & Jenrette, and Goldman Sachs. (1/25/07 Tr. 14:2–16 (Lavin); MX 68 at MOT 1,266,001 (6/97 IPO Prospectus))

Iridium's IPO was quite successful and was oversubscribed (1/29/07 Tr. 108:11–109:2 (Schmiedeler); MX 69 at MLUC 16267 (Merrill Lynch case study of IWCL IPO ("[The] stock price opened at $22 1/4 … representing an 11% increase over IPO price))) and resulted in net proceeds of approximately $223 million to Iridium. (MX 98 at MOT 958,544 (7/11/98 Series A & B Prospectus))

Merrill Lynch, Goldman Sachs, NationsBank, Salomon Smith Barney ("SSB"), and Soundview were lead underwriters for Iri-

---

**43.** Robert Schmiedeler was Vice President in Investment Banking at Merrill Lynch from 1997 to 1999. Schmiedeler led the Merrill Lynch team for Iridium's 1997 IPO, 1997 and 1998 debt offerings, and January 1999 second equity offering.

dium's secondary offering. (1/29/07 Tr. 112:1–4 (Schmiedeler); 2/26/07 Tr. 9:20–10:3 (Jones[44]); 1/25/07 Tr. 15:6–9 (Lavin); MX 87 at MOT 2,247,437 (1/99 Secondary Offering Prospectus))

The secondary offering closed successfully on January 21, 1999, resulting in net proceeds of approximately $242 million. (MX 501 at MOT 1,379,090 (Iridium 1998 10–K)) and was fully subscribed. (MX 87 at MOT 2,247,437 (Secondary Offering Prospectus); MX 501 at MOT 1,379,090 (Iridium 1998 10–K))

Merrill Lynch and SSB believed that the disclosures in the IPO Prospectus and Secondary Offering Prospectus were fair and accurate. (1/29/07 Tr. 105:7–12 (Schmiedeler); 2/26/07 Tr. 45:10–46:2, 78:23–79:12 (Jones)) Notably, the secondary offering closed after commercial activation and only seven months before the bankruptcy filing demonstrating investor confidence when actual service characteristics were fully disclosed.

### 1. Public Equity Due Diligence And Understanding Of System Limitations

#### a. Merrill Lynch

As the lead underwriter on Iridium's public offerings, Merrill Lynch performed due diligence that spanned a two year period (1/29/07 Tr. 68:2–10, 69:15–23 (Schmiedeler)) and that involved a review of all areas covered in the offering documents. (1/29/0 Tr. 68:11–25 (Schmiedeler))

Merrill Lynch received, reviewed, and discussed Iridium's market research (1/9/07 Tr. 157:20–159:2 (Reiss); 1/29/07 Tr. 77:12–24, 82:4–18, 88:8–89:15, 93:18–94:7, 127:25–128:11, 198:11–200:16 (Schmiedeler); 1/25/07 Tr. 25:22–26:8 (Lavin); MX

102 at 1,052,701, 714 (Memo re Motorola Certificate)) and analyzed Iridium's 1997 and 1998 projections. (1/29/07 Tr. 101:14–17, 114:8–20, 127:17–24 (Schmiedeler)); MX 55 at IR 8645 (IPO Kick Off Meeting Memo ("The purpose of the meeting was [ ] to provide the underwriters with an update on the development of Iridium's new business plan and financial model"))

Based on its extensive review, Merrill Lynch determined that Iridium's projections were reasonably achievable. (1/29/07 Tr. 106:9–13, 140:4–10 (Schmiedeler))

For each of Iridium's public offerings, Merrill Lynch examined and considered technical issues and the expected and actual performance of the system, including in the case of the secondary offering, using the Iridium phones and receiving updates on actual performance. (1/24/07 Tr. 88:4–16 (Hoppal); 1/29/07 Tr. 91:15–20, 122:15–123:3, 187:16–20 (Schmiedeler); MX 57 at IR 090482, 484 (1/97 Memo re Merrill Lynch IPO Due Diligence Requests))

Merrill Lynch learned through its diligence that the Iridium System had limitations if the line-of-sight between the antenna and the satellite was blocked. (1/29/07 Tr. 183:10–23, 185:22–187:11 (Schmiedeler)); see also MX 58 at IR 26899 (1/23–24/97 IPO Due Diligence Meeting Materials (discussing limitations in buildings, vehicles and cities))

Merrill Lynch also understood in 1997 that targeting the business traveler had its risks since satellite service was limited to line-of-sight, and did not function well in buildings and in urban areas. (MX 65 at MLUC 013519 (5/97 Merrill Lynch ECC Memo))

---

44. Thomas Jones was Managing Director of Investment Banking at Salomon Smith Barney from 1997 to 2000. He was the head of the investment banking team at SSB that worked on the Iridium project.

### b. Salomon Smith Barney

In 1998, Salomon Smith Barney ("SSB") became a co-manager of Iridium's secondary offering. SSB performed due diligence on Iridium for at least seven months before closing of the secondary offering. (2/26/07 Tr. 9:20–10:21 (Jones); MTX 7 at SSBUC 3086 (12/98 ECC Memo)) At the time, SSB had one of the largest telecom groups on Wall Street, was the leading strategic advisor to the telecom industry, had already underwritten offerings for industry participants Globalstar and ICO and had advised many other satellite companies. (2/26/07 Tr. 12:6–14 (Jones); MX 987 at SSBUC 578, 582, 591 (3/98 SSB Discussion Materials); MTX 7 at SSBUC 3097 (12/98 SSB ECC Memo)) Consequently, SSB has a great deal of knowledge concerning the mobile satellite industry sector.

Over the period of March 1998 to January 1999, SSB was in regular contact with Iridium. (MX 991 at SSBUC 2542 (11/98 SSB Prescreening Memo); MX 989 (8/98 SSB Equity Linked Financing Discussion Materials); MX 990 at SSBUC 3444 (10/98 SSB Equity Market Alternatives Discussion Materials)) Investment bankers from SSB reviewed and analyzed Iridium's projections and examined the assumptions underlying them. (2/26/07 Tr. 13:20–14:2 (Jones); MX 1000 at SSBUC 5180–81 (11/17/98 SSB Due Diligence Questionnaire); MX 1001 at SSBUC 5160 (11/20/98 SSB Questions on Financial Projections); MTX 7 at SSBUC 3086 (12/98 ECC Memo (SSB met with Iridium's senior management team to review the business model)))

SSB also developed its own projections and analyzed Lehman Brothers' projections. (2/26/07 Tr. 38:17–40:10 (Jones); MX 1004 at SSBUC 2664–65 (Iridium Model Assumptions re: Iridium Service / Market Penetration))

Upon completion of its review, SSB concluded that Iridium's projections were reasonable. (2/26/07 Tr. 70:14–71:17 (Jones); MTX 7 at SSBUC 3086 (12/98 ECC Memo ("Iridium has developed an attractive strategy to capitalize on the significant demand and growth potential for MSS services")))

SSB understood that line-of-sight issues would limit an Iridium satellite phone because, like any satellite phone, it connects to the constellation when it is in line-of-sight to the nearest satellite and therefore would not operate well in urban areas or inside buildings and cars. (MX 1006 at SSBUC 846 (1/6/99 Report re Follow–On Equity Offering))

Thomas Jones of SSB testified that he understood the satellite service worked in clear line-of-sight conditions and thought "people understood exactly what [the Iridium] phone would and wouldn't do." (2/26/07 Tr. 47:3 –48:21, 54:11–12 (Jones)) Jones testimony was informed by his opportunity to use the Iridium service after commercial launch. (2/26/97 Tr. 48:2–21 (Jones))

### 2. Equity underwriter valuations of Iridium

From 1997–1999, the equity underwriters assessed Iridium and believed that it had a high positive equity value:

?? May 1997: Goldman Sachs gave Iridium $5.4 billion private market equity value. (MX 1289 at GSUC 6627 (5/97 Goldman Sales Memo))

?? May 1997: Merrill Lynch gave Iridium a $4.1 billion private market equity value. (1/29/07 Tr. 99:21–100:24 (Schmiedeler); 2/26/07 Tr. 108:11–110:8 (Pfleiderer); 3/19/07 Tr. 54:20–55:10 (Den Uyl); MX 65 at MLUC 13470, 13473 (5/97 Merrill Lynch ECC Memo))

?? December 1998: Merrill Lynch gave Iridium a $14 billion private market equity value. (MX 93 at MLUC 3387 (12/15/98 Merrill Lynch ECC Memo))

?? December 1998: SSB gave Iridium an $11.9 billion private market equity value. (2/26/07 Tr. 154:19–157:2 (Pfleiderer); MTX 7 at SSBUC 3226 (12/22/98 SSB ECC Memo))

In coming to their positive assessments of value, many investment bankers did not rely on or use Iridium's projections, but performed their own analyses or relied upon the independent work of their research analysts. (1/10/07 Tr. 16:11–19:3, 23:15–25:9, 42:20–43:12 (Reiss); MX 1289 at GSUC 6627 (5/97 Goldman Sales Memo); MTX 7 at SSBUC 3219–3220, 3226 (12/22/98 SSB ECC Memo); MTX 100 at 5704–5708, 5719 (12/15/98 Merrill Lynch Draft Valuation Analysis (determining projections using subscriber, usage, and pricing assumptions and comparison to Globalstar); MX 65 at MLUC 013473–75 (5/97 Merrill Lynch ECC Memo); 2/26/07 Tr. 111:7–113:19, 137:8–138:9 (Pfleiderer); 3/19/07 Tr. 32:9–34:12, 64:23–66:17 (Den Uyl))) The Court does not accept these valuations as true, but does find that their very existence is a factor that tends to rebut the Committee's assertions regarding insolvency. These underwriter valuations fall into the category of anecdotal information that does not prove solvency or establish enterprise value. What these valuations do demonstrate, however, is that there was a widely held perception on the part of sophisticated Wall Street investment firms that Iridium was a company with a substantial positive value.

### D. Iridium's Public Debt Offerings

In 1997 and 1998, Iridium LLC, through its affiliates, Iridium Capital Corporation and Iridium Operating LLC, engaged in three public debt offerings. (MX 98 (7/11/97 Series A and B Prospectus); MX 100 (10/9/97 Series C Prospectus); PX 123 (5/8/98 Series D Prospectus))

The lead underwriters for the Series A and B Bond Offering were Chase Securities Inc. and Merrill Lynch. (1/25/07 Tr. 14:17–21 (Lavin); MX 98 at MOT 958,520 (7/11/97 Series A & B Prospectus))

The Series A and B Bond Offering closed on July 16, 1997, resulting in net proceeds of approximately $746 million to Iridium. (MX 98 (7/11/97 Series A & B Prospectus); MX 487 at MOT 1,351,782 (1997 Iridium 10–K))

The lead underwriters for the Series C Bond Offering were Chase Securities Inc., BT Alex Brown, and Merrill Lynch. (1/25/07 Tr. 14:22–15:1 (Lavin); MX 100 at MOT 967,707 (10/9/97 Series C Prospectus))

The Series C Bond Offering closed on October 17, 1997, resulting in net proceeds of approximately $293 million to Iridium. (MX 487 at MOT 1,351,782 (1997 Iridium 10–K))

The lead underwriters for the Series D Bond offering were Chase Securities Inc. and Barclays Capital. (1/25/07 Tr. 15:2–5 (Lavin); PX 123 at MLUC 014640 (5/8/98 Series D Prospectus))

The Series D Bond Offering closed on May 13, 1998, resulting in net proceeds of approximately $342 million to Iridium. (MTX 60 at 22 (9/30/98 Iridium 10–Q))

From 1995 through January 1999, Iridium's bonds generally traded at a price at or near par value and this indicated that the bond market believed that Iridium would be able to repay the debt owing on the bonds. (2/26/07 Tr. at 143:16–150:1 (Pfleiderer))

Credit rating agencies, including Moody's and Standard and Poor's, moni-

tored Iridium's risk of default in connection with its bank facilities and bond offerings. The rating agencies did not downgrade Iridium's credit ratings until March, 1999. (2/26/07 Tr. 150:9–153:10 (Pfleiderer)) This shows a perception of deterioration in credit quality and an increased risk of default that did not arise until approximately five months prior to bankruptcy.

### E. Bondholder due diligence and understanding of system limitations

Committee member Wall[45] invested in Iridium bonds in 1997, 1998 and in February through May of 1999. (1/29/07 Tr. 7:2–5, 8:8–11, 8:17–19 (Dixon[46]); 1/29/07 Tr. 23:6–10, 24:25–25:2, 27:15–28:3 (Wall); MX 104, MX 105, MX 106, MX 108, MX 109 (Wall Account Info.))

Former Committee member Alliance Capital purchased Iridium bonds in 1997, 1998 and 1999 with a total investment in the $100 million-range. (1/29/07 Tr. 40:16–41:22 (Jantzen[47]))

These bondholders also invested in competing satellite telecommunications services, such as Globalstar and ICO. (1/29/07 Tr. 31:14–16 (Wall); 1/29/07 Tr. 38:21–39:9 (Jantzen); MX 104 at IRIDCOM 4021 (Wall Account Information); MX 113 at IRIDCOM 3403 (Securities Portfolios))

As a result of their knowledge of the industry and their due diligence, the bondholders, as sophisticated investors, understood that there were risks involved in investing in Iridium, including marketing, technological and regulatory risks.

(1/29/07 Tr. 15:24–16:23 (Dixon); 1/29/07 Tr. 45:6–9, 46:4–13, 50:3–8, 53:22–54:1 (Jantzen); MX 1227 at AC 00055 (7/97 Alliance Capital Memo); MX 1229 at AC 00542 (7/22/97 KDP Analyst Report))

## VII. IRIDIUM'S STOCK PRICE AND ANALYST ASSESSMENTS

### A. Iridium Stock Price

A stock price represents a consensus estimate of expectations for the future of a company based on the discounted value of future cash flows and all manner of other information about the company. (3/19/07 Tr. 49:8–18 (Den Uyl); 2/27/07 Tr. 80:9–81:15 (Pfleiderer); see also 2/9/07 Tr. 119:4–9 (Attwood (expressing belief that a company's stock price evidences its value); see also MX 69 at MLUC 16267 (6/9/97 Merrill Lynch Case Study)))

The public stock market reaches a price by aggregating and factoring in information from many sources. (2/26/07 Tr. 120:1–122:3, 127:11–23 (Pfleiderer))

Iridium's price per share represented its market value at a given point in time. (2/26/07 Tr. 127:11–23 (Pfleiderer); 3/20/07 Tr. 102:18–103:2 (Den Uyl))

Throughout 1997 and 1998, Iridium's stock prices ranged from $17 up to above $70, implying an equity valuation between $2.3 and $10 billion. (See, e.g., 3/19/07 Tr. 49:19–50:2, 79:4–15 (Den Uyl (discussing implied values as of 6/97, 11/97 and 12/98)); 2/26/07 Tr. 126:13–128:12 (Pfleiderer); MTX 7 at SSBUC 3212 (12/22/98 SSB ECC Memo))

---

**45.** Bruno Wall is President of Wall Financial Corporation, an Iridium bondholder and member of the Committee.

**46.** John Dixon is a member of the Committee, and Chief Investment Officer of Taras Financial from 1994–2002. As Chief Investment Officer, Dixon was responsible for recom-

mending investments and conducting due diligence.

**47.** Nelson Jantzen is a Senior Vice President at Alliance Capital, a former Committee member, who ran Alliance's Public High Yield Group during the 1997 to 1999 timeframe.

Iridium's implied market value based on price per share was lower than the discounted cash flow ("DCF") values reached by investment bankers at the time. This correlation between the DCF analysis and the value implied by the public markets is an indication that irrational exuberance did not distort Iridium's stock price. (2/27/07 Tr. 87:19–89:16, 97:10–100:15 (Pfleiderer); 1/8/07 Tr. 192:25–193:13 (Reiss))

Sophisticated market participants at the time considered Iridium's stock price to evidence its value, including:

?? June 1997: Merrill Lynch found that the IPO price implied a public market value of Iridium of $2.8 billion. (MX 69 at MLUC 16266 (6/9/97 Merrill Lynch Case Study))

?? December 1997: Lehman Brothers found a total enterprise value of $7.9 billion based on Iridium's market capitalization. (MTX 27 at IR 82 (12/8/97 Lehman Brothers Report))

?? October 1997: Iridium's Global Arrangers noted that Iridium's market capitalization of $6.2 billion was evidence of its ability to project a positive outlook and value to equity investors. (MX 313 at IR 012609 (10/97 Confidential Information Memorandum))

?? March–December 1998: SSB consistently analyzed Iridium's stock price and volume and calculated large positive market values. (MX 987 at SSBUC 598 (3/98 SSB Discussion Materials ($8.3 public market equity value in March 1998))); MX 989 at SSBUC 657 (8/98 SSB Presentation ($6 billion public market equity value in August 1998)); MX 990 at SSBUC 3454 (10/98 SSB Discussion Materials ($6.4 billion public market equity value in October 1998))

### B. Analysts

From January 1998 to January 1999 a great number of analysts believed that Iridium had an equity value that ranged between $4 and $14 billion. (2/2/607 Tr. 131:24–133:1 (Pfleiderer); see also MTX 32 (Den Uyl's Summary of Analyst Reports) (including 1997, 1998, and 1999); 3/20/07 Tr. 140:10–141:4 (Den Uyl)) Although these assessments do not establish that the value of the company was within that range, this evidence does provide insight regarding the contemporaneous thinking of well-informed market observers. These indications of value are not determinative but do add weight to the proposition that Iridium was a company with a robust value at the time.

Examples of conclusions reached by the analysts who performed a discounted cash flow analysis with respect to Iridium are as follows:

?? July 1997: DLJ gave Iridium a $6.2 billion private market equity valuation. (PX 1492 at IR–B 49124 (7/24/97 DLJ Report))

?? October 1997: BancAmerica Robertson Stephens gave Iridium a $9.3 billion private market equity value. (MTX 9 at MOT 1,868,070 (10/8/97 BancAmerica Robertson Stephens Report); 1/10/07 Tr. 51:11–53:8 (Reiss))

?? December 1997: Lehman Brothers gave Iridium an $11.5 billion private market equity value. (3/19/07 Tr. 46:25–48:11 (Den Uyl); MTX 27 at IR 95 (12/8/97 Lehman Brothers report)); see also MTX 23 at 10 (10/8/97 Lehman Brothers Report (attributing $16.9B equity value to Iridium))

?? February 1998: Nationsbank gave Iridium a $10.6 billion private market equity value. (3/19/07 Tr. 68:10–69:1 (Den Uyl); MTX 26 at

IR 53507 (2/13/98 NationsBank Report))

?? February 1998: Goldman Sachs found $10.6 billion private market equity value. (MTX 81 at 11977 (2/98 Goldman Report))

?? March 1998: Morgan Stanley gave Iridium a $6.9 billion private market equity value. (3/19/07 Tr. 66:18–67:11 (Den Uyl); 2/26/07 Tr. 135:13–137:19 (Pfleiderer); MTX 8 at MLUC 65 (3/18/98 Morgan Stanley Report))

?? July 1998: SSB research analyst gave Iridium a $12.4 billion private market equity value. (MTX 7 at SSBUC 3261 (12/22/98 SSB ECC Memo))

At the time they valued Iridium, the analysts appear to have been aware of line-of-sight limitations applicable to the Iridium service. For example:

?? August 1995: It was known that the Iridium satellite system had line-of-sight limitations. (MTX 5 at PWC 69290 (08/95 YankeeWatch Report); 1/9/07 Tr. 68:23–70:15 (Reiss))

?? September 1997: NationsBank wrote that both Iridium and Globalstar have "the need for line-of-sight between users and satellites," and further noted that "neither system will enable a user to complete a call from inside a conference room without windows, and calls made from inside many buildings and cars (even if the user is next to a window) will not go through." (MTX 64 at AC 531 (9/16/97 NationsBanc Montgomery Report))

?? October 1997: Chase High Yield Research described Iridium's satellite system as something available assuming an unobstructed view of the sky, and noted that tall buildings and dense construction can im-

pair the line-of-sight from the handset to the satellite. (2/7/07 Tr. 38:22–40:12 (Cassin); MX 1230 at AC 00494, 00497 (10/97 Chase High Yield Research Report))

?? October 1997: BancAmerica Robertson Stephens stated that "[s]atellite transmissions require a line-of-sight between the satellite and receiver on the ground." (MTX 9 at MOT 1,868,020 (10/8/97 BancAmerica Robertson Stephens Report))

?? March 1998: Morgan Stanley believed that satellite subscribers would need to "be sure to find an open area where" obstructions "would not interfere with [the] phone's line-of-sight reception to the satellite." (MTX 8 at MLUC 000067 (3/98 Morgan Stanley Research Report))

?? December 1998: CSFB explained that the Iridium satellite system worked where a "line-of-sight transmission is possible." (MTX 52 at 80 (12/23/98 CSFB Report); 1/10/07 Tr. 53:9–55:20 (Reiss))

## VIII. EVIDENCE REGARDING IRIDIUM'S CAPITAL ADEQUACY

### A. Iridium's Financial Advisors

From 1993 to 1995, Goldman Sachs served as Iridium's financial advisor. (2/9/07 Tr. 82:16–83:5, 106:15–24 (Attwood); MX 1208 at GSUC 23281 (1/18/94 Goldman Presentation to Finance Committee); MX 1211 at MOT 1,402,672 (4/20/94 IBOD Minutes))

Goldman Sachs recommended Iridium's target capital structure of 60% debt and 40% equity and considered the structure conservative. (2/9/07 Tr. 108:19–109:5, 110:20–112:13 (Attwood); MX 1208 at GSUC 23282 (1/94 Goldman Presentation

to Finance Committee); MX 622 at MOT 1,324,452 (12/15/93 Goldman Sachs Preliminary Financing Plan))

Goldman Sachs advised that Iridium first should pursue the equity portion of its capital structure prior to accessing the debt market. (2/9/07 Tr. 86:18–87:19, 110:20–112:13 (Attwood); MX 1208 at GSUC 23281–82 (1/18/94 Goldman Presentation to Finance Committee)) The relationship between Iridium and Goldman Sachs soured and was terminated following the failure of the Contemplated Debt Offering.

### B. Iridium CFO/CEO

As CFO from January 1994 through March of 1997, Paul Daverio acted as a member of Iridium's senior management. He attended board meetings, oversaw the accounting function and assisted in Iridium's financing decisions. (12/11/06 Tr. 75:5–77:5 (Daverio))

Daverio believed that Iridium had a reasonable financial plan. (12/11/06 Tr. 130:7–25 (Daverio)) Iridium and its advisors periodically reviewed and revised the plan as changes in Iridium's circumstances or the market dictated. (12/11/06 Tr. 76:23–77:5, 80:5–83:21 (Daverio)) Iridium generally studied multiple alternatives and attempted to be proactive in obtaining funding, including planning for downside scenarios. (12/11/06 Tr. 79:25–80:4, 83:5–21, 107:9–108:13, 140:14–25 (Daverio); MX 912 at MOT 946327–333 (4/19/95 IBOD Materials); MTX 77 at IR 067453–71 (1/18/94 Finance Committee Material); MTX 83 at IR 200418–20 (4/30/97 B & F Committee Material); MTX 83 at IR 2013 84–86 (7/22/96 B & F Committee Material); MTX 86 at IR–B 59850–859 (3/13/98 B & F Committee Materials))

Daverio testified that Iridium's ability to pay its debts as they came due was never an issue during his tenure as CFO.

(12/11/06 Tr. 108:24–109:3, 131:8–14 (Daverio))

At the close of the private equity offering in 1996, Daverio believed that Iridium had sufficient equity capital in place. (12/11/06 Tr. 107:6–108:23 (Daverio); MX 634 at IR 67761 (4/16/96 Banking and Finance Committee Meeting Materials))

Upon the completion of the December 1998 financing package and through early 1999, Dr. Staiano expressed his belief that Iridium had sufficient funding in place and would be able to pay its debts as they came due to the point that Iridium was projected to turn cash positive. He also believed in December 1998 that Iridium would be a financial success and would meet the business plan projections. (11/7/06 Tr. 69:15–70:19, 82:3–9, 85:19–86:2 (Staiano))

Demonstrating the sincerity of that belief, in March 1999, Dr. Staiano purchased with his own funds a half million dollars worth of Iridium stock. (11/7/07 Tr. 91:16–23 (Staiano))

### C. KPMG

As of December 31, 1996, 1997 and 1998, KPMG concluded that Iridium was a going concern, meaning that there was no substantial doubt that it would be able to meet its obligations as they came due for the following 12 months. (1/31/07 Tr. 76:22–78:17, 79:1–82:6, 83:25–87:6, 87:18–88:6 (Milligan); MX 473 (12/96 Completion Memorandum); MX 494 (12/98 Completion Memorandum); MX 496 (12/98 Evaluation of Going Concern))

In March of 1999, KPMG re-examined whether Indium was a going concern and concluded that no substantial doubt existed about Iridium's ability to continue as a going concern (and pay its debts as they came due) through January 1, 2000. (1/31/07 Tr. 88:10–91:15 (Milligan); MX

497 (3/99 Addendum To Going Concern Memorandum))

As of March of 1999, KPMG concluded that although revenues and subscribers had been below expectations, the original projections were not unreasonable. (1/31/07 Tr. 89:14–91:6 (Milligan); MX 497 (3/99 Addendum To Going Concern Memorandum))

## IX. MOTOROLA SOLVENCY EXPERTS

Motorola called two expert witnesses who testified regarding Iridium's solvency and capital adequacy: Professor Paul Pfleiderer and R. Bruce Den Uyl.

### A. Paul Pfleiderer

The Court accepted Dr. Pfleiderer as an expert in financial economics and corporate finance, including valuation. (2/26/07 Tr. 83:23–25, 88:14–21 (Pfleiderer))

Dr. Pfleiderer has a Ph.D. in financial economics from Yale and has been a Professor of Finance at Stanford University for 25 years. Dr. Pfleiderer teaches principles of valuation to MBA and undergraduate students. (2/26/07 Tr. 82:6–83:22, 86:18–88:13 (Pfleiderer)) Dr. Pfleiderer was asked by Motorola to examine the solvency and capital adequacy of Iridium between 1995 and 1999. Although Dr. Pfleiderer has never before given a solvency opinion, this Court found him to be an especially credible witness. He approached the question of Iridium's solvency from an academic point of view, and he responded to questions, both on direct examination and during cross examination, with great candor. He sincerely believes that market judgments are the most reliable tools for measuring enterprise value.

Professor Pfleiderer looked at what may be inferred from the decisions made by market participants and examined Iridium's solvency and capital adequacy from an economics perspective for the period from 1995 through the end of January 1999. (2/26/07 Tr. 88:22–89:12, 90:12–92:10 (Pfleiderer)) Based on his review of market data and the behavior of market participants, Dr. Pfleiderer concluded that Iridium was solvent and adequately capitalized during this period.

This Court agrees with Professor Pfleiderer that the value implied by an efficient market fairly reflected the underlying enterprise value of Iridium.

### B. Bruce Den Uyl

The Court accepted Bruce Den Uyl as an expert in valuation and solvency. (3/19/07 Tr. 6:8–13 (Den Uyl)) Den Uyl has valued companies since at least 1985, including numerous public, telecom, and start-up companies, and companies in the bankruptcy context. (3/19/07 Tr. 4:11–6:2 (Den Uyl))

Den Uyl examined the issue of Iridium's solvency from June 1995 to the end of January 1999. (3/19/07 Tr. 6:14–7:21, 9:20–10:17 (Den Uyl))

He utilized a number of valuation methodologies, including the DCF approach and market approach, which included looking at guideline companies and comparables, Iridium's public stock price, debt offerings, and contemporaneous valuations. (3/19/07 Tr. 7:22–9:14 (Den Uyl))

#### 1. Den Uyl DCF Analysis

Den Uyl performed a discounted cash flow analysis (or DCF) as of June 30, 1995, November 30, 1997, and December 31, 1998. (3/19/07 Tr. 9:20–10:17 (Den Uyl))

While generally a "base case" DCF is performed, it is also standard practice to perform a sensitivity analysis and examine a "downside case." A "downside case" factors in additional risks, including the

possibility that results will be lower than the base case projections. (3/19/07 Tr. 12:26–13:4 (Den Uyl))

### a. 1995 DCF analysis

Under his 1995 "base case," using Iridium's 1995 projections and a 30% discount rate, Den Uyl concluded that Iridium was solvent and had an equity value of $1.7 billion. (3/19/07 Tr. 16:25–17:20 (Den Uyl))

Under his June 1995 "downside case," Den Uyl reduced Iridium's 1995 projections by 25%, used a 25% discount rate and concluded that Iridium was solvent and had an equity value of more than $1 billion. (3/19/07 Tr. 19:19–23 (Den Uyl))

### b. 1997 DCF analysis

Under his November 1997 "base case," using Iridium's 1997 projections and a 30% discount rate, Den Uyl concluded that Iridium was solvent and had an equity value of approximately $11.9 billion. (3/19/07 Tr. 32: 9–12 (Den Uyl))

Den Uyl performed two "downside case" DCF analyses as of November 30, 1997 using reduced projections: (1) an analyst median and (2) the C & L banking case. (3/19/07 Tr. 32:13–34:2, 36:2–24 (Den Uyl))

Under the 1997 downside analyst case, Den Uyl concluded that Iridium was solvent and had an equity value of more than $7.5 billion. (3/19/07 Tr. 33:13–35:8 (Den Uyl))

Under the C & L downside "banking case," Den Uyl concluded that Iridium was solvent and had an equity value of $5.4 billion. (3/19/07 Tr. 36:2–25 (Den Uyl))

### c. 1998 DCF analysis

Under Den Uyl's 1998 base case, using Iridium's 1998 projections and a 30% discount rate, Den Uyl concluded that Iridium was solvent and had an equity value of about $15.8 billion. (3/19/07 Tr. 63:15–64:3)

Using reduced revenue projections based on analyst reports and a 25% discount rate, Den Uyl concluded that Iridium was solvent and had an equity value of approximately $8.8 billion as of December 31, 1998. (3/19/07 Tr. 64:4–22 (Den Uyl))

Using revenue projections taken from the Global Arrangers' technical consultants and a 23% discount rate, Den Uyl concluded that Iridium was solvent and had an equity value of approximately $6.4 billion as of that same date. (3/19/07 Tr. 69:12–70:25 (Den Uyl))

Mr. Den Uyl was credible, but his work product also seemed to be largely deriva-. tive of the work of others and to be based on a recycling and repackaging of valuation data contained in analyst reports.

### C. Other Evidence Regarding Iridium's Solvency

In connection with assessing Iridium's financial condition, Den Uyl and Dr. Pfleiderer examined the following indicators of Iridium's value:

?? Private equity investments in Iridium. (3/19/07 Tr. 25:12–26:25 (Den Uyl); 2/26/07 Tr. 93:4–98:11)

?? Contemporaneous third party valuations of Iridium. (See 3/19/07 Tr. 8:22–9:19, 52:13–53:11, 56:7–58:24, 81:1–82:19 (Den Uyl); 2/26/07 Tr. 91:20–92:10, 107:16–110:16, 129:7–130:4 (Pfleiderer); MTX 32 (Den Uyl Equity Analyst Valuation Chart))

?? The analysis of Iridium's lenders and their decisions to extend credit. (See 2/26/07 Tr. 159:24–164:24 (Pfleiderer); 2/27/07 Tr. 57:22–58:9, 58:15–25, 59:7–20, 111:19–113:23 (Pfleiderer); 3/19/07 Tr. 56:11–17, 59:8–23, 79:16–80:1 (Den Uyl))

?? Iridium's stock price and the views of market participants at the time who considered Iridium's stock price to be evidence of value. (*See* 3/19/07 Tr. 8:22–9:19, 49:8–18, 79:4–79:15 (Den Uyl); 2/26/07 Tr. 126:16–128:12 (Pfleiderer))

?? The market's positive response to and value of other MSS competitors, including Globalstar and ICO. (*See* 3/19/07 Tr. 8:22–9:18, 40:6–41:20, 71:12–74:9 (Den Uyl); 2/26/07 Tr. 168:11–179:14 (Pfleiderer))

Den Uyl also examined the market multiples of guideline companies in the wireless and satellite industry and compared those multiples to the multiples resulting from his DCF analysis of Iridium. (3/19/07 Tr. 20:15–21:12, 39:8–40:5, 103:25–140:5 (Den Uyl))

### X. COMMITTEE'S SOLVENCY EXPERT

The Committee presented two solvency experts from FTI Consulting, Inc. M. Freddie Reiss, a partner and co-chair of FTI's reorganization practice, analyzed Iridium's solvency using the DCF analysis based on projections prepared by his partner Mark Spragg[48] and using a discount rate of 34.5%. Mr. Reiss considered all of the standard valuation methodologies—the cost approach, precedent transactions, market comparables (or guideline companies), and the DCF methodology—but concluded that only the DCF methodology should be used to value Iridium. (1/8/07 Tr. at 46:14–54:11, 53:15–54:11, 103:8–103:25 (Reiss)).

Reiss performed two DCF analyses, one at June 30, 1995 and a second at March 31, 1997. (1/8/07 Tr. 15:16–18:5 (Reiss)) Reiss did not perform a DCF valuation after

March 31, 1997. (1/8/07 Tr. 160:9–22 (Reiss)) The Court has difficulty in comprehending why FTI made no attempt to value Iridium during the almost two and one-half year period between March 31, 1997 and the petition date, particularly in view of the many significant transactions from a financial point of view that occurred during this period. FTI's election not to directly address such obviously important capital markets transactions is not an oversight, but a calculated decision leading to the inference that FTI's analysis has been manipulated to enable Reiss to express the opinion that Iridium was insolvent.

Reiss ignored and/or did not rely on the following contemporaneous reference points of Iridium's value in his solvency analysis:

?? Iridium's stock price; (1/8/07 Tr. 193:14–194:6 (Reiss))

?? Iridium's market capitalization; (1/8/07 Tr. 194:20–195:18 (Reiss))

?? Iridium analyst reports; (1/10/07 Tr. 37:14–20, 45:11–46:8, 57:22–58:1, 101:7–12 (Reiss))

?? Investment banker valuations of Iridium; (1/10/07 Tr. 10:18–11:6, 101:1–12 (Reiss))

?? Comparable company analyses for Iridium, including satellite or wireless companies; (1/8/07 Tr. 102:18–23, 174:15–18 (Reiss))

?? Globalstar, including its stock price, capital structure, or analyst valuations; and (1/10/07 Tr. 72:5–9; 80:7–16, 101:13–102:1 (Reiss))

?? KPMG's going concern opinion. (1/10/07 Tr. 102:2–24 (Reiss))

---

**48.** Mark Spragg, a Senior Managing Director in FTI's Corporate Finance practice, was the Committee's expert responsible for evaluating Iridium's market research instruments and creating the projections used in Reiss' DCF analyses.

Reiss elected not to rely on the testimony of numerous witnesses who had knowledge of Iridium's projections and capital markets. (*See generally* 1/8/07 Tr. 137:17–155:18 (Reiss))

Reiss and his partner, Spragg, also did not consider or rely on C & L's final reports or "banking case" projections in forming their opinions. (1/9/07 Tr. 14:9–15:5; 1/10/07 Tr. 33:7–37:5 (Reiss); 1/22/07 Tr. 7:18–9:13 (Spragg ("we did not use the report that came out after the March 31, 1997 2.0 Plan because that came out in June of 1997 [after FTI's last valuation benchmark of March 31.1997], I believe.")))). FTI believed, however, that C & L's final report "validated" their view of Iridium's value. (1/9/07 Tr. 14:9–15:5)

Reiss' unreasonably small capital analysis consisted of calculating an internal rate of return based on the same FTI-created projections that Reiss used in his DCF. (1/10/07 Tr. 149:4–7 (Reiss)) Reiss also opined that Iridium had unreasonably small capital based on its efforts to raise financing in 1995 sufficient to meet cash flow needs through the fall of 1996 (e.g., Iridium's abandoned Contemplated Debt Offering necessitating additional capital inflow from current investors). (1/8/07 Tr. at 82:24–83:2 (Reiss)). Iridium was ultimately able to raise significant amounts of debt and equity in subsequent transactions that were not considered by FTI in its unreasonably small capital analysis.

## A. The Committee's Adjusted Iridium Projections

Spragg created revised projections for Iridium four years after Iridium's bankruptcy using data and market research from 1995–1997. (1/12/07 Tr. 48:12–17 (Spragg))

Spragg created his own projections from the bottom up rather than starting with Iridium's revenue projections and analyzing those. (1/12/07 Tr. 46:22–48:11 (Spragg)) Spragg believed it was necessary to create revenue projections for Iridium's business because Iridium was an almost entirely fixed cost business and, therefore, the primary risk facing Iridium was its ability to generate the large revenues needed to meet its obligations. To do so, Spragg used a financial model of Iridium's projections that FTI created. (1/11/07 Tr. 16:19–17:13 (Spragg)).

Spragg created his projections by selecting consultant reports and then adjusting downward from the estimates in those reports. (1/12/07 Tr. 48:4–24 (Spragg))

Spragg disagreed with the methodology used by the experts at the time and, in many cases, decided that the experts at the time made illogical and unreasonable assumptions. (1/12/07 Tr. 49:12–19 (Spragg)). Believing that his analysis of the information was superior to the analysis done at the time, in some cases Spragg substituted his assumptions for the ones made when the projections were initially created. (1/12/07 Tr. 49:22–50:14 (Spragg))

In order to determine whether Iridium's projections and methodologies for creating those projections were reasonable, Spragg compiled his own projections which he believed were based on reasonable assumptions, and then compared those side by side with Iridium's. Because Spragg found a large gap between the two sets of projections, he decided that Iridium's projections were unreasonable. (1/12/07 Tr. 53:10–55:14 (Spragg))

### 1. Spragg's 1995 Projections

Spragg created 1995 Professional Business Traveler (PBT) satellite-only revenue projections. In coming up with his projections, Spragg started with the 6/91 ADL Study and 1993 BAH Report. (1/11/07 Tr.

39:4–39:15 (Spragg)) The 1993 BAH Study discussed subscribers in 2002, five years after commercial activation, while the 6/91 ADL Study estimated subscribers in 2000 and 2007, three and ten years after commercial activation. (PX 1036 at IR 97592 (6/91 ADL Study); MX 402 at MOT 1,886,-220 (BAH 1993 2–Volume Study))

For his 1995 projections, Spragg made three adjustments to the "BAH" and "ADL" subscriber numbers—one for handset size, one for service limitations and one for handset price. (1/12/07 Tr. 170:6–16 (Spragg))

Additionally, Spragg made an 85% downward adjustment to both his "ADL" and "BAH" starting subscriber numbers for their purported failure to factor in service limitations. Though not an engineer, Spragg came to this determination through review of the Irilite small antenna study. (1/11/07 Tr. 49:4–12 (Spragg); 1/12/07 Tr. 109:7–22, 147:17–148:2 (Spragg)) In forming his opinions about the Irilite study, Spragg did not read any deposition testimony from Motorola or Iridium engineers, nor did he rely on the expert opinions of the technical experts engaged in this case by the Committee. (1/12/07 Tr. 148:3–149:3 (Spragg))

Spragg's 1995 professional traveler subscriber projections for 1998 were approximately 97% less than what Booz Allen and ADL were estimating; his subscriber projections for 2002 were 85–95% less than what ADL and Booz Allen estimated. (1/12/07 Tr. 170:17–171:5 (Spragg))

*2. Spragg's 1997 Projections*

As in the case of the 1995 projections, Spragg substituted his own judgment of the market for that of those Iridium employees and outside consultants who were preparing estimates of the market for Iridium based on what they knew at the time. Spragg's exercise in looking back and re-creating those projections for purposes of litigation exposes his work to particularly close scrutiny and raises questions as to why his work product should be deemed a valid starting point for a DCF analysis. The fundamental question becomes why his revised numbers should be considered more reliable than the numbers that were generated by those who were closest to the development of Iridium's projections and business plans.

To come up with his revised 1997 satellite subscriber projections, Spragg made downward adjustments to certain estimates in the AT Kearny Study. One significant adjustment of 70% was on account of the penetration rate. Spragg relied on a discussion in the C & L October 1996 preliminary report about penetration rates to support his adjustment. (1/22/07 Tr. 37:3–37:10 (Spragg); 2/28/07 Tr. 18:24–19:2 (Kenny)) Kenny of C & L testified that C & L did not quantify the penetration rate in that study but rather was showing the impact of hypothetical changed assumptions. (2/28/07 Tr. 22:5–23:21 (Kenny); *see also* MX 229 at IR 39082–83 (C & L 10/96 Phase I Final Report (noting "C & L has not yet quantified these risks")))

The other report that Spragg used to come up with his 1997 satellite-only professional business traveler projections was a March 1996 BAH study. That report was not one of the six market research studies relied upon by Iridium in its business plan 2.0, nor was it based on any primary research. (1/22/07 Tr. 9:15–24 (Spragg)) At the time it was created, the 1996 BAH study was not intended to be used by Iridium as a tool for creating projections or assessing demand for Iridium's services. (12/6/06 Tr. 21:16–22:12 (Katz); *see also* MX 157 (BAH 1996 study, Volume 1—Demand Assessment); MX 1076 (BAH proposal to perform research))

Spragg's 1997 professional traveler subscriber projections for the year 2004 were 88% less than what Iridium had projected for the same year. (1/12/07 Tr. 32:13–23 (Spragg)) Spragg testified his projections were "considerably less" than were Iridium's. (1/12/07 Tr. 32:13–23 (Spragg))

Upon consideration of the methods used by Spragg to adjust the 1997 projections of AT Kearney and Booz Allen, the Court believes that Spragg could not have been purely objective in his selection of data and his determination to reduce subscriber estimates based on handset size, service limitations and pricing factors. Based on the examination and cross-examination of Spragg, the Court is left with the distinct impression that Spragg's work was carried out with litigation bias and for the express purpose of showing that Iridium was insolvent. Therefore, the Court finds that Mr. Spragg's work product is not a reliable starting point for a DCF analysis.

## CONCLUSIONS OF LAW

### XI. BURDEN OF PROOF

In this phase of the trial, the Committee has the burden of proof to show by a preponderance of the evidence that Iridium was either insolvent or inadequately capitalized at the time of any transfer made during the four-year period from August 13, 1995 through August 13, 1999. As the party seeking to avoid transfers during this time period, the Committee must establish each element of its

fraudulent transfer and preference claims, including Iridium's insolvency or the inadequacy of its capital. *See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 34 (2d Cir.1996); *Establissement Kadaq Vaduz v. Piha*, 901 F.Supp. 139, 140 (S.D.N.Y.1995); *In re Worldcom, Inc.*, No. 02–13533, 2003 WL 23861928, at *40 (Bankr.S.D.N.Y. Oct.31, 2003).

The Committee contends that the burden of proof shifts to Motorola to rebut a presumption of insolvency arising under the District of Columbia Uniform Fraudulent Conveyance Act ("DCUFCA"). Section 28–3102(b) of the DCUFCA states that, "a debtor who is generally not paying his or her debts as they become due is presumed to be insolvent." D.C.Code § 28–3102.[49] The Committee contends that Iridium was "generally not paying its debts" and therefore should be presumed to be insolvent because it deferred $594 million in contractual payments to Motorola from July to December of 1998, deferred another $400 million in early 1999 and defaulted on $90 million of interest payments on its public debt in July of 1999.[50]

It is undisputed that Iridium did not pay $90 million dollars in interest payments on its public debt in July 1999. "The failure to pay a single debt ... however, ... even over a long period, will usually not justify a finding that a debtor is generally not paying its debts as they become due." *In re Better Care, Ltd.*, 97 B.R. 405, 409 (Bankr.N.D.Ill.1989); *see*

**49.** The DCUFCA is the District of Columbia's adoption of the Uniform Fraudulent Transfer Act ("UFTA"). The D.C. Legislature adopted the UFTA almost in its entirety on November 27, 1995, and it became effective February 2, 1996. *See* Feb. 9, 1996, D.C. Law 11–83, § 2, 42 DCR 6773. Section 28–3102(b) is based on Section 2 of the UFTA. *Id.* For the purposes of this litigation, the DCUFCA is applicable because Iridium's principal place of business was located in Washington, D.C.

**50.** The Committee did not raise this issue until after the close of evidence in its post-trial briefs. Prior to making this argument, the Committee took the position that it had the burden of proof and so stated in the opening statement of counsel (10/23/06 Tr. 4:17–21 (Danilow)).

*also In re Reed,* 11 B.R. 755, 760 (Bankr. S.D.W.Va.1981). Thus, the failure to make one $90 million interest payment one month prior to its bankruptcy filing does not, by itself, support a finding that Iridium was not paying its debts as they became due.

■ The only other basis for a determination that Iridium was generally not paying its debts as they became due is the approximately $900 million in payments owed to Motorola that were deferred by Iridium with the consent of Motorola. *See In re All Media Properties, Inc.,* 5 B.R. 126, 145 (Bankr.S.D.Tex.1980) (making arrangements to extend payments to insiders can be evidence of failure to pay debts as they become due); *In re Int'l Teldata Corp.,* 12 B.R. 879, 882 (Bankr.D.Nev.1981) (deferral on long-term debt obligations to insiders is evidence of equitable insolvency). In *All Media* and *Int'l Teldata* the Court considered it a critical fact that the debtor's deferral of payments was to an insider. *In re All Media Props., Inc.,* 5 B.R. at 147; *In re Int'l Teldata Corp.,* 12 B.R. at 882.

In its argument regarding deferral of amounts owed to Motorola, the Committee assumes that Motorola is an insider of Iridium. While at some point it may be proven that Motorola is an insider, no evidence was presented on that subject during the trial. The Committee does not cite any cases, nor has this Court found any cases, to support the proposition that the deferral of payments by non-insider creditors should be construed as an indication of equitable insolvency. As such, Iridium's postponement of payments to Motorola may be a sign of financial distress or simple accommodations to manage cash flow before system activation, but the deferral, even when combined with the $90 million missed interest payment, does not demonstrate that Iridium was generally not pay-

ing its debts as they became due. The Committee thus has failed to show that Iridium was equitably insolvent for purposes of § 28–3102 of the DCUFCA, and so there is no presumption of Iridium's insolvency.

■ Even if there were such a presumption of insolvency under the DCUF-CA, Motorola has offered substantial, credible evidence to rebut any such presumption. A rebuttable presumption created by equitable insolvency under the DCUFCA does not, as the Committee argues, shift to Motorola the burden of persuasion to prove that the nonexistence of insolvency is more probable than its existence. The Committee relies on the legislative commentary to the UFTA, which states that the "presumption imposes on the party against whom the presumption is directed the burden of proving that the nonexistence of insolvency ... is more probable than its existence," but the District of Columbia did not adopt this commentary. As such, the commentary is "merely advisory." *See Prairie Lakes Health Care Sys., Inc. v. Wookey,* 583 N.W.2d 405, 414 (S.D.1998).

■ Motorola has also sufficiently rebutted the presumption of insolvency during the 90 days preceding a bankruptcy filing under 11 U.S.C. § 547(f) by introducing evidence that Iridium was not insolvent. For the purposes of § 547(f), "[a] creditor may rebut the presumption by introducing some evidence that the debtor was not in fact insolvent at the time of the transfer. If the creditor introduces such evidence, then the [Committee] must satisfy its burden of proof of insolvency by a preponderance of the evidence." *In re Roblin Indus., Inc.,* 78 F.3d at 34.

Therefore, counsel for the Committee was correct when he indicated at the outset of the trial that the Committee has the

burden of proof. As such, the Committee must establish by a preponderance of the evidence that Iridium was insolvent or inadequately capitalized at the time of each of the transfers that the Committee seeks to recover. The Court concludes that the Committee has failed to show that Iridium was either insolvent or had unreasonably small capital at the time of these transfers and that the Committee has failed to meet its burden of proof.

## XII. LEGAL STANDARDS FOR PROVING INSOLVENCY/INADEQUACY OF CAPITAL

### A. Insolvency

To prove insolvency, the Committee must demonstrate that the sum of Iridium's debts exceeded the value of all of its assets, at a fair valuation, from August 13, 1995 through August 13, 1999. 11 U.S.C. § 101(32)(A).

■ The Court of Appeals for the Second Circuit has adopted a "flexible approach to insolvency analysis." *Union Bank of Switzerland v. Deutsche Fin. Servs. Corp.*, No. 98 Civ. 3251, 2000 WL 178278, at *8 (S.D.N.Y. Feb. 16, 2000). No rigid approach should be taken regarding the fair valuation of a company within the context of solvency analysis, but rather courts should consider the totality of the circumstances. *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d at 38. Additionally, although not dispositive, expert appraisals and valuations should be considered, when possible, in a solvency analysis. *Id.*

"Insolvent" is defined as a "financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property, at a fair valuation ..." 11 U.S.C. § 101(32)(A); *see also In re Total Technical Servs., Inc.*, 150 B.R. 893, 899 (Bankr.D.Del.1993) ("Insolvency is defined by the general balance sheet test—the debtor is insolvent if the sum of the debtor's debt (liabilities) is greater than all of its property at a fair valuation"). Likewise, the DCUFCA states that a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." D.C.Code § 28–3102(a).

■ Fair valuation for a company that can continue day-to-day operations is based on a "going concern" or "market price" valuation. *In re PWS Holding Corp.*, 228 F.3d 224, 233 (3d Cir.2000).

■ When a business is a going concern, fair value "is determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts." *In re Roblin Indus., Inc.*, 78 F.3d at 35.

Courts generally look at a combination of valuation methodologies to determine valuation, including: (a) actual sale price, (b) discounted cash flow method, commonly referred to as DCF, (c) adjusted balance sheet method, (d) market multiple approach, (e) comparable transactions analysis, and (f) market capitalization. *See, e.g., In re Coated Sales, Inc.*, 144 B.R. 663, 670 (Bankr.S.D.N.Y.1992) (actual sale); *MFS/ Sun Life Trust–High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 939–43 (S.D.N.Y.1995) (asset purchase price, DCF, comparable transactions); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 104 (Bankr.D.Del.1999) (DCF), *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 541 (Bankr.D.Del. 2002) (adjusted balance sheet, market multiple approach, and comparable transactions); *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir.2007) (market capitalization).

*B. Capital Adequacy*

 "In order to determine the adequacy of capital for purposes of 11 U.S.C. § 548(a)(1)(B)(ii)(II), a court will look to such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue." *MFS/Sun Life Trust–High Yield Series,* 910 F.Supp. at 944. While a company must be adequately capitalized, it does not need resources sufficient to withstand any and all setbacks. *Id.* (*citing Credit Managers Ass'n of S. Cal. v. Fed. Co.,* 629 F.Supp. 175, 187 (C.D.Cal.1985)).

 In undertaking an analysis of unreasonably small capital, courts compare a company's projected cash inflows (also referred to as "working capital" or "operating funds") with the company's capital needs throughout a reasonable period of time after the questioned transfer. *Moody v. Sec. Pac. Bus. Credit, Inc.,* 971 F.2d 1056, 1071–72 (3d Cir.1992); *see also Barrett v. Continental Ill. Nat'l Bank & Trust Co.,* 882 F.2d 1, 4 (1st Cir.1989) (The "critical inquiry when considering whether a transfer or conveyance has left a company with an unreasonably small capital is ... one that weighs raw financial data against both the nature of the enterprise itself and the extent of the enterprise's need for capital during the period in question.").

Only those cash inflows that were reasonable for a company to have expected to receive? whether through new equity, cash from operations, or available credit? are considered in this analysis. *Moody,* 971 F.2d at 1072 n. 24, 1073.

 In determining whether a company was adequately capitalized, courts examine not what ultimately happened to the company, but whether the company's then-existing cash flow projections (i.e., project-ed working capital) were reasonable and prudent when made. *See Credit Managers,* 629 F.Supp. at 187.

 Based on the substantial work, both from within and from outside the company, that went into creation and testing of Iridium's projections, the Court has concluded that these projections were reasonable and prudent when made and that the Committee has failed to prove that Iridium was insolvent or was inadequately capitalized to perform under its business plan.

*XIII. RELEVANCE OF IRIDIUM'S SUBSEQUENT FAILURE IN DETERMINING INSOLVENCY AND/OR INADEQUACY OF ITS CAPITAL*

 The Committee's case relies, in part, on the common sense proposition that Iridium's failure is a strong indication of its insolvency and capital inadequacy during the period when the challenged transfers were made. Courts in this jurisdiction may consider postpetition events to some extent under certain circumstances, but reject the use of improper hindsight analysis in valuing a company's pre-bankruptcy assets. *See In re Coated Sales, Inc.,* 144 B.R. at 668. When determining the value of a company's assets prepetition, "it is not improper hindsight for a court to attribute 'current circumstances' which may be more correctly defined as 'current awareness' or 'current discovery' of the existence of a previous set of circumstances." *Id.* Such value, however, must be determined as of "the time of the alleged transfer and not at what [assets] turned out to be worth at some time after the bankruptcy intervened." *Id.*

The Committee has failed to show that there was concealment of relevant circumstances at the time of the transfers or that there was a subsequent discovery of such

circumstances that must to be taken into account when determining Iridium's value. The record has shown that the market was generally aware of all relevant information regarding Iridium's system capabilities and limitations, although such awareness of the technical limitations applicable to satellite service is not equivalent to an awareness of the impact that those limitations would have upon Iridium's ability to achieve its business plan.

Other jurisdictions have also rejected the theory that evidence of insolvency after the petition date is indicative of the value of a company prepetition. *VFB LLC v. Campbell Soup Co.*, 482 F.3d at 633 (determining that the value or insolvency of a company at, or just after, the petition date is not indicative of the value of the company at a transfer date significantly preceding the petition date); *Matson v. Strickland (In re Strickland)*, 230 B.R. 276, 283 (Bankr.E.D.Va.1999) ("[t]he fact that the Debtor was insolvent nine months after the alleged transfer is immaterial because evidence of insolvency on a date significantly distant in time from the date of the alleged transfer, without more, is 'insufficient to support finding of insolvency on date of transfer for preference . . . purposes'") (quoting *In re Washington Bancorporation*, 180 B.R. 330, 333 (Bankr. D.D.C.1995); *Heilig–Meyers Co. v. Wachovia, N.A. (In re Heilig–Meyers Co.)*, 319 B.R. 447, 467 (Bankr.E.D.Va.2004)), *aff'd Heilig–Meyers Co. v. Wachovia, N.A.*, 328 B.R. 471 (E.D.Va.2005) (noting that simply proving insolvency on the petition date is not sufficient evidence to prove insolvency at the transfer date).

While there is case law supporting the contention that a significant business failure may indicate insolvency a short time prior to filing of the bankruptcy petition, (*see In re Washington Bancorporation*, 180 B.R. at 333 (holding gross insolvency of \$32 million on the petition date may permit an inference of insolvency on a date preceding the petition date, but that same inference cannot be applied to a date six months prior to the petition date)), there is no case law that supports extending that finding over a four-year prepetition period, as the Committee asks the Court to do here, without other supporting evidence. The failure of a business, even a monumental failure, does not alone prove the insolvency of the business in the months and years prior to its demise.

Iridium's indisputable postpetition insolvency does not prove that Iridium was insolvent at any point during the four years prior to filing for bankruptcy, and the Committee is unable to demonstrate prepetition insolvency by pointing to post-petition events, such as the sale of assets for a mere fraction of the cost to design, build and deploy them.

## XIV. ROLE OF CONTEMPORANEOUS EVIDENCE IN DETERMINING IRIDIUM'S INSOLVENCY AND/OR INADEQUACY OF ITS CAPITAL

### A. Iridium's Market Capitalization

This Court considered contemporaneous valuations of Iridium, notably evidence of Iridium's stock price and the assessments of market analysts. A company's stock price is an "ideal datapoint" for determining value. *VFB LLC v. Campbell Soup Co.*, No. Civ. A. 02–137, 2005 WL 2234606, at *22 (D.Del. Sept.13, 2005). The Court in *VFB* recognized the advantage of contemporaneous market evidence as being "untainted by hindsight or post-hoc litigation interests" and found it important to consider the company's stock price and the opinions regarding value of other contemporaneous market participants. *Id.*

The Third Circuit, in *VFB*, affirmed the district court's "primary" reliance on the stock price and market-based valuations as a measure of value. *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 at 631. The Court reasoned that "[e]quity markets allow participants to voluntarily take on or transfer among themselves the risk that their projections will be inaccurate." *Id.* The Court further noted that market capitalization reflects all the information that is publicly available about a company at the relevant time of valuation. *Id.* (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 245, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).

Absent some reason to distrust it, the market price is "a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses." *VFB*, 482 F.3d at 633; *In re Prince*, 85 F.3d 314, 320 (7th Cir.1996); *see also In re Hechinger Investment Co. of Del.*, 327 B.R. 537, 548 (D.Del.2005); *Peltz v. Hatten*, 279 B.R. 710, 738 (D.Del.2002); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 835 (7th Cir.1985) ("[T]he price of stock in a liquid market is presumptively the one to use in judicial proceedings.").

The Supreme Court in *Basic v. Levinson*, 485 U.S. at 244, 108 S.Ct. 978, explained the importance of market price in determining value:

> "With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price."

**B. Iridium Projections of Future Cash Flows**

Another important part of the insolvency or unreasonably small capital analysis involves an evaluation of the debtor's own projections of future cash flows and whether those projections were "reasonable and prudent" when made. *MFS/ Sun Life Trust–High Yield Series v. Van Dusen Airport Servs.*, 910 F.Supp. at 943 (expert analyses were correctly based on company projections which were determined to be reasonable; "[T]he question the Court must decide is *not* whether [the] projection was correct, for clearly it was not, but whether it was reasonable and prudent when made." (quoting *Credit Managers*, 629 F.Supp. at 184)); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1076 (3d Cir.1992) (upholding district court determination that based on a company's own projections, which it found to be reasonable, the company was not insolvent); *see also VFB*, 2005 WL 2234606, at *26, *29 n. 71 (D.Del.2005) (projections created by expert unreasonable because they "fly in the face of what everyone involved in the spin-off believed at that time") *aff'd* 482 F.3d 624 (3d Cir.2007).

One important indication of the reasonableness of a company's projections is management's input into the creation of the projections. *See In re Radiology Assocs., Inc. Litig.*, 611 A.2d 485, 490 (Del. Ch.1991). An "informed judgment from management" regarding projected earnings, which took into account anticipated events and expectations, was a reasonable valuation. *In re Duplan Corp.*, 9 B.R. 921, 926 (S.D.N.Y.1980) (internal quotations omitted). " 'Without a firm basis to replace management's cost projections' with those developed for litigation, the starting point for a solvency analysis should be management's projections." *In re Longview Aluminum, L.L.C.*, Nos. 03 B 12184,

04 A 01051, 04 A 00276, 04 A 00279, 2005 WL 3021173, at *9 (Bankr.N.D.Ill. July 14, 2005) (rejecting expert's projections as an unreliable method of determining solvency).

When there is "substantial evidence presented to show that the [b]usiness [p]lan was prepared in a reasonable manner, using supportable assumptions and logically consistent computations," a "[b]usiness [p]lan constitutes a fair, reasonable projection of future operations" and "alternative projections of future operations" should be rejected. *In re Mirant Corp.*, 334 B.R. 800, 825 (Bankr.N.D.Tex. 2005). Here the Committee bases its case for insolvency on alternative projections that must be rejected because they disregard the deliberative process of development and testing that produced Iridium's projections, projections that by virtue of that deliberative process appear to be reasonable.

## C. Analysts, Investors and Lenders

Expert analysis by investment bankers that confirms the validity of management's projections is an indicator of reasonableness. *In re Duplan Corp.*, 9 B.R. at 926 n. 9 (rejecting bondholders attempts to discard management's projections during litigation, when expert analysis by Bear Stearns confirmed the validity of the projections). Similarly, a thorough analysis by an independent accounting firm of the projections that affirms their validity is an indicator of reasonableness. *In re Fiberglass Indus., Inc.*, 74 B.R. 738, 745–746 (Bankr.N.D.N.Y.1987) (rejecting an after-the-fact revision to the projections). Here, the role played by Coopers & Lybrand in analyzing Iridium's projections is such an indicator of reasonableness.

Courts further recognize that "[a] powerful indication of contemporary, informed opinion as to value" comes from private investors who "[w]ith their finances and time at stake, and with access to substantial professional expertise, [ ] concluded at the time [ ]that the business was indeed one that could be profitably pursued." *In re Longview Aluminum*, 2005 WL 3021173, at *7; *see also Davidoff v. Farina*, No. 04 Civ. 7617, 2005 WL 2030501, at *10, *11, n. 19 (S.D.N.Y. Aug. 22, 2005) (finding it important that "sophisticated investors with the most intimate knowledge of [the debtor's] business plan and capitalization had confidence in the company's future and certainly did not think that the company was undercapitalized" since it makes "no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail."); *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d at 835 ("The price at which people actually buy and sell, putting their money where their mouths are, is apt to be more accurate than the conclusions of any one analyst.")

In *Peltz v. Hatten*, 279 B.R. at 740, the Court credited the valuations of the "informed and sophisticated" parties at the time, whose beliefs were confirmed by both market comparables and contemporaneous DCF studies. 279 B.R. at 740. The *Peltz* Court rejected an expert's DCF "done after the fact and for the purpose of proving a point in an adversarial proceeding," finding it "too subjective and too subject to manipulation." *Peltz*, 279 B.R. at 741–742; *see also In re Hechinger Inv. Co. of Del.*, 327 B.R. at 548 ("because valuation is, to a great extent, a subjective exercise [ ], the court will give deference to prevailing marketplace values rather than to values created with the benefit of hindsight for the purpose of litigation") (internal citations omitted); *In re Prince*, 85 F.3d at 320 ("where market information is available, looking to the stock's 'fair mar-

ket value'" is "the most accurate representation of the present value of the stock's future cash flows."); *Metlyn Realty*, 763 F.2d at 835 (stock price is a valuation that includes the information of many professionals and is "an unusually reliable source of information").

Courts have also found comparable analyses involving developing companies to be a reliable valuation method. *Gentile v. SinglePoint Fin., Inc.*, No. Civ. A. 18677–NC, 2003 WL 1240504, at *6 (Del.Ch. Mar.5, 2003) (relying on a comparable analysis between a software company in the "product development" stage and other emerging growth companies); *VFB*, 2005 WL 2234606, at *27.

Sophisticated Wall Street firms, such as Merrill Lynch and Solomon Smith Barney, were underwriters of Iridium's equity and debt offerings. In addition, the DCF and comparables analyses performed or endorsed by the underwriters and analysts at the time attributed large positive values to Iridium. These are the same types of valuations to which Courts have given great deference. *See, e.g., VFB*, 2005 WL 2234606, at *26–27; *Peltz v. Hatten*, 279 B.R. at 740 (deferring to the "the informed and sophisticated" investment bankers in the case). Although these analyst reports were not admitted into evidence for the truth of the conclusions reached regarding Iridium's enterprise value, the reports nonetheless do reflect the assessments of analysts at the time they were prepared and reveal the prevailing perceptions as to Iridium's value. These assessments of value by analysts do not establish the value of Iridium, but these multiple judgments, all of which are consistent with positive value, do demonstrate what sophisticated observers believed to be true and provide ancillary support for concluding that Iridium was not insolvent.

Courts examining the question of adequate capital also place great weight on the ability of the debtor to obtain financing. *See Moody*, 971 F.2d at 1071–73. The fact that Iridium closed on three syndicated bank loans and raised over $2 billion in the capital markets between 1996 and 1999 is an indication of both solvency and capital adequacy. *See Credit Managers Ass'n of S. Cal. v. Fed. Co.*, 629 F.Supp. at 187.

## XV. EXPERT TESTIMONY ON INSOLVENCY AND INADEQUATE CAPITAL

Messrs. Reiss and Spragg's failure to reconcile their opinions of insolvency and inadequate capital with the contradictory evidence of positive value attributed to the business at the time provides sufficient reason for this Court to question the reliability and credibility of their opinions.

### A. Legal Standards Regarding The Reliability And Credibility Of Expert Testimony

A proponent of expert testimony must demonstrate that the proffered testimony is both reliable and relevant. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir.2002).

The *Daubert* factors apply not only to the admissibility of evidence, but also apply to weight and credibility determinations. *See, e.g., Elliott v. Commodity Futures Trading Comm'n*, 202 F.3d 926, 934 (7th Cir.2000) (affirming district court's decision to ignore unreliable testimony and finding that a "fact-finder should employ the reliability benchmark in situations ... in which unreliable expert testimony somehow makes it in front of the fact-finder, and assign the unreliable testimony little if any weight."); *Libas, Ltd. v.*

U.S., 193 F.3d 1361, 1366 (Fed.Cir.1999) (reliability of expert testimony applies to the weight accorded to that testimony as well as its admissibility).

■ To assess whether expert testimony meets the requisite standards the court should undertake "a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos,* 303 F.3d at 267.

■ An expert's opinion that is not "based on sufficient facts or data" nor "the product of reliable principles and methods properly applied," should be rejected. *Lippe v. Bairnco Corp.,* 288 B.R. 678, 686 (S.D.N.Y.2003) *aff'd* 99 Fed.Appx. 274 (2d Cir.2004); *In re Rezulin Prods. Liab. Litig.,* 369 F.Supp.2d 398, 425 (S.D.N.Y.2005) (rejecting expert testimony where "the plaintiffs' experts have ignored a large amount of information that calls many aspects of the [expert's theory] into question" and explaining that "any theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect.")

■ An expert's disregard for methodology advocated by valuation authorities and typical practice in investment banking and academia shows that his opinions are not the product of "reliable principles and methods." *Lippe,* 288 B.R. at 690.

■ Expert opinion is unreliable and not based on sufficient facts and data when the expert "made no attempt to reconcile his view [ ] with a number of real world events" and "fail[s] to acknowledge and account for these events." *Point Prod. A.G. v. Sony Music Entertainment, Inc.,* No. 93 Civ. 4001, 2004 WL 345551, at *10 (S.D.N.Y. Feb.23, 2004).

■ "[F]ailure to look" at facts, "even for a reality check" means that an expert lacks sufficient facts and renders his opinion unreliable. *Zenith Elecs. Corp. v. WH–TV Broadcasting Corp.,* 395 F.3d 416, 418 (7th Cir.2005).

**B. The Expert Opinion Testimony Regarding Insolvency Offered By The Committee Is Not Persuasive**

Messrs. Reiss and Spragg's analyses do not adequately explain, rebut, or analyze contemporaneous market valuations that indicate Iridium was solvent leading the Court to seriously question the reliability of the opinions expressed by these experts.

■ A court should reject an expert's conclusions when there is "an analytical gap between the data and the opinion proffered." *See Gen. Elec.Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Nat'l Communications Ass'n, Inc. v. Am. Tel. & Tel. Co.,* No. 92 Civ. 1735, 1998 WL 118174, at *46 (S.D.N.Y. March 16, 1998) (rejecting economist's opinion because he ignored experience in the market).

■ Similarly, a court should exclude expert valuation testimony if the expert bases his analysis on an inappropriate set of cash flow projections, did not consider market values, and cannot explain the unreasonable implications of his analysis. *Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 186–87 (7th Cir.1993).

An inability to reconcile a comparable companies analysis and DCF analysis has been determined to be an indicator of unreliability. *Lippe v. Bairnco,* 99 Fed. Appx. 274, 279 (2d Cir.2004); *To–Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.,* 953 F.Supp. 987, 996–997 (N.D.Ill.1997) *aff'd* 152 F.3d 658 (7th Cir. 1998) (finding expert analysis was not credible because price-to earnings ratio

that DCF implied left DCF analysis "open to attack" and made it "farfetched").

■ Mr. Spragg's opinions are suspect because he ignored or wrongly discarded Iridium's projections and much of the contemporaneous market research underlying those projections and instead created his own projections for litigation purposes. *In re Longview Aluminum, L.L.C.*, 2005 WL 3021173, at *7–8 (rejecting expert's analysis as insufficient to rebut the reasonableness of management's projections); *see also In re Fiberglass Indus., Inc.*, 74 B.R. at 745–746 (finding that DCF analysis should use the projections prepared by management, who was well-qualified and experienced). Where alternative projections "are no better supported by the evidence than are those in the Business Plan," the projections in management's business plan should be used in the DCF. *In re Mirant Corp.*, 334 B.R. at 825.

Mr. Reiss' opinions are similarly open to doubt. While the discounted cash flow method is a valid and standard approach (*In re Radiology Assocs. Inc. Litig.*, 611 A.2d at 489), and may even be the preferred method for valuing a business such as Iridium,[51] the DCF "methodology has been subject to criticism for its flexibility; a skilled practitioner can come up with just about any value he wants." *To–Am Equip. Co.*, 953 F.Supp. at 996–97. For this reason, it is important to validate conclusions reached using this methodology by comparing the results obtained when other accepted approaches to valuation are used.

■ Mr. Reiss' sole reliance on the DCF analysis to the exclusion of other valuation methodologies substantially diminishes the weight to be accorded to his opinion. Here, Mr. Reiss' use of only one valuation methodology "simply did not provide the necessary 'check' on the value he arrived at that would render that value a reliable measure of the company's worth." *In re Med Diversified, Inc.*, 334 B.R. 89, 99 (Bankr.E.D.N.Y.2005).

Mr. Reiss' opinions are also entitled to less weight because of his conscious disregard of traditional valuation techniques and contemporaneous market evidence, including Iridium's stock price, which the courts view as a critical piece of information in valuing a company. *See VFB*, 482 F.3d at 631. Basing his opinion only on two DCF analyses, combined with Mr. Reiss' inability to reconcile his conclusions of insolvency and inadequate capital with the market validation of Iridium's business plan and positive value at the time, leads to the conclusion that his opinions are of doubtful reliability. *See Lippe*, 288 B.R. at 690; *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2004 WL 345551, at *10.

This Court follows the reasoning of the courts in *Peltz v. Hatten* and *VFB*. In *Peltz*, the court rejected the solvency expert's opinion that a valuation was unrea-

---

**51.** *See Lippe v. Bairnco Corp.*, 288 B.R. at 689 (*citing Frymire–Brinati v. KPMG Peat Marwick*, 2 F.3d at 186) (finding DCF to be "the most reliable method for determining the value of a business"); *Questrom v. Federated Dep't Stores, Inc.*, 84 F.Supp.2d 483, 488 (S.D.N.Y.2000), *aff'd*, 2 Fed.Appx. 81 (2d Cir. 2001) (finding that DCF analysis is the "preeminent valuation methodology") (internal quotations omitted); *In re Med Diversified, Inc.*, 334 B.R. 89, 99 (Bankr.E.D.N.Y.2005) (finding that the "failure to use the DCF method amount[ed] to a material flaw in [the expert's] methodology"); *Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.)*, 348 B.R. 234, 276 (Bankr.D.Del.2005), *aff'd*, 2007 WL 1232185 (D.Del. Apr.26, 2007) (stating that preferred method of valuing a company as a going concern is DCF); *TV58 Ltd. Partnership v. Weigel Broad. Co.*, 1993 WL 285850, at *4 (Del.Ch. July 22, 1993) (finding when a company is a start-up, DCF is "most appropriate" method to value the company).

sonable when that valuation had been agreed to by informed and sophisticated parties and supported by market comparables. 279 B.R. at 738–40, 744. After rejecting the expert's opinion, it found the trustee could not carry its burden and thus, the fraudulent transfer claims were decided in favor of the defendant. *Id.* at 748.

In *VFB,* the court also rejected the expert solvency analyses that it found to be unreliable and unpersuasive. The court then determined that "[b]ecause the most persuasive evidence runs directly contrary to its position," VFB had not met its burden to prove insolvency and inadequate capital by a preponderance of the evidence. 2005 WL 2234606 at *31. The Third Circuit affirmed the district court's judgment that the valuations of hired experts were a "side-show to the disinterested evidence of VFB's capitalization in one of the most efficient capital markets in the world." *VFB,* 482 F.3d at 629.

■■■ A solvency analysis lacks credibility when an expert uses projections that "fly in the face of what everyone[ ] believed at that time." *VFB,* 2005 WL 2234606 at *30 n. 71. Here, Messrs. Reiss and Spragg's conclusions of insolvency and inadequate capital do not correlate with the market validation of Iridium's business plans and the positive value attributed to the business during the relevant period. This failure of the Committee's experts to reconcile their conclusions with the prevailing market judgment or to cast serious doubt on the reliability of that market judgment provides sufficient reason for this Court to seriously question the reliability of their opinions.

In light of the doubts surrounding the opinions of Messrs. Spragg and Reiss, the Committee has failed to carry its burden of proving, by a preponderance of the evidence, that Iridium was insolvent or had unreasonably small capital at the time of the questioned transfers.

### *CONCLUSION*

Notwithstanding its considerable length, this opinion can be reduced to a very basic proposition. The outcome of the solvency phase of the trial is due to the Committee's failure, despite diligent effort and passionate, effective advocacy, to carry its burden of proof on the central themes of insolvency and capital adequacy.

Upon application of the familiar litigation paradigm of burden of proof, the outcome here is relatively routine—the plaintiff Committee has not proven insolvency by a preponderance of the evidence. That failure of proof is due principally to the existence of conflicting market evidence that could not be credibly explained away and that throughout the relevant period (even as bankruptcy was imminent) pointed to a positive enterprise value for Iridium.

The fact that Iridium failed in such a spectacular fashion stands out as a disturbing counterpoint to the market's optimistic predictions of present and future value for Iridium, but in the end, the market evidence could not be denied. The capital markets synthesized and distilled what all the smart people of the era knew or believed to be true about Iridium. Given the overwhelming weight of that market evidence, it may be that the burden of proving insolvency and unreasonably small capital simply could not be met under any circumstances, regardless of the evidence adduced, in the wake of the Third Circuit's *VFB* decision, an influential case that has helped to illuminate the proper way to resolve the valuation questions presented here.

Therefore, Counts I, II, III and IV of the Committee's complaint are dismissed

on account of the failure to establish an essential statutory element for recovery. Motorola shall submit an Order consistent with this Opinion in a form acceptable to the Committee, and the parties are directed to attend a case status conference on September 12, 2007 at 10:00 a.m. to consider procedures applicable to the resolution of Counts V, VIII, IX and X, the causes of action of the complaint that remain open and unresolved.